# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In Re: JPMORGAN CHASE BANK HOME EQUITY LINE OF CREDIT LITIGATION | ) )  ) ) ) | Master Docket No. 10 C 3647 |
| | | All Cases |
| | | Judge Rebecca R. Pallmeyer |

## <u>MEMORANDUM OPINION AND ORDER</u>

A home equity line of credit ("HELOC") is a revolving line of credit secured by a holder's primary residence. In this class action, eight individuals to whom Defendant had extended HELOCs charge Defendant with having reduced or suspended those HELOCs without a permissible reason for doing so, thus violating the Federal Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq*, and its implementing regulation, Regulation Z, 12 C.F.R. 226. Plaintiffs also allege that Defendant's suspension or reduction of their HELOCs, and the manner in which those reductions or suspensions were carried out, constitute breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of California, Illinois, and Minnesota consumer protection laws. This action comes to the court after having been consolidated by the United States Judicial Panel on Multidistrict Litigation. Defendant moves to dismiss the Complaint in its entirety, arguing that federal law and relevant contractual provisions permit Defendant to reduce or suspend Plaintiffs' HELOCs. Defendant challenges Plaintiffs' claims on a host of other grounds as well.

For the reasons explained here, the court concludes that Plaintiffs have adequately pleaded a violation of TILA and Regulation Z by alleging that Defendant suspended or reduced HELOCs in the absence of a significant decline in the value of the property securing the HELOC. Defendant is correct that the failure to consider present available equity, the use of "automated valuation models," the use of "unlawful triggering events," and reduction or suspension absent a "sound factual basis" are not independent bases for relief. Those practices are, however, relevant in

considering whether Defendant reduced or suspended HELOCs even though the properties securing them suffered no significant decline in value. The court is also satisfied that Plaintiffs have adequately pleaded that the HELOCs at issue were obtained primarily for personal, family, or household purposes, as required by TILA. The court declines to dismiss Plaintiffs' claims for declaratory relief, as such relief may be sought as an alternative to the remedies provided for by TILA and Regulation Z. The court concludes, further, that Plaintiffs' allegations that Defendant reduced or suspended their HELOCs without adequate justification are sufficient to state claims for breach of contract under Minnesota, California, Texas and Delaware law. Certain other state law claims survive, as well, including Plaintiffs' unfair conduct claims under the California and Illinois consumer protection laws, and their claim under the Minnesota Deceptive Practices Act.

## BACKGROUND

Plaintiffs William Cavanagh, Robert M. Frank, Maria I. Frank, Shannon Hackett, Michael Malcolm, Daryl Mayes, Michael Walsh, and Robert Wilder, have brought a consolidated class action complaint against Defendant JPMorgan Chase, alleging that the bank reduced or suspended their home equity lines of credit ("HELOCs") in violation of the Federal Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq*, and its implementing regulation, Regulation Z, 12 C.F.R. 226.[1] (Compl. ¶¶ 1, 2.) Plaintiffs also allege breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of California, Illinois, and Minnesota consumer protection laws. (*Id.*)

HELOCs, as noted, are revolving lines of credit used by consumers for significant expenditures including education, home improvements, medical bills, and debt consolidation. (*Id.* ¶ 3.) Because HELOCs are secured by the borrower's primary residence (meaning default can result in foreclosure), lenders base the amount of a HELOC, in part, on the level of equity in the

---

[1] As discussed below, Plaintiffs filed a consolidated complaint after their cases were transferred to this court by the United States Judicial Panel on Multidistrict Litigation.

home. (*Id.* ¶ 4.) The HELOC agreements entered into between Plaintiffs and Defendant[2] allow Plaintiffs to utilize a HELOC in exchange for an annual fee payable for each one-year "draw period." (*Id.* ¶ 5.) Under the terms of the agreement, Defendant is permitted to reduce or suspend the HELOC in the event that "[t]he value of the Property declines significantly below the value as determined by us at the time you applied for your" HELOC.[3] (*Id.* ¶ 6; Group Ex. A at 14.) *See also* 15 U.S.C. § 1647(c)(2)(B) (Truth in Lending Act provision allowing HELOC reduction when the value of the property "is significantly less than the original appraisal value of the dwelling"); 12 C.F.R. § 226.5b(f)(3)(vi)(A) (TILA implementing regulation, Regulation Z, explaining that a reduction is permitted when the value of the property "declines significantly below the dwelling's appraised value"). In order to determine whether a significant decline in value warranting HELOC reduction or suspension had occurred, Defendant used "automated valuation models" ("AVMs"), which, Plaintiffs allege, unreasonably undervalued homes and lacked validation mechanisms necessary to ensure accuracy. (Compl. ¶¶ 10, 11.)

At the time it suspended or reduced a HELOC, Defendant sent the borrower a two-page form letter explaining, first, that home values throughout the nation were falling[4] and, second, that Defendant's estimate of the individual Plaintiff's particular property value "no longer supports the

---

[2]     Plaintiffs did not all sign identical agreements, but the agreements are similar in relevant respects, as described herein. The agreements are attached as Group Exhibit A to Plaintiffs' Consolidated Amended Complaint. (Dkt. 41.) Several Plaintiffs signed agreements with Chase Manhattan, Bank One, and Washington Mutual, which have since been acquired by or merged with J.P. Morgan to become JPMorgan Chase. Some Plaintiffs signed their agreements with JPMorgan Chase itself.

[3]     Each agreement contains similar language regarding when Defendant is permitted to reduce or suspend the amount of a HELOC.

[4]     Washington Mutual's letter explained that "[w]ith home values continuing to fall in many parts of the country, a recent review of your account identified a decline in the value of the property securing your HELOC since the date you applied for your HELOC or increase." (Group Ex. B at 10.) Chase's letter similarly explained that, "[w]ith home values falling in many parts of the country, we've used a proven valuation method to estimate your home's value . . . ." (Group Ex. B at 8.)

full amount of [the] credit line." (*Id.* ¶ 15; *see also* Group Ex. B.)  In several cases, the letters were

sent the day after or the day before the account's reduction or suspension; in other cases, the

letters are not dated, or the dates do not appear in the copies submitted to the court.  (*See* Group

Ex. B at 4, 10.)  In most cases, the letters did not contain any additional information, such as the

estimated decrease in the value of the property, or an explanation of how that decrease was

determined.  (*Id.* ¶ 16.)  The letters explained that in order to request reinstatement of the HELOC,

the customer must order and pay for an appraisal to be conducted by an appraiser chosen by

Defendant.  (*Id.* ¶ 18.)  Plaintiffs contend that these notices did not disclose  Defendant's valuation

of the property at the time of the HELOC origination, nor provide any other information that would

assist the consumer in determining whether or not to appeal the action and request reinstatement.

(*Id.* ¶ 19.)  Plaintiffs allege, further, that those borrowers whose HELOCs were suspended

nevertheless continued to be charged an annual fee and did not receive a refund of their annual

fee for any portion of the draw period during which the HELOC remained suspended.  (*Id.* ¶ 22.)

**Individual Plaintiffs' Allegations**

Although Plaintiffs' factual circumstances are not identical, all allege unwarranted reductions

in their lines of credit, as follows:

• Plaintiff William Cavanagh entered into a HELOC agreement in February 2008 for a
$400,000 line of credit secured by a mortgage on his primary residence in Edina,
Minnesota.  (*Id.*  ¶¶ 23, 36.)  At the time of origination, Cavanagh's property was valued by
Chase at $950,000, and he had $650,000 in available equity (the precise method by which
Chase arrived at this original valuation is not specified).  (*Id.* ¶ 36.)  In January 2009,
Cavanagh received a letter from Defendant announcing that future draws on his HELOC
would be suspended effective January 10, and that his home's value had been estimated
using a "proven valuation method" at $736,290.  (*Id.* ¶ 37.)  Cavanagh hired an appraiser,
who determined that his home value had actually *increased* to $1.1 million, and several
weeks later Defendant reinstated Cavanagh's HELOC.  (*Id.*  ¶¶ 38, 39.)  The suspension
caused Cavanagh to lose access to the HELOC, his primary line of credit, for several
months, and increased his credit utilization rate, potentially damaging his credit score and
increasing his credit costs.  (*Id.*  ¶¶ 40, 41.)

• Robert M. and Maria I. Frank entered into a HELOC agreement with Washington Mutual in
April 2003 for a $100,000 line of credit secured by their home in Auburn, California.
(*Id.* ¶ 24, 42.)  The home was valued at $389,000 at the time of origination, and by April

2009, the Franks had paid down their mortgage from $177,000 to $122,000. (*Id.*) On April 16, 2009, Defendant reduced the Franks' HELOC from $100,000 to $13,100 based on an estimated decrease in their property value. (*Id.* ¶ 43.) Defendant estimated the value of the home at $345,600, which, coupled with the mortgage payments made to that date, Plaintiffs assert, actually reflected an increase in the available equity in the property from $112,000 to $123,600. (*Id.* ¶ 47.)

- Shannon Hackett entered into a HELOC agreement with Chase in May 2004 for a $100,000 line of credit secured by Hackett's home in Evanston, Illinois, which was valued at $445,000 by Defendant's "automated valuation model." (*Id.* ¶ 50.) Hackett's $283,125 balance on her first mortgage left unencumbered equity, after accounting for the HELOC, of $61,857. (*Id.* ¶ 51.) Defendant reduced Hackett's HELOC from $100,000 to $57,000 in December 2008 after determining her home value had declined to $400,000; Hackett alleges she did not learn about this HELOC reduction until February 2010, when she began inquiring into a later HELOC suspension. (*Id.* ¶ 52.) Specifically, on November 5, 2009, Hackett received a letter from Defendant announcing that the HELOC had been suspended because the property value had declined to $358,000. (*Id.* ¶ 53.) Hackett paid for an appraisal of the property, which took place on November 9, 2009, and resulted in a valuation of $400,000. (*Id.* ¶ 55.) She requested reinstatement of the HELOC on December 9, 2009. (*Id.*) Defendant refused to reinstate the HELOC, contending that the value of Hackett's home was insufficient to support any line of credit. (*Id.* ¶¶ 56, 57.) Plaintiffs acknowledge that the amount of available equity in Hackett's home in 2009 had decreased to $41,540, but they allege that this decrease was just 32.8 percent from that available at the time of the HELOC origination, which they argue is not a "significant decline" for purposes of Section I and III, TILA, and Regulation Z. (*Id.* ¶¶ 60-62.)

- Michael Malcolm entered into a HELOC agreement in March 2006 for a $122,000 line of credit secured by his $1 million Mountain View, California home. (*Id.* ¶¶ 26, 65.) Defendant suspended Malcolm's HELOC on August 7, 2009, based on a "proven valuation method" that put the home's value at $826,000 (no other details of this valuation were provided). (*Id.* ¶ 66.) Malcolm paid for an appraisal (the date on which it was conducted is not specified), which showed that his property value had actually increased to $1.07 million. (*Id.* ¶¶ 68, 69.) Defendant reinstated Malcolm's line of credit after he filed his original lawsuit. (*Id.* ¶ 69.)

- Daryl Mayes entered into a HELOC agreement with Washington Mutual in November 2006 for a $17,000 line of credit secured by his $172,000 home in Arlington, Texas. (*Id.* ¶ 71.) The amount of available equity in Mayes's home at the time of origination was $34,690. (*Id.* ¶ 72.) Defendant suspended Mayes's HELOC on March 26, 2009. Although it did not specify the property's current valuation or the reduction in value, Defendant explained that "a recent review of your account identified a decline in the value of the property securing your HELOC." (*Id.* ¶ 73; Group Ex. B at 10.) After numerous phone calls to Defendant, on June 20, 2009, Mayes secured a valuation report from Defendant, in which Defendant valued his property at $151,000. (Compl. ¶ 76.) An appraisal conducted ten days prior to his receipt of notice of the suspension, obtained in connection with a refinancing of Mayes's primary mortgage (also held by Defendant), determined the home's value to be $165,000. (*Id.* ¶ 77.) Defendant nevertheless refused to reinstate Mayes's HELOC, invoking a new policy that required a loan-to-value ratio of 70 percent; Plaintiff Mayes contends the required ratio was 80 percent at the time of origination. (*Id.* ¶ 78.) Because Mayes had paid off a

portion of his mortgage after the HELOC origination, the available equity in his property had decreased by just 2.2 percent between the HELOC origination and suspension, and, even without considering the additional equity, had decreased by only 20 percent. (*Id.* ¶¶ 82, 84.)

- Michael Walsh entered into a HELOC agreement with Washington Mutual in August 2003 for a $100,000 line of credit secured by his $490,000 home in Garden Grove, California. (*Id.* ¶ 87.) Defendant reduced the HELOC from $100,000 to $16,300 effective April 16, 2009. (*Id.* ¶ 88.) Defendant told Walsh during a May 15, 2009, phone call that it had valued his home at $502,589 at origination, and its value had since fallen to $466,300. (*Id.* ¶ 91.) Plaintiff alleges that "[d]espite the fact Chase's own AVM purportedly showed the property to be worth $466,300, during that same telephone call the customer service representative notified Walsh, inexplicably, that he would need an appraisal value of $412,353 to reinstate his HELOC–that is, Chase informed Walsh that its own AVM had valued his property at $54,000 *more* than would be needed to keep his HELOC open." (*Id.*)
- Robert Wilder entered into a HELOC agreement, similar to those entered into by other Plaintiffs, with Bank One in July 2003 for a $250,000 line of credit secured by Wilder's $900,000 Scottsdale, Arizona home. (*Id.* ¶ 94.) Defendant suspended Wilder's HELOC effective April 17, 2009, based on a valuation of $811,800. (*Id.* ¶ 95.) Wilder obtained an appraisal, which he forwarded to Defendant in June 2009, that showed his property value had increased to $970,000. (*Id.* ¶ 101.) Defendant reinstated his HELOC after he filed this lawsuit (the precise date is not specified). (*Id.*)

Plaintiffs sought centralization of their various cases pursuant to 28 U.S.C. § 1407(a), which allows for "coordinated or consolidated pretrial proceedings . . . when civil actions involving one or more common questions of fact are pending in different districts." The United States Judicial Panel on Multidistrict Litigation granted Plaintiffs' request on June 7, 2010. *In re: JPMorgan Chase Bank Home Equity Line of Credit Litigation*, 716 F. Supp. 2d 1363 (U.S. Jud. Pan. Mult. Lit. 2010). The panel noted that the common factual allegations included that Defendant "improperly suspended or reduced plaintiffs' respective home equity line of credit accounts and, relatedly, used inappropriate automated valuation models in assessing the value of the underlying properties." *Id.*

### DISCUSSION

Defendant has moved to dismiss the complaint for failure to state a claim for relief. FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009). In evaluating a motion to dismiss, the court accepts Plaintiffs'

well-pleaded factual allegations as true, and draws reasonable inferences in Plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

## I.    Violations of TILA and Regulation Z

Congress enacted the Truth in Lending Act to enhance "economic stabilization" and competition in the consumer credit industry through the "informed use of credit." 15 U.S.C. § 1601. TILA's stated purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare . . . the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing. . . ." *Id.* As relevant to this case, the Act also regulates HELOCs, permitting lenders to alter them only under certain circumstances.

Plaintiffs allege that Defendant violated TILA and its implementing regulation, Regulation Z, in four different respects: (1) suspending and reducing HELOCs in the absence of a significant decline in the value of the property securing the HELOC, and failing to reinstate such HELOCs when appropriate (Compl. ¶¶ 113-15); (2) using inaccurate and unreliable methods to value Plaintiffs' homes (*Id.* ¶¶ 116-20); (3) failing to consider the amount of available equity in Plaintiffs' homes before concluding their home values had declined significantly for TILA and Regulation Z purposes (*Id.* ¶ 121); and (4) using unlawful triggering events in deciding to suspend or reduce HELOCs. (*Id.* ¶¶ 122-26.) The court examines each in turn.

### A.    Reduction or Suspension of HELOCs Absent Significant Decline

Plaintiffs' central claim is that their HELOCs were reduced or suspended in the absence of a significant decline in the value of their properties, a practice prohibited by TILA and Regulation Z. TILA explains that a HELOC may be reduced "during any period in which the value of the consumer's principal dwelling which secures any outstanding balance is significantly less than the original appraisal value of the dwelling." 15 U.S.C. § 1647(c)(2)(B). Regulation Z similarly allows

HELOC reduction or suspension if "[t]he value of the dwelling that secures the [HELOC] declines significantly below the dwelling's appraised value . . . ." 12 C.F.R. § 226.5b(f)(3)(vi)(A).

The Federal Reserve Board's Official Commentary to Regulation Z explains that "what constitutes a significant decline . . . will vary according to individual circumstances." 12 C.F.R. Pt. 226, Supp. 1, 5b(f)(3)(vi)-6 ("Official Commentary" or "Commentary"). The Commentary goes on to explain, however, that "if the value of the dwelling declines such that the initial difference between the credit limit and the available equity (based on the property's appraised value for purposes of the plan) is reduced by fifty percent, this constitutes a significant decline." *Id.* Thus, for example, if a $100,000 home, with a $50,000 first mortgage, secures a HELOC of $30,000, then the difference between the credit limit and available equity is $20,000. If the value of that home decreases by $10,000, the difference between the credit limit and the available equity would decrease by $10,000 as well, from $20,000 to $10,000–a 50 percent reduction, and a "significant decline" for purposes of the statute. *Id.* The statute and regulation do not explain what steps must be taken prior to suspension. The Act states only that "a creditor [need not] obtain an appraisal before suspending credit privileges . . . [but that] a significant decline must occur before suspension can occur." *Id.*

Defendant argues that Plaintiffs have not sufficiently alleged that their HELOCs were reduced or suspended in the absence of a significant decline in value, and that their allegations amount to no more than the type of "threadbare recitals" that *Iqbal* determined were insufficient to survive a motion to dismiss. (Def.'s Br. at 14-15 (quoting *Iqbal*, 129 S.Ct. at 1940).) According to Defendant, its valuations did, in fact, demonstrate declines in value of between 7 and 23 percent, which, it contends, are significant for purposes of the statute. (Def.'s Br. at 15.) Further, Defendant urges that "[w]hile some Plaintiffs . . . allege that they subsequently obtained appraisals showing their properties' values had recovered to support reinstatement," those circumstances are insufficient to establish a TILA violation. (*Id.*) In Defendant's view, "[i]f a borrower could allege a

TILA violation any time he subsequently obtained an appraisal warranting reinstatement, this would gut the TILA and Regulation Z provisions permitting the lender to suspend the line." (*Id.* at 15-16.)

The court does not share Defendant's understanding of Plaintiffs' allegations. Plaintiffs have specifically alleged that Defendant suspended or reduced HELOCs based on property-value estimates that were rebutted within close temporal proximity to the valuations Defendant provided. Such a pattern supports an inference that Defendant's valuations are not reliable indicators, or that Plaintiffs' property values did not actually decline to the extent Defendant claimed. The court disagrees, further, with Defendant's assertion that allowing such a claim to survive would "gut" the applicable laws–if such a claim could not be supported with a subsequent or contemporaneous appraisal, it is difficult to see how it could ever be supported.

Notably, numerous courts have declined to dismiss similar complaints where plaintiff offered nothing more than unadorned allegations that a "significant decline" did not occur prior to suspension or reduction of the HELOC. *In re Citibank HELOC Litig.*, No. C-09-0350 MMC, 2010 WL 3447724, at *3 (N.D. Cal. Aug. 30, 2010) (denying motion to dismiss where plaintiff pleaded that there had not been a significant decline, without any additional specifics); *Malcolm v. JPMorgan Chase Bank, N.A.*, No. 09-4496-JF (PVT), 2010 WL 934252, at *3 (N.D. Cal. March 15, 2010) (denying motion to dismiss where appraisal conducted during the same month as the HELOC reduction revealed an increase in the value of the home); *Hickman v. Wells Fargo Bank N.A.*, 683 F. Supp. 2d 779, 785-86 (N.D. Ill. 2010) (St. Eve, J.) (denying motion to dismiss though plaintiff "did not specifically allege any factual support for his allegation that the value of his home did not decline significantly").

Plaintiffs have adequately alleged that their HELOCs were suspended or reduced in the absence of a significant decline in the value of the property securing the HELOC.

### B.    Consideration of Available Equity

Plaintiffs also allege that Defendant violated TILA and Regulation Z by failing to consider

the present available equity[5] in the property securing the HELOC before suspension or reduction. Defendant contends that TILA does not require such consideration. (Def.'s Br. at 7.)

As discussed previously, TILA and Regulation Z do not explicitly discuss the issue of present available equity. The Official Commentary does discuss available equity in setting out its "safe harbor" provision.[6] The Commentary, however, illustrates that provision without reference to the amount of present available equity. Instead it references the amount of available equity at the HELOC's inception. Defendant also notes that the Commentary explains that the safe harbor requires lenders to consider whether the equity has been reduced to fifty percent of that "*initial difference*" between the available equity and the credit limit. 12 C.F.R. Pt. 226, Supp. 1, 5b(f)(3)(vi)(A)-6 (emphasis added). This suggests, Defendant urges, that the borrower's equity as of the time of a HELOC suspension is not a factor. That view is bolstered, according to Defendant,

---

[5]     For purposes of this opinion, the court uses the term "present available equity" to refer to the amount of unencumbered equity in the subject property at the time of the HELOC reduction or suspension. "Available equity" refers to the amount of unencumbered equity at the time of HELOC origination. The difference between these two figures represents the payments that have been made in the interim on the subject property's principal, minus the reduction in value that has occurred (as well as any additional liabilities to which the property has become subject, which does not appear to be a factor in this case).

[6]     The Official Commentary's "safe harbor" provision is considered controlling law, absolving a lender from liability for reductions that occur based on declines in value within the "safe harbor" parameters. *See Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525, 528 (7th Cir. 2007) ("Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act [TILA] or Regulation [Z] should be dispositive.") (citation and quotation omitted).

The safe harbor provision reads, in full:

6. Significant decline defined. What constitutes a significant decline for purposes of § 226.5b(f)(3)(vi)(A) will vary according to individual circumstances. In any event, if the value of the dwelling declines such that the initial difference between the credit limit and the available equity (based on the property's appraised value for purposes of the plan) is reduced by fifty percent, this constitutes a significant decline in the value of the dwelling for purposes of § 226.5b(f)(3)(vi)(A). . . . This provision does not require a creditor to obtain an appraisal before suspending credit privileges although a significant decline must occur before suspension can occur.

12 C.F.R., Pt. 226, Supp. 1, 5b(f)(3)(vi)(A)-6.

by a proposed rule that "clarifies that in determining whether a decline results in a 50 percent equity cushion reduction, the creditor may, but does not have to, consider any changes in available equity based on the status of the first mortgage." *Truth in Lending: Proposed Rules*, 74 Fed. Reg. 43,428, 43,491 (Aug. 26, 2009).

At least one district court found this argument persuasive. In *Raeth v. National City Bank*, 755 F. Supp. 2d 899 (W.D. Tenn. 2010), the court concluded that a lender need not consider the amount of present available equity before suspending or reducing a HELOC. *Id.* at 903-04. That court noted that TILA and Regulation Z do not contain any reference to the "present equity level" (or "present available equity," as this court defines it). The "sole operative variable" the Commentary references, the court noted, is the value of the home. *Id.* at 904. The court observed, further, that while "[t]he level of equity at origination is essential to the safe harbor because it sets the baseline by which the decline will be judged," the example offered in the Commentary makes "no reference to the present level of equity–it could be unchanged or it could be irrelevant." *Id.* at 903. Finding the reference to "available equity" ambiguous, the court declined to read into the statute a requirement that the lender consider present available equity. The court also rejected policy arguments in favor of such a requirement. *Id.* at 904. Specifically, plaintiff in *Raeth* had argued that reading the statute without the equity requirement would discourage borrowers from paying off their mortgages, and that because the purpose of the statute is to "prevent unfair lending practices" it should be read in favor of consumers. *Id.* The court determined that requiring consideration of present equity could have the opposite effect: "[M]aking it more difficult for creditors to protect themselves against perceived risk could harm consumers if loans were subsequently made available to consumers only on more onerous terms." *Id.*

Plaintiffs distinguish *Raeth* on the ground that in that case, the value of the borrower's property had dropped such that, even considering the present available equity, there was an overall decline within the safe harbor provision. (Response at 12 n.5.) In this case, by contrast, even

without considering present available equity, none of the named Plaintiffs' homes fall within the 50 percent safe harbor provision. (*Id.*) Plaintiffs note, further, that they are not alleging that Defendant's refusal to take account of available equity constitutes an independent claim for relief; instead, "any allegations . . . regarding failure to consider equity . . . are alleged as being demonstrative of unfair and potentially fraudulent practices." (*Id.*)

In this court's view, present available equity should in fact play some role in a responsible creditor's lending decision—after all, the amount of a HELOC is based on the amount of equity in the home; it makes little sense to suggest that an increase in the amount of that equity will have no bearing on the HELOC. The *Raeth* court is correct that not allowing lenders to appropriately protect themselves against risk could create incentives to impose more onerous terms on consumers, but that is not an obvious result from a holding that recognizes the relevance of present available equity. In the wake of the economic downturn, Plaintiffs here have seen their HELOCs reduced, allegedly not for legitimate reasons like a decline in home values, but instead mostly to insulate the lender from risk. According to Plaintiffs, Defendant's arbitrary reductions, unrelated to the actual value of the home or the home's equity, contravene TILA's purposes of "economic stabilization" for consumers and informed credit usage and potentially compromise the borrower's credit score.[7] While financial institutions must be able to safeguard against risk, TILA and Regulation Z restrict their ability to do so rashly and arbitrarily–by allowing a reduction or suspension only in the event of a "significant decline"–precisely because of the effect such actions have on consumers.

The court need not decide whether Defendant's failure to consider equity increases itself violates TILA, as Plaintiffs' allegations survive regardless. For now, this allegation, as Plaintiffs argue, serves only to illustrate the practices it alleges violate TILA and Regulation Z.

---

[7]     *See, e.g., FDIC Outlook: The U.S. Consumer Sector*, online at http://www.fdic.gov/ bank/analytical/regional/ro20044q/na/2004winter_03.html ("HELOC borrowers who increase their draws may not be aware that the higher their use of this revolving line of credit, the more it negatively affects their credit score.") (visited June 28, 2011).

**C. Use of Inaccurate and Unreliable Valuation Methods**

Plaintiffs also allege that in determining that their properties had suffered significant declines in value, Defendant relied on inaccurate, unreliable, and unreasonable valuation methods. Specifically, Plaintiffs allege that the "automated valuation models" ("AVMs") that Defendant uses are "flawed and inaccurate" and "generat[e] false positives resulting in reductions or suspensions in the absence of the required significant decline in value." (Response at 15.)

Defendant argues that this claim should be dismissed because the law permits a lender to use AVMs in order to estimate home values. Indeed, Regulation Z "does not require a creditor to obtain an appraisal" before suspending a HELOC. 12 C.F.R. Pt. 226, Supp. 1, 5b(f)(3)(vi)-6. Defendant also points to a proposed rule explaining that "appropriate valuation methods may include, but are not limited to" AVMs. *Truth in Lending: Proposed Rule*, 74 Fed. Reg. 43,428, 43,492 (Aug. 26, 2009). Further, Defendant argues, Plaintiffs' suggestion that Defendant must ensure its AVMs are accurate finds no support in TILA or Regulation Z, neither of which "contains any requirements regarding validating, back-testing or verifying AVM models." (Def.'s Br. at 11.)

Plaintiffs, for their part, concede that the use of AVMs is not "*per se* improper," and that Defendant's "failure to adequately validate and back-test AVMs, while contrary to the FDIC's recommendations" also do not *per se* violate the Act. (Response at 15.) Instead, Plaintiffs argue that the use of these AVMs "contributes to, and results in, Chase's unlawful suspensions of HELOCs in the absence of significant declines in home values." (*Id.* at 16.)

The court's ruling on this motion does not turn on the propriety of Defendant's use of AVMs. The ultimate question is whether Defendant reduced or suspended HELOCs in the absence of a significant decline in property values, in violation of TILA and Regulation Z. 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A). To the extent Defendant's use of AVMs contributed to improper reductions or suspensions of HELOCs, it is relevant, but Plaintiffs do not contend that the use of AVMs in and of itself violated TILA or Regulation Z. The court concludes that the fact

13

that TILA and Regulation Z permit the use of AVMs also does not require dismissal of this claim.[8]

###    D.    Use of Unlawful Triggering Events

Defendant contends that Plaintiffs' challenge to the use of "triggering events" in deciding to suspend or revoke HELOCs must be rejected "because it purports to impose TILA prohibitions beyond those contained in TILA or Regulation Z." (Def.'s Br. at 11-12.)  The focus of this argument is on Plaintiffs' allegation that Defendant suspended or revoked HELOCs based on a 5 percent decline in property value.  (Compl. ¶ 123.)  Plaintiffs Walsh, Wilder, and Frank allege specifically that Defendant's customer service representative told them (in conversations not further detailed in the complaint) "that [Defendant] was entitled to suspend or reduce their respective HELOCs because their home values had decreased by 5%." (*Id.*)  In effect, Plaintiffs allege, Defendant violates the law by creating its own metrics for reduction or suspension decisions that are independent of the exhaustive list set forth in TILA and Regulation Z.[9]  Indeed, the Commentary does explain that "a contract cannot contain a provision allowing the creditor to freeze a line due to an insignificant decline in property value since the regulation allows that response only for a significant decline."  12 C.F.R. Pt. 226, Supp. 1, 5b(f)(3)(i)-2.

Defendant insists that TILA and Regulation Z do not provide threshold values for determining whether a "significant decline" has occurred, and therefore "a lender is free to consider

_____

[8]        Defendant has submitted supplemental authority in support of its argument that Plaintiffs' allegations do not state a claim for violations of TILA or Regulation Z, and, in particular, that the use of AVMs does not run afoul of those laws.  In the cited case, however, the plaintiff had not made "a single allegation anywhere . . . that purports to correct the alleged mistaken property value reached by Wells Fargo.*"  Brigliadora v. Wells Fargo Bank, N.A.*, No. 8:10-CV-01944-EAK-TGW, 2011 WL 2217485, at *4 (M.D. Fla. June 7, 2011).  In other words, the *Brigliadora* plaintiff did not rebut the valuation that was a product of Wells Fargo's use of AVMs. Plaintiffs here, by contrast, have specifically alleged that their property values had not suffered declines that can be deemed significant.

[9]        Again, the court notes, Plaintiffs have not presented these circumstances as an independent violation, but because Defendant argues as though they have, the court addresses the argument here.

the individual circumstances surrounding the decline." (Def.'s Br. at 12-13.) Because Plaintiffs have not alleged "that, in their particular circumstances, a 5 [percent] decline was not a 'significant decline' in value," Defendant argues, their claim must be dismissed. (*Id.*) Plaintiffs respond that they have alleged that the declines upon which Defendant based its reduction or suspension decisions were not significant. Those allegations are sufficient, Plaintiffs urge; forcing Plaintiffs to "identify a specific value that would constitute a significant decline under TILA . . . is inappropriate at the pleadings stage." (Response at 17.) The court agrees. Plaintiffs have adequately alleged that their HELOCs were reduced or suspended in the absence of a significant decline. The allegation regarding the purported 5 percent standard is merely an example of an allegedly impermissible reason given by Defendant for suspending or reducing a HELOC.

Defendant also argues that Plaintiffs lack standing to challenge its suspension or revocation of HELOCs based on this theory because "each Plaintiff alleges [Defendant] suspended or reduced their HELOCs based on a decline [in] property value in excess of 5 [percent]." (Def.'s Br. at 13.) Plaintiffs are correct, however, that "[Defendant] can make such assertions only if [Defendant] completely ignores Plaintiffs' allegations regarding the actual values of their respective homes." (Response at 17.) Plaintiffs acknowledge that Defendant *claimed* to have taken action in response to declines in value that exceeded 5 percent, but Plaintiffs also contend that any actual decline was not in fact "significant"—in other words, the allegation is that Defendant's claims as to the amount of the decline were incorrect, and that action was taken in response to what were actually insignificant declines. The court declines to strike Plaintiffs' allegations regarding Defendant's reliance on a "triggering event" other than a significant decline in value.

E.     **Lack of a Sound Factual Basis**

Defendant next argues that Plaintiffs' allegation it reduced or suspended HELOCs without a "sound factual basis" for doing so is improper because TILA and Regulation Z do not impose such a requirement. (Def.'s Br. at 14.) Again, however, Plaintiffs have not alleged that a suspension or

15

reduction without a "sound factual basis" is an independent harm, but rather urge that it is "demonstrative of unfair and potentially fraudulent practices." (Response at 12 n.5.) Defendant's objection to this allegation is overruled.

F.    **Failure To Allege HELOCs Were Obtained For Personal, Family, or Household Purposes**

Finally, Defendant argues that Plaintiffs fail to adequately allege that their HELOCs were used primarily for personal, family, or household purposes. (Def.'s Br. at 16.) Both parties agree that to come within the meaning of "consumer" for the purposes of asserting a TILA claim (the relevant portion applies only to consumer transactions), the transactions at issue must be "primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h).

In their Complaint, each Plaintiff does allege that his or her HELOC was obtained "primarily for personal, family and/or household purposes, including household items and personal expenses." (Compl. ¶ 28.) These allegations are repeated with slight variation as to each Plaintiff. (*Id.* ¶¶ 23-29.) Defendant alleges that these are "[c]onclusory allegations that simply restate statutory language." (Def.'s Br. at 17.) Defendant cites to two cases as support for its contention that an allegation of this type is insufficient. In the first, a motion to dismiss was granted in part because plaintiff alleged only that the HELOC was for "basic expenses." *Hamilton v. Wells Fargo Bank, N.A.*, No. 09-04152 CW, 2010 WL 1460253, at *2 (N.D. Cal. April 12, 2010). In the second, *Schulken v. Washington Mutual*, No. C 09-02708 JW, slip op. at 6 (N.D. Cal. March 3, 2010), plaintiff alleged that the "purposes of the loan included home renovations" but not that such purposes were the primary reason for the HELOC. *Id.*

In the Complaint before this court, Plaintiffs do specifically allege that the HELOC was used "primarily" for consumer purposes. Though conclusory, these allegations are not implausible within the meaning of *Iqbal* or *Twombly* such that a more detailed factual showing must be made at the pleadings stage. Defendant offers nothing to suggest these funds were used for non-consumer

purposes, and offers the court no reason to question Plaintiffs' assertions. If Plaintiffs were required to provide detailed records concerning the nature of their HELOC expenditures at this stage, the already-lengthy Complaint would become unwieldy. The court declines to dismiss Plaintiffs' Complaint based on the lack of detail concerning HELOC expenditures.

## II. Declaratory Relief

Defendant argues that Plaintiffs' declaratory judgment claim (Count II) should be dismissed because TILA's statutory scheme provides a complete remedy, and a declaratory judgment would serve no useful purpose. (Def.'s Br. at 18.)

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The decision to entertain a declaratory judgment action lies within the discretion of the district court, and is not precluded by the availability of another form of relief. FED. R. CIV. P. 57; *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); *City of Highland Park v. Train*, 519 F.2d 681, 693 (7th Cir. 1975).

Plaintiffs argue that "it is unknown at this time whether TILA damages will sufficiently compensate the Class." (Response at 20-21.) Further, Plaintiffs argue, as Defendant "does not consider itself required to use accurate AVMs or to otherwise act with a sound factual basis when suspending accounts . . . a declaration affirming that Chase's conduct violates TILA may prove more beneficial to the Class members than any fractional share of a statutory damages award." (*Id.* at 21.) Because TILA's statutory remedies may indeed prove insufficient, the court declines to strike Plaintiffs' request for declaratory relief. *Cf. Hickman v. Wells Fargo Bank, N.A.*, No. 09 C 5090, 2010 WL 3833669, at *4 (N.D. Ill. May 11, 2010) (declining to strike declaratory relief claim pleaded in the alternative).

## III. Breach of Contract

Plaintiffs allege that Defendant breached its contracts in several ways, most significantly that it reduced or suspended HELOCs when no significant decline in property value justifying such action had occurred, and that it did so through the use of faulty AVMs, unlawful triggering events, and lack of consideration of available equity. (Compl. ¶¶ 135-40.) Plaintiffs also allege that Defendant's annual fees and other fees also constituted contractual breaches. (*Id.* ¶¶ 141-42.)

Defendant challenges Plaintiffs' breach of contract claims on a variety of grounds, urging, first, that Plaintiffs have not identified any express contractual provision that has been breached. (Def.'s Br. at 19.) Defendant argues, further, that neither the allegations of improper suspensions or reductions of HELOCs, nor the alleged improper collection of fees, states a breach of contract. (*Id.*)[10]

## A.   Absence of an Express Contractual Provision

Defendant's initial contract defense is another version of one the court has already addressed. Specifically, Defendant urges that Plaintiffs have not identified a specific contract provision that has been breached. (Def.'s Br. at 19), but Plaintiffs respond by pointing to the portion of the HELOC agreement that allows Defendant to reduce a credit limit if "the value of your property declines significantly below the property's appraised value . . . [including], for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances." (Response at 22; Compl. ¶ 135; Group Ex. A at 6, 14, 22, 29, 36, 47, 53.) Defendant responds that it has not

---

[10]     The court notes that Plaintiffs' contract claims are governed by the laws of different states.  "[T]he choice-of-law rule for pendent state claims should be that of the forum [state]." *Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.*, 805 F.2d 663, 681 (7th Cir. 1986). In Illinois, "the law applicable to a contract is that which the parties intended . . . [w]hen that intent is expressed." *Hofeld v. Nationwide Life Ins. Co.*, 59 Ill.2d 522, 529, 322 N.E.2d 454, 458 (1975). The HELOC agreements require the use of Minnesota law (Cavanagh, Group Ex. A at 5), California law (Frank, Group Ex. A at 6; Malcolm, Group Ex. A at 5; Walsh, Group Ex. A at 6), Delaware law (Hackett, Group Ex. A at 7), Texas law (Mayes, Group Ex. A at 5), and Arizona law (Wilder, Group Ex. A at 5).

breached this provision because Plaintiffs have not adequately pleaded that their property values did not significantly decline. (Reply at 9.) For the reasons explained earlier, the court concludes that Plaintiffs have indeed so alleged. This objection is overruled.

**B.       Implicit Contractual Provisions**

Defendant also challenges Plaintiffs' claims based on implied contractual terms. These include allegations that Defendant failed to consider available equity in a home before deciding to revoke or suspend a HELOC; used unlawful triggering events in making those decisions; and relied improperly on the use of automated valuation models. (Def.'s Br. at 19.) Citing *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 189 P.3d 285 (Cal. 2008), Plaintiffs contend that provisions of TILA and Regulation Z are incorporated by law into the contract, and "insofar as [Defendant's] conduct plausibly violates TILA, such conduct also plausibly states a claim for breach of contract." (Response at 23.) Because the court is able to resolve Defendant's objections to Plaintiffs' Complaint without determining whether the contract incorporates TILA and Regulation Z, the court need not decide the issue. In any event, should Plaintiffs prevail on their claims that Defendant has violated TILA, a claim that the conduct also constitutes a breach of contract would not obviously yield any additional relief.

**i.       Available Equity**

Defendant contends that no contractual provision requires that it take into consideration available equity before suspension or reduction of a HELOC. The court agrees. Plaintiffs point to a provision in their HELOC agreements explaining that Defendant may reduce or suspend a HELOC when

> [t]he value of the Property declines significantly below the value as determined by us at the time you applied for your Credit Line Account. This includes, for example, a decline such that the difference between the Credit Line and the available equity is reduced by fifty percent . . . and may include a smaller decline depending on individual circumstances.

(Group Ex. A at 14.). As the court reads this provision, it does not require Defendant to consider

available equity in deciding whether to suspend or revoke a HELOC. The mention of "available equity" refers to a situation in which action *might* be taken. The preceding sentence explains when Defendant is permitted to take action, and refers only to the value of the property, not to available equity. Further, the term "available equity" could be understood either to mean the available equity at the time of origination, or the present available equity at the time of suspension or reduction. The former interpretation accords more closely with the court's earlier reading of Regulation Z and the Commentary. *See infra* I.A. The court concludes that no express contractual provision requires Defendant's consideration of available equity at the time of any revocation or suspension.

To the extent Plaintiffs contend consideration of available equity is implied in the contract, the court is unpersuaded. As discussed earlier, TILA and Regulation Z do not appear to dictate that present available equity be considered, and any suggestion that TILA and Regulation Z are incorporated therefore would not require Defendant to consider present available equity as a contractual matter.

The court notes that, while Plaintiffs devote a section of their brief to arguing that Defendant's failure to consider available equity is an independent contract violation, they appear to withdraw that argument in a footnote that acknowledges, "any allegations in the instant Complaint regarding failure to consider equity . . . are alleged as being demonstrative of unfair and potentially fraudulent practices." (Response at 12 n.5.) The court concludes that it must dismiss any breach of contract claim premised solely on failure to consider present available equity in making a reduction or suspension decision.

### ii. Triggering Events

Defendant next argues that Plaintiffs' allegation that Defendant relied on "unlawful triggering events" in suspending or revoking HELOCs constitutes an "impermissibl[e] attempt to bootstrap nonexistent TILA statutory violations into a breach of contract claim." (Reply at 11.) Plaintiffs argue that because "the HELOC contracts provide an exhaustive list of grounds upon which [Defendant]

can base a HELOC suspension or reduction . . . [Defendant's] reliance on different grounds—*i.e.*, insignificant property value declines—would breach the contract." (Response at 24.) Thus, Plaintiffs assert, Defendant breached the parties' contract by reducing or suspending Plaintiffs' HELOCs on the basis of insignificant declines in property values. (*Id.*) The court agrees with Plaintiffs that a reduction or suspension in the absence of a significant property value decline constitutes a breach of contract–but that is the same claim alleged previously. Plaintiffs previously identified the express contractual provision breached and explained in what way it was breached. *See supra* III.A. To the extent Plaintiffs are attempting to assert an additional breach of contract claim here, it is stricken as duplicative.

### iii.     Use of AVMs

Defendant asks the court to dismiss Plaintiffs' claim to the extent it is premised on the use of AVMs because no contractual provision or law prohibits their use. The court agrees that Defendant's use of AVMs, does not by itself, constitute breach of contract. Thus, though Plaintiffs mention Defendant's "reliance on flawed AVMs" in passing (*see, e.g.,* Compl. ¶¶ 10-12, 138, 150, 155, 159), they offer no contractual provision that addresses the use of AVMs. This practice may be demonstrative or supportive of Plaintiffs' breach of contract claims, but is not independently actionable.

### iv.     Loan-To-Value Ratios

Plaintiffs contend that Defendant breached its contract with HELOC borrowers by suspending or revoking HELOCs based on changes in its own internal loan-to-value ("LTV") ratio policies. (Response at 24.) An account's failure to "meet the bank's new internal LTV ratio requirements is not one of the enumerated grounds" for which an account can be suspended or reduced, Plaintiffs note: "[N]othing in [Defendant's] contract allows it to base suspensions and reductions on unilateral changes to its internal LTV ratio requirements that are made *after* its customers sign their HELOC contracts." (*Id.*)

21

Defendant argues that Plaintiffs have not identified any contractual provisions that govern Defendant's use of LTV ratios. (Def.'s Br. at 20.) The HELOC agreement, however, does provide an enumerated list of circumstances under which Defendant is able to suspend or revoke a HELOC;[11] TILA and Regulation Z also limit the circumstances when such action may be taken to enumerated occurrences. Defendant's decision to modify its own internal loan-to-value ratios is not on either list, and Defendant does not point to any provision that authorizes its action. Were Defendant able to modify the HELOC terms based on any circumstance *not* enumerated in the agreement or applicable laws, the contract and laws governing HELOCs would become meaningless. Defendant allegedly told Mayes that his HELOC would be suspended because of a change in Defendant's LTV ratio, and similarly told Wilder in suspending his HELOC that his ratio was "high." (Response at 24.) Plaintiffs have stated a plausible claim that HELOCs were reduced or suspended due to Defendant's unilateral decision to change its LTV ratio, and not in response to a significant decline in home value, as the party's contracts require. Defendant's motion to dismiss this breach of contract theory is denied.

v.    **Annual Fee**

Defendant next challenges Plaintiffs' assertion that Defendant breached the HELOC agreement by charging customers an annual fee for use of a HELOC account even after the account had been suspended. It appears that Plaintiff Hackett is the only named Plaintiff who paid

---

[11]    The Washington Mutual agreement entered into by Plaintiff Frank provides an illustrative list. It explains that a HELOC may be reduced or suspended if: the property value declines significantly; the bank believes the borrower cannot meet his or her obligations; the borrower defaults on his or her obligations; the government prohibits charging the APR specified in the agreement; government action affects the priority of the bank's security interest in the property; the government informs the bank "that continued advances may constitute an unsafe and unsound business practice"; or the maximum APR has been reached. (Group Ex. A at 14.) Defendant explains the reductions or suspensions at issue in this case solely by reference to the provision permitting such action where there has been a significant decline in property value; it does not contend that the reductions or suspensions are justified by reference to any other enumerated provision.

a fee after suspension.  Defendant argues that Hackett herself has not alleged she was *charged* a fee after suspension of the HELOC (Reply at 12); instead, she alleges only that Defendant failed to refund the annual fee after her account was suspended.  (Compl. ¶ 22.)  In any event, Defendant asserts, the agreement permits such a charge unless the account has been terminated and the loan balance paid off.  (Def.'s Br. at 21.)  Thus, the HELOC agreement Hackett entered into explains that "[u]nless you terminate your Credit Account and pay the outstanding balance, the Annual Participation Fee will be charged to your Credit Account annually. . . . " (Group Ex. A at 22.)

The *Hickman* court examined a similar claim.  Plaintiff there alleged that Wells Fargo breached its contract by charging a $75 annual fee after reducing his HELOC.  683 F. Supp. 2d at 792.  The court noted that HELOC contract terms require the borrower "to be responsible for full payment of the balance of [the] Account as well as all other account obligations, according to the terms of this Agreement."  *Id.*  Another portion of the agreement explained that each year the HELOC was open, "a $75 non-refundable Annual Fee will be charged to [plaintiff's] account."  *Id.* The contract also provided for situations in which the credit limit could be reduced.  *Id.*  The court concluded that because the contract contained no provision excusing payment of the annual fee in the event of a HELOC reduction, and because the contract expressly held plaintiff responsible for all account obligations and fees in the event of a reduction, plaintiff had not pleaded any breach of contract claim with respect to the annual fee.  *Id.*  Plaintiffs attempt to distinguish *Hickman* because it involved an account reduction, rather than suspension, but the terms of Hackett's HELOC contract do not support such a distinction.[12]

---

[12]    Hackett's agreement explains that

You agree to pay us a non-refundable Annual Participation Fee of $25.00 during the Draw Period and any extension of the Draw Period.  Unless you terminate your Credit Account and pay the outstanding balance, the Annual Participation Fee will be charged to your Credit Account annually during the Draw Period in the Monthly Statement Period ending on your anniversary month which we assign to your Credit

(continued...)

Plaintiffs have failed to state a claim for breach of contract in connection with Defendant's charging an annual fee.

## IV. Breach of Implied Covenant of Good Faith and Fair Dealing

Defendant argues that Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing should be dismissed because they fail to identify a contract term that creates an implied duty, or, alternatively, their claims do not actually state a breach of the implied duty. Whether Plaintiffs can pursue claims for a breach of the implied covenant of good faith and fair dealing turns on state law and requires the court to address the state law relevant to each named Plaintiff's claims. The court notes that Plaintiffs have acknowledged that Texas law does not support a contractual cause of action for breach of the implied covenant of good faith and fair dealing, and have withdrawn Plaintiff Mayes's claim based on Texas law. (Response at 28 n. 13.)

### A. California

Claims for the implied covenant of good faith and fair dealing by Plaintiffs Frank, Malcolm and Walsh are governed by California law.[13] (Frank, Group Ex. A at 6; Malcolm, Group Ex. A at 5; Walsh, Group Ex. A at 6). California law recognizes a cause of action for the implied covenant of good faith and fair dealing. Thus, in *Brehm v. 21st Century Ins. Co.*, 166 Cal. App. 4th 1225, 1236, 83 Cal. Rptr. 3d 410, 417 (Cal. App. 2008), the court observed that "breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing." Defendant attempts to limit the reach of that holding by noting that in another

---

[12](...continued)
Account.

(Group Ex. A at 22.)

[13]     Plaintiffs do not discuss what state law they believe applies to each Plaintiff's implied covenant claim, but as their claims are based on contractual performance, this court applies the same choice-of-law provisions to these claims. *See Amakua Development LLC v. Warner*, 411 F. Supp. 2d 941, 948 (7th Cir. 2006).

portion of its opinion, the court explains that "the principle that no breach of the covenant of good faith and fair dealing can occur if there is no coverage or potential for coverage under the [insurance] policy is quite different from the argument that no breach of the implied covenant can occur if there is no breach of an express contractual provision." *Id.* at 1236, 83 Cal. Rptr. 3d at 417. But this citation only supports Plaintiffs' argument–it confirms that a breach of the implied covenant can occur even in the absence of a violation of an express contractual provision, so long as the contract is in force. *Brehm* goes on at some length to explain that in that case, dealing with an insurance contract, "an insurer's obligations extend beyond simply paying the benefits to which its insured is entitled." *Id.* Tactics that delay, frustrate, or oppress the insured can support a claim for relief even if the insured eventually receives the payment due under the policy. *Id. Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 327, 8 P.3d 1089, 1095 (2000), cited by Defendant, is to the same effect; it explains that the implied covenant cannot substantively alter the terms of a contract, but the covenant does require "mutual fairness in applying a contract's actual terms . . . ."

This court concludes that California law therefore allows claims for the breach of the implied covenant of good faith and fair dealing in the execution of a contract's terms, so long as the implied covenant does not impose obligations inconsistent with the express terms of the written agreement.

At least one of the transferor courts so concluded in this case. There, in examining one Plaintiff's claims before consolidation, the district judge in Northern California determined that Plaintiff stated a claim for breach of the implied covenant of good faith and fair dealing based on Defendant's suspension of a HELOC. *Malcolm*, 2010 WL 934252, at *6. "Allegations that Defendant claimed that the property value had declined without a sufficient factual basis, failed to provide specific information as to how it reached that conclusion, and then required the borrower to pay the cost of an appraisal to show otherwise are sufficient to state a claim for breach of the implied covenant of good faith and fair dealing." *Id.*

Defendant insists that allegations that it suspended or reduced HELOCs without considering

present available equity, based its decisions on inaccurate and unreliable valuation methods, and charged excessive fees,\ do not state claims for the breach of any implied duty. (Def.'s Br. at 24.) At this stage, however, the court is satisfied that Plaintiffs have pleaded sufficient facts to suggest Defendant arbitrarily suspended their agreements based on valuations inconsistent with the actual declines in value experienced by the properties at issue. Plaintiffs have alleged that the appraisals they obtained after being notified of a suspension or reduction of their HELOCs diverge significantly from the valuations relied upon by Defendant in making the decision to revoke or suspend their HELOCs.[14] Plaintiffs assert, further, that they received delayed notifications from Defendant, did not receive notifications at all, received conflicting and inaccurate information, were charged excessive fees in connection with their HELOC suspensions and revocations, or had their attempts to secure reinstatement of their HELOCs frustrated. The court concludes these allegations are sufficient to state a claim that Defendant violated the covenant of good faith and fair dealing in connection with the HELOCs.

## B.  Delaware

Plaintiff Hackett's claim is governed by Delaware law. (Hackett, Group Ex. A at 7.) In Delaware, "[t]he implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (citation and quotation omitted) (cited by Defendant). As in California, "[t]he implied covenant cannot be invoked to override the express terms of the contract." *Id.* To state a claim, plaintiff must identify "a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the

---

[14] Plaintiffs do not break out their allegations on this claim by individual Plaintiff, but rather allege generally that the implied covenant was breached by Defendant in some or all of these ways as to each Plaintiff. (Compl. ¶¶ 146-62.)

fruits of the contract." *Id.* (citation and quotation omitted). A general allegation that defendant acted in bad faith is insufficient. *Id.*

The court concludes that Plaintiff Hackett has also adequately pleaded a claim for breach of the implied covenant. Plaintiff Hackett makes the same general allegations as do the other Plaintiffs, that the contract's terms were carried out improperly, but also alleges that she was charged a $30 fee to have a document faxed to her that Defendant was already obligated to provide. (Compl. ¶ 152.) This allegation is also sufficient to state a claim for breach of the implied covenant based on oppressive execution of the contract's terms.

### C.  Minnesota

Plaintiff Cavanagh's claim is governed by Minnesota law. (Cavanagh, Group Ex. A at 5.) Minnesota's implied covenant of good faith and fair dealing "requir[es] that one party not 'unjustifiably hinder' the other party's performance of [a] contract" and that a party not "take advantage of the failure of a condition precedent when the party itself has frustrated performance of that condition." *In re Hennepin County 1986 Recycling Board Litig.*, 540 N.W.2d 494, 502 (Minn. 1995). The covenant "does not extend to actions beyond the scope of the underlying contract," but Minnesota law does not require a plaintiff asserting an implied covenant breach to first establish breach of an express contractual provision. *Id.* at 503. For the reasons stated previously, the court concludes that Plaintiff Cavanagh states a claim for breach of the implied covenant of good faith and fair dealing.

### D.  Arizona

Plaintiff Wilder's claim is governed by Arizona law. (Wilder, Group Ex. A at 5.) The court notes that Defendant offers no specific discussion of Wilder's claim and does not dispute that the implied covenant can be enforced under Arizona law. (Def.'s Br. at 23.) The transferor court in the Central District of California found that Wilder stated a claim for breach of the implied covenant of good faith and fair dealing based by alleging that Defendant required him to pay for his appraisal

up front and failed to provide information about the HELOC suspension sufficient to enable him to determine whether to appeal the determination and request reinstatement. *Wilder v. JPMorgan Chase Bank, N.A.*, No. SACV 09-0834 DOC (RNBx), 2009 U.S. Dist. Lexis 124242, at *12 (C.D. Cal. Nov. 25, 2009).

The court noted that Arizona's implied covenant of good faith and fair dealing prohibits either party from acting in a way that will "impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Id.* at *11 (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 153-54, 726 P.2d 565, 569-70 (Ariz. 1986)). To state a claim under this theory, the court observed, a plaintiff need only allege that defendant's actions "potentially impair Plaintiff's right to the benefit of HELOC funds." *Id.* This court declines to depart from that conclusion. Plaintiff Wilder's allegations are sufficient to state a claim under essentially the same standard as those previously discussed.

## V.     Restitution and Unjust Enrichment

Plaintiffs have also challenged Defendant's conduct under an unjust enrichment theory. They allege that Defendant has been unjustly enriched in at least three ways: (1) by having received the benefit of appraisals paid for by Plaintiffs; (2) by retaining funds otherwise borrowed by Plaintiffs and profiting by lending those funds to other borrowers; (3) by retaining annual fees paid by Plaintiffs after their HELOCs were reduced or suspended.

### A.     Express Contracts

Defendant first argues that the HELOC contract governs the relationships between the parties and precludes any claim for unjust enrichment. Defendant contends that California law does not recognize a claim for unjust enrichment at all, and that although Minnesota, Delaware, and Texas law recognize such a claim, it is barred where a contract exists. Plaintiffs argue that because they have pleaded their unjust enrichment claim in the alternative, it should survive the motion to dismiss. (Response at 35.)

The court is satisfied that a claim for unjust enrichment or restitution is recognized in each of the four forum states. California recognizes a claim for restitution (although there is some conflicting authority). *Malcolm*, 2010 WL 934252, at *7 (citing *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006)); *Wilder*, 2009 U.S. Dist. Lexis 124242 at *14 ("[T]he weight of authority indicates that California law recognizes a cause of action for unjust enrichment/restitution.").

Defendant is correct that Minnesota, Texas, and Delaware bar unjust enrichment claims where the parties' relationship is governed by contract,[15] but all four states allow such a claim to proceed when pleaded in the alternative. *Malcolm*, 2010 WL 934252, at *7 (California); *Excel Homes of Minnesota, Inc. v. Ivy Ridge Home Builders, Inc.*, No. C2-00-1686, 2001 WL 506782, at *3 (Minn. App. May 15, 2001); *Peters v. Norwegian Cruise Line Ltd.*, No. 01-05-00906, 2007 WL 1633555, at *10 (Tex. App. June 7, 2007); *Narrowstep, Inc. v. Onstream Media Corp.*, No. 5114-VCP, 2010 WL 5422405, at *16 (Del. Ch. Dec. 22, 2010). As Plaintiffs note, two courts upheld unjust enrichment claims in this case pre-consolidation on the basis that those claims were pleaded in the alternative. *See Wilder*, 2009 U.S. Dist. Lexis 124242, at *15 ("It would be inappropriate to dismiss Plaintiff's claim before the Court has held that an express, enforceable contract governed the subject matter for which Plaintiff seeks restitution."); *Yakas v. Chase Manhattan Bank, U.S.A., N.A.*, No C 09-02964 WHA, 2010 WL 367475, at *7 (N.D. Cal. Jan. 25, 2010) ("At this point, the Court is unwilling to categorically exclude the possibility that unjust enrichment will turn out to be an appropriate remedy.").

---

[15]     *See Zupancich v. U.S. Steel Corp*, No. 08-5847 ADM/RLE, 2009 WL 1474772, at *3 (D. Minn. May 27, 2009) ("In Minnesota, the existence of an express contract between the parties . . . precludes recovery under the theories of unjust enrichment and quantum meruit."); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) ("A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."); *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ("Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory.").

The court agrees that the existence of an express contract potentially covering these claims is not fatal at this stage and declines to dismiss Plaintiffs' unjust enrichment claims on this basis.

**B.      Retention of Benefits**

Defendant argues that any unjust enrichment claim should also fail because Plaintiffs do not allege Defendant wrongfully retained any actual benefit, an element of such a claim in California, Minnesota, Texas, and Delaware.  The four states differ in minor ways in how they define unjust enrichment:  A restitution claim in California requires "receipt of benefit and unjust retention of that benefit at the expense of others."  *Malcolm*, 2010 WL 934252, at \*7 (quoting *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726, 91 Cal. Rptr. 2d 881, 883 (Cal. App. 2000)).  In Minnesota, an unjust enrichment claim requires a showing that "(1) a benefit [was] conferred by the plaintiff on the defendant; (2) the defendant accept[ed] the benefit; (3) the defendant retain[ed] the benefit although retaining it without payment is inequitable."  *Zinter v. University of Minnesota*, No. A10-2041, ___ N.W. 2d ___, 2011 WL 2175872 (Minn. App. June 6, 2011).  Texas allows recovery on an unjust enrichment theory "when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."  *Christus Health v. Quality Infusion Care, Inc.*, No. 01-09-00591-CV, ___ S.W.3d ___, 2011 WL 2432117, at \*3 (Tex. App. June 16, 2011) (quoting *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).  Delaware law requires a showing of "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law."  *Ocwen Loan Servicing, LLC v. SFJV-2001-1, LLC*, C.A. No. N10C-09-071 CLS, 2011 WL 2175995, at \*2 (Del. Super. May 25, 2001) (citation and quotation omitted).  Although the definitions thus differ slightly, all essentially require the inequitable or unjustified retention of a benefit or enrichment at the plaintiff's expense.

Defendant argues that the retention of a "benefit" in the form of the up-to-date appraisal cannot be characterized as unjust because TILA and Regulation Z allow Defendant to charge up

front for such appraisals. (Def.'s Br. at 30.) Defendant cites no authority for this proposition, but there is support for it. The *Hickman* court noted that "neither the statute, regulations nor Official Commentary contain any provisions prohibiting [creditors] from shifting the burden of obtaining and paying upfront for a property appraisal to borrowers." *Hickman*, 683 F. Supp. 2d at 789. The *Raeth* court agreed, explaining that neither TILA, Regulation Z, or the Commentary "require a creditor to incur appraisal fees." *Raeth*, 755 F. Supp. 2d at 905. The *Raeth* court noted that the relevant provision explains that

> a creditor may collect only bona fide and reasonable appraisal and credit report fees if such fees are actually incurred in investigating whether the condition permitting the freeze continues to exist. A creditor may not, in any circumstances, impose a fee to reinstate a credit line once the condition has been determined not to exist.

12 C.F.R. Pt. 226, Supp. 1, 5b(f)(3)(vi)-3. In addition, while the creditor is allowed to shift the burden to request reinstatement to the borrower, as it has done here, "[o]nce the consumer requests reinstatement, the creditor must promptly investigate to determine whether the condition allowing the freeze continues to exist." 12 C.F.R. Pt. 226, Supp. 1, 5(b)(f)(3)(vi)-4. Together, these provisions do suggest, as the *Raeth* and *Hickman* courts concluded, that the creditor may shift the burden of incurring an appraisal fee to the consumer.[16]

Such a shift, however, is premised on the assumption that a "condition allowing the freeze" existed in the first place. The allegation Plaintiffs make here is that no such condition ever existed, and that they were forced to incur fees[17] in order to rebut Defendant's claim of a significant decline

---

[16]     The court finds no provision in the HELOC agreements that explicitly addresses the reinstatement process or identifies which party is responsible to pay the costs of such a reinstatement, nor have the parties identified such a provision.

[17]     Plaintiffs' complaint does not include detailed information concerning which Plaintiffs paid for appraisals, how much they paid, who they paid for the appraisals, whether they received refunds, or the amount of any refunds received. The complaint does allege that Cavanagh paid for an appraisal but did not receive full reimbursement (Compl. ¶ 39); that Hackett paid $385 for an appraisal (*id.* ¶¶ 55, 64); that Malcolm paid $385 for an appraisal, which was not reimbursed (*id.* ¶ 69); and that Wilder paid for an appraisal. (*Id.* ¶ 101.)

in their property values–a decline that was solely a function of faulty valuation models.  Whether this is the case has not yet been determined, but the allegation precludes a determination that no unjust benefit had been conferred upon Defendant.  The court agrees with Defendant, however, that this claim is not available to any Plaintiff who did not pay for an appraisal based on a HELOC suspension or reduction, or to any Plaintiff who received a timely refund of his appraisal fee.  One of the pre-consolidation courts reached this conclusion as well.  *See Malcolm*, 2010 WL 934252, at *7 (dismissing certain unjust enrichment claims but concluding that the claim survived "as to the appraisal, [because] Defendant did receive and retain that benefit at Plaintiff's expense").

Plaintiffs also allege that Defendant wrongfully retained the funds it should have made available to Plaintiffs, enabling it to lend those funds to other customers at higher interest rates and to maintain necessary reserves.  Defendant argues that this claim fails for lack of a specific allegation as to what benefit was wrongfully retained.  (Def.'s Br. at 31.)  In other words, "Plaintiffs make no specific allegations of what actual monetary benefits Chase allegedly wrongfully retained." (Reply at 18.)  Plaintiffs contend that "the existence, nature and type of benefit retained by [Defendant] will be confirmed through discovery." (Response at 37.)  The court shares Defendant's concern that Plaintiffs' claims are sketchy at this point, but notes that Plaintiffs have plausibly alleged that they have lost the time value of the money they would have had access to, were it not for the allegedly improper suspensions or reductions.  As one pre-consolidation court explained, "Chase had the benefit of the use of the money that would otherwise be lent to Plaintiff between when the loan was frozen and when the loan was restored, and that benefit would have otherwise belonged to Plaintiff."  *Wilder*, 2009 U.S. Dist. Lexis 124242, at *7.  Defendant's motion to dismiss this claim is denied.

Finally, Defendant argues that Plaintiffs state no unjust enrichment claim stemming from collection of annual fees after the suspension of HELOCs because Plaintiffs have not pleaded that they were indeed charged an annual fee after the HELOC suspension.  (Def.'s Br. at 31.)  As

discussed previously, *infra* III.B.v., no Plaintiff has alleged that he or she was *charged* an annual fee after the suspension of a HELOC. The question of whether an annual fee was unjustly retained, however, is a different question. If Plaintiffs succeed in showing that the HELOCs themselves were improperly suspended or reduced, Plaintiffs may have paid an annual fee in exchange for a HELOC whose benefit of the bargain they did not actually receive. Plaintiffs have not addressed such a theory in their response brief, however. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *County of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 818 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action.") (citation and quotation omitted).

The court concludes Plaintiffs have adequately pleaded that Defendant was unjustly enriched by unjustifiably requiring appraisals at Plaintiffs' expense and by improper retention of credit to which Plaintiffs are entitled. Plaintiffs' unjust enrichment claims are otherwise dismissed.

## VI.     Consumer Protection Claims

Plaintiffs allege that Defendant violated California, Illinois, and Minnesota consumer protection laws through fraudulent activity designed to discourage borrowers from challenging their suspensions, and through unfair or unlawful conduct that resulted in improper suspensions or reductions of their HELOCs. Defendant seeks dismissal of these claims on the ground that they do not meet the heightened pleading standard imposed by Federal Rule of Civil Procedure 9(b) for claims involving fraudulent conduct. (Def.'s Br. at 31-32.) The unfair or unlawful conduct claims fail, Defendant argues, for the same reasons that the breach of contract claim should be dismissed. (*Id.* at 33-34.) The court concludes that Plaintiffs' fraud claims should be dismissed for failure to plead actual reliance, but that the unfair or unlawful conduct claims survive.

### A.     Fraud Claims

In support of their fraud claims, Plaintiffs allege that Defendant "made a false statement of

33

material fact"[18] in the HELOC suspension and revocation notices it sent out by asserting that properties securing the HELOCs had suffered significant declines in value when, in fact, no significant declines had occurred. (Compl. ¶ 197.) Defendant made these false statements, Plaintiffs allege, in order to trigger its right to suspend or reduce HELOCs. (*Id.* ¶ 198.) Those statements "were likely to deceive reasonable HELOC borrowers into believing that their home values did in fact decline significantly and that their HELOC suspensions or reductions were proper, and were further likely to prevent or limit appeals of [Defendant's] HELOC[] suspensions and reductions." (*Id.*) Plaintiffs also allege Defendant made false statements related to Plaintiffs' appeals of their HELOC suspensions and revocations. (*Id.* ¶ 199.) Plaintiffs allege that Defendant made these statements intending that customers, including Plaintiffs, rely on them and believe "there was nothing that could be done to have the account reinstated." (*Id.* ¶ 201.)

Defendant argues that Plaintiffs have not adequately alleged that they relied on the alleged fraud, were deceived by the alleged fraud, or incurred damages based on the allegedly deceptive conduct as required to state a fraud claim. (Def.'s Br. at 32.) The court first examines the state laws upon which Plaintiffs brings their claims, to determine whether some allegation of actual reliance is required.

### i.    California

Planitiffs Frank, Walsh, and Malcolm[19] allege fraud based on California's unfair competition

---

[18]    Although the Complaint uses slightly different terminology, in the court's view, and for purposes of this motion, a "false statement of material fact" of the type alleged by Plaintiffs is essentially the same allegation as the "fraudulent business act" required to state a UCL claim under California law, Cal. Bus & Prof. Code § 17200, a "deceptive act or practice" of the type required by Illinois law, *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 149, 776 N.E.2d 151, 160 (2002), and a "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice," as required by Minnesota law, Minn. Stat. § 325F.69.

[19]    The court notes that Plaintiffs have withdrawn claims pursuant to the California UCL on behalf of Wilder because neither he nor Defendant are California residents. (Response at 38 n. 18.)

law ("UCL"), which prohibits "any unlawful, unfair or fraudulent business act." Cal. Bus & Prof. Code § 17200. Under California law, such a claim may be brought "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. In other words, the law allows prosecution by a private plaintiff, although the remedies available under those circumstances are "generally limited to injunctive relief and restitution." *Clark v. Superior Court*, 50 Cal.4th 605, 610, 235 P.3d 171, 174 (2010) (citation and quotation omitted). The term "fraudulent business act" is not further defined in the statute, but the statute has the broad purpose of "protect[ing] both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 949, 45 P.3d 243, 249 (2002).

Defendant here focuses not on whether its conduct fits within that term but instead whether Plaintiffs have adequately pleaded reliance on that conduct. Defendant cites *In re Tobacco II Cases*, 46 Cal.4th 298, 207 P.3d 20 (2009), for the proposition that California law requires a plaintiff to show actual reliance on an alleged misrepresentation in order to succeed on a UCL fraud claim. (Def.'s Br. at 32.) *Tobacco II* was brought by plaintiffs who alleged that "tobacco industry defendants violated the UCL by conducting a decades-long campaign of deceptive advertising and misleading statements about the addictive nature of nicotine and the relationship between tobacco use and disease." 46 Cal.4th at 306, 207 P.3d at 25. The court in that case did require plaintiffs to plead actual reliance on the tobacco industry advertisement. The court also explained, however, that "while a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct." *Id.* at 328, 207 P.3d at 40.

Plaintiffs argue that their allegations are sufficient under this standard. They rely on *Aron v. U-Haul Co. of California*, 143 Cal. App. 4th 796, 49 Cal. Rptr. 3d 555 (Cal. App. 2006), which

35

explained that a plaintiff alleging a fraudulent business practice must show only that the representations at issue "would be misleading to a reasonable consumer." *Id.* at 807, 49 Cal. Rptr. 3d at 563. In that case, the plaintiff alleged that U-Haul labeled a fee charged for returned trucks a "fueling fee" despite the fact that "fuel is not in fact replaced and this fact is not disclosed to the consumer." *Id.* at 806, 39 Cal. Rptr. 3d at 562. These allegations were adequate, the court concluded, because "there is no connection between the imposition of a fee or cost and whether the customer has in fact refueled the vehicle." *Id.* at 807, 39 Cal. Rptr. 3d at 563. Defendant argues that *Aron* is no longer good law because of the standing requirement imposed by Proposition 64, effective January 1, 2009, which requires that such a claim may be prosecuted only by "a person who has suffered injury in fact and has lost money or property *as a result of the unfair competition.*" Cal. Bus. Code & Prof. Code § 17204 (emphasis added). *Tobacco II* cited this change in the law in holding that plaintiffs were required to plead actual reliance in addition to loss when pursuing a UCL fraud claim of the type alleged here. *Id.* at 328, 207 P.3d at 40.

ii.    **Illinois**

The Illinois Supreme Court has explained its interpretation of the state's Consumer Fraud Act as requiring that litigant plead "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira*, 201 Ill.2d at 149, 776 N.E.2d at 160 (interpreting 815 ILCS 505/2 and 815 ILCS 505/10a(a)). The Illinois Supreme Court has explained that "a plaintiff must prove that he or she was actually deceived by the misrepresentation in order to establish the element of proximate causation." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 199, 835 N.E.2d 801, 861 (2005). Plaintiffs argue that this standard does not require "actual reliance," but in the court's view the requirement that a plaintiff be "actually deceived by the misrepresentation" is indistinguishable from a requirement that plaintiff "actually rely" on the

misrepresentation.

### iii.    Minnesota

Minnesota law provides that "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise[20], whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable . . . ." Minn. Stat. § 325F.69.  The statute does not require actual reliance if a plaintiff seeks an injunction, but Minnesota courts have required proof of actual reliance on the defendant's fraudulent conduct to support an award of damages.  *Thompson v. American Tobacco Co.,* 189 F.R.D. 544, 553 (D. Minn. 1999) (rejecting class certification for cigarette smokers seeking relief in the form of the establishment of a "cessation program" because the court concluded it was "nothing more than a disguised attempt for compensatory damages" and would therefore "requir[e] proof of individual reliance," which would preclude class certification).  Plaintiffs suggest that there is an exception to the requirement of a showing of individualized reliance "where the plaintiffs' damages are alleged to be caused by a lengthy course of prohibited conduct that affected a large number of consumers." (Response at 46 (quoting *Group Health Plan v. Philip Morris Inc.*, 621 N.W.2d 2, 13 (Minn. 2001)). But the *Group Health* court did conclude that plaintiffs must prove causation: although "direct evidence of reliance by individual consumers" is not necessary, plaintiffs are required to "demonstrate that defendants' conduct had some impact on their members' use of tobacco products that caused their damages."  *Id.* at 13-14. The court concludes that Minnesota law employs a flexible standard for proof of reliance and does not require a showing for each individual class member, but does require plaintiffs to prove they relied on defendant's alleged false statements.

Plaintiffs here have not pleaded that Defendant's statements actually did influence their

---

[20]    For the purposes of the statute, "merchandise" includes loans.  Minn. Stat. § 325F.68, subdivision 2.

decisions to pursue or not pursue HELOC appeals, or that they actually relied on the allegedly fraudulent statements made by Defendant.  As such an allegation is necessary under the Illinois, Minnesota, and California consumer protection laws, Plaintiffs' fraud claims based on those laws are dismissed without prejudice.

**B.      Unfair Conduct Claims**

Plaintiff also brings claims for "unfair" or "unlawful" conduct based on the unfair competition laws ("UCL") of Illinois and California, which, as explained here, differ from UCL claims for fraudulent conduct.  Plaintiffs allege that Defendant engaged in unfair business practices through the use of "inaccurate and unsubstantiated" and "faulty and unreliable" AVMs, "in order to undervalue the property values of its customers and provide a false and improper basis for reducing credit limits."  (Compl. ¶¶ 186, 187.)  Thus, Plaintiffs allege, "Chase deprived borrowers of critical information needed to determine whether to seek credit line reinstatement" including the value of the property at HELOC origination and the value needed for reinstatement.  (*Id.* ¶ 189.)  Further, Defendant "pretextually suspended and reduced credit lines based on flawed and inaccurate AVMs and without properly considering the level of available equity in the properties and then took steps to discourage borrowers from appealing the suspensions."  (*Id.*)  Plaintiffs also allege that the $30 fee for faxing a two-page notice containing information it alleges Defendant was already obligated to provide was "outrageous and oppressive."  (*Id.* ¶ 188.)

**i.      California**

Plaintiffs Frank, Walsh, and Malcolm have invoked the California unfair competition law's prohibition of unfair or unlawful conduct.  Cal. Bus & Prof. Code § 17200.  These terms, like the "fraudulent business act" term discussed earlier, are not defined by the statute, "and courts have struggled to come up with a workable definition."  *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 593-94, 101 Cal. Rptr. 3d 697, 706 (Cal. App. 2009) (citation and quotation omitted).  The California courts currently employ two separate definitions of "unfair."  The first asks the court to

"weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis*, 179 Cal. App. 4th at 594, 101 Cal. Rptr. 3d at 707 (citation and quotation omitted). The second treats conduct as unfair if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws," but that definition has not been held applicable in consumer claims such as this one. *Id.* at 594, 101 Cal. Rptr. 3d at 707. As for the "unlawful" prong of the law, Section 17200 has been interpreted to render "violations of federal, state or local law. . . unlawful practices which are independently actionable." *Countrywide Financial Corp. v. Bundy*, 187 Cal. App. 4th 234, 256, 113 Cal. Rptr. 3d 705, 721 (Cal. App. 2010).

Plaintiffs' unfair or unlawful conduct claims should be dismissed, Defendant urges, because under California law, if the conduct at issue does not violate TILA, it does not constitute "unlawful" conduct for purposes of the state consumer protection laws. (Def.'s Br. at 34.) This argument is answered by the court's earlier conclusion that Plaintiffs have adequately stated a claim under the Truth in Lending Act. Such allegations were held sufficient to state a violation of the UCL in two pre-consolidation cases. *See Walsh v. Washington Mutual Bank*, CV 09-4387 RGK (Anx), slip op. at 5 (C.D. Cal. March 5, 2010) (Ex. A to Response) ("By sufficiently alleging that Defendant's reduction of the HELOC violated TILA, Plaintiff adequately pleads an unlawful business practice under the UCL."); *Kimball v. Washington Mutual Bank*, No. 09-cv-1261 MMA (AJB), slip op. at 14 (S.D. Cal. April 15, 2010) (Ex. C to Response) ("Because the Court has already declined to dismiss [TILA] claims, the Court finds that Plaintiff has stated a claim for relief under the 'unfair' and 'unlawful' prongs of California's UCL."). Here, similarly, Plaintiffs' claims based on the "unlawful" prong of the California UCL succeed because they have pleaded a violation of TILA and Regulation Z. (Response at 39.)

Defendant also argues that Plaintiffs' claims based on the "unfair" prong of the UCL fail because Defendant complied with TILA and Regulation Z. (Def.'s Br. at 34.) Again , however, the court's conclusion that Plaintiffs have adequately pleaded a violation defeats this defense. In

California, a "business practice is unfair within the meaning of the UCL if it . . . is . . . unscrupulous and causes injury to consumers which outweighs the benefits." *McKell v. Washington Mutual Inc.*, 142 Cal. App. 4th 1457, 1473, 49 Cal. Rptr. 3d 227, 240 (Cal. App. 2006). The determination of whether a business practice is unfair is usually a question of fact and inappropriate for a motion to dismiss. *Id.* Defendant's motion to dismiss this claim is denied.

### ii. Illinois

In Illinois, the question of whether a business practice is unfair within the meaning of the Illinois Consumer Fraud Act depends on "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers." *Hickman*, 683 F. Supp. 2d at 795 (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663, 669 (7th Cir. 2008)). Illinois law also explains, however, that the consumer fraud law does not require lenders to make "more extensive disclosure[s]" than are required by TILA. *Lanier v. Associates Finance, Inc.*, 114 Ill.2d 1, 17, 499 N.E.2d 440, 447 (1986). In *Hickman*, the court concluded that plaintiff did state an ICFA claim "by alleging that Defendant's conduct in reducing borrower's HELOC limits without a sufficient factual basis and using faulty and inaccurate AVMs was 'unfair, immoral, and unscrupulous.'" *Hickman*, 683 F. Supp. 2d at 795. The court determined that plaintiff nevertheless did not state a claim that defendant had deprived borrowers of information needed to seek credit reinstatement because compliance with TILA is a defense under the ICFA, and "the allegations in Plaintiff's Complaint establish that Defendant complied with the relevant notice and reinstatement provisions established by TILA, Regulation Z, and the Official Commentary." *Id.* at 796. *See also Swanson v. Bank of America, N.A.*, 566 F. Supp. 2d 821, 828 (N.D. Ill. 2008) (ICFA does not prohibit conduct "specifically authorized by laws administered by any regulatory body . . . [or] conduct in compliance with the orders or rules of or a statute administered by a Federal, state or local governmental agency.") (quoting 815 ILCS 510/4(a), 815 ILCS 505/10b(1)).

Plaintiffs' allegations state a claim that Defendant engaged in actions that violate the ICFA through its use of inaccurate AVMs to reduce or suspend HELOCs. Though Defendant's alleged failure to consider available equity may not by itself violate the ICFA, that failure is a factor to be considered in evaluating Defendant's other alleged wrongdoing. And the allegation that Defendant required Plaintiffs to pay for information it was obligated to provide is sufficient to state a claim based on oppressive conduct in violation of the ICFA. The ICFA claim survives this motion.

### iii.    Minnesota Deceptive Practices

Plaintiff Cavanagh also pleads a violation of the Minnesota Uniform Deceptive Practices Act, Minn. Stat. § 325D.44, subdivision 1, which prohibits a person from representing "that goods or services have . . . characteristics . . . they do not have" or otherwise creating a "likelihood of confusion or misunderstanding." Claims brought pursuant to this act are "based on conduct by the defendant and do not require reliance by the plaintiff." *Ford Motor Credit Co. v. Majors*, No. A04-1468, 2005 WL 1021551, at *3 (Minn. App. May 3, 2005). The Minnesota statutes affords injunctive relief as well as costs and attorneys fees, in addition to relief available under other state statutes or common law. Minn. Stat. § 325D.45.

Defendant argues that Plaintiffs do not meet the requirement of Rule 8 or Rule 9(b) for this claim because they have offered merely a "formulaic recitation" of the cause of action. (Def.'s Br. at 33.) Plaintiffs allege that Defendant represented that Cavanaugh would receive a line of credit that would not be revoked or suspended absent a significant decline in the value of his home, but that in reality he received a HELOC with no such protections, and one in which the decision to reduce or suspend the HELOC did not depend on any actual change in the value of his property. These allegations are sufficient, in the court's view, to state a claim under Minnesota's law. The motion to dismiss this claim is denied.

### CONCLUSION

Defendant's motion to dismiss [49] is granted in part and denied in part. The court dismisses

Plaintiffs' breach of contract claim to the extent it relies on Defendant's charging an annual fee after HELOC suspension. Plaintiffs' fraud claims, brought under the California, Illinois, and Minnesota consumer protections laws, are also dismissed, as is Plaintiffs' claim for unjust enrichment based on the collection of annual fees. The motion is otherwise denied.

ENTER:

Dated: June 30, 2011

_____
REBECCA R. PALLMEYER
United States District Judge