## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

## EASTERN DIVISION

| | |
|---|---|
| In Re: JP MORGAN CHASE BANK HOME EQUITY LINE OF CREDIT LITIGATION | ) MDL No. 2167 <br> ) <br> ) Master Docket No. 10-cv-3647 <br> ) <br> ) All Cases <br> ) <br> ) Hon. Judge Rebecca R. Pallmeyer <br> ) <br> ) |

### JPMORGAN CHASE BANK, N.A.'S ANSWERS
### TO CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Defendant JPMorgan Chase Bank, N.A. ("Chase"), by its undersigned attorneys, hereby submits the following answer and affirmative or other defenses to Plaintiffs' Consolidated Amended Class Action Complaint.

### NATURE OF THE CASE

1. This case is about illegal account suspensions and reductions of credit limits on home equity lines of credit ("HELOCs") extended by Defendant JPMorgan Chase Bank, N.A. ("Chase"). In an attempt to reduce its exposure to the risks of the real estate market and force low-interest HELOC borrowers into higher interest alternatives, Chase has utilized credit limit suspension and reduction standards that are contrary to federal regulations and has suspended or reduced HELOCs without first reasonably and accurately assessing the value of each affected property and without a sound legal and factual basis. Chase's conduct, as described herein, is a violation of the Federal Truth-in-Lending Act ("TILA") and its implementing regulation, Regulation Z, and a breach of its contractual promises to its HELOC account holders (collectively "Class members").

**ANSWER TO PARAGRAPH 1:** Chase admits that Plaintiffs purport to seek relief regarding HELOCs that were suspended or reduced by Chase, but denies that its conduct was illegal, in violation of federal law, or in breach of the HELOC agreements, and denies the remaining allegations of this paragraph.

2.   Each member of the putative Class and Subclasses (as defined herein) had a HELOC for which Chase reduced the available credit or suspended the accounts in a manner that was both illegal and unfair, thereby denying members of the Class and Subclasses access to hundreds of millions of dollars worth of credit at a critical economic time. Plaintiffs bring this class action on behalf of themselves and the putative classes alleging violations of TILA (15 U.S.C. § 1640(a); 12 C.F.R. § 226.5b), breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of California, Illinois and Minnesota consumer protection laws.

**ANSWER TO PARAGRAPH 2:**   Chase admits that Plaintiffs purport to bring this class action on behalf of themselves and a putative class and subclasses, but denies that this action is appropriate for class treatment.   Chase further admits that Plaintiffs purport to bring claims for alleged TILA violations, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, and violations of California, Illinois, and Minnesota consumer protection laws, but denies any wrongdoing and denies that Plaintiffs or others are entitled to any relief on these purported claims.

## GENERAL ALLEGATIONS

3.   In the past decade, Chase has extended credit through the granting of HELOCs to hundreds of thousands of homeowners across the nation. A HELOC is a form of revolving credit in which the borrower's home serves as collateral. Homeowners typically use HELOCs for major personal and household expenses, such as education, home improvements, automobile purchases or medical bills.[1]

FN 1: *See* http://www.federalreserve.gov/pubs/equity/equity_english.htm#equity (last visited Aug. 17, 2010). According to Chase, its HELOC customers may use their HELOCs for such purposes as, for example, making home improvements, consolidating credit card debts, or paying for private school or college tuition. CHASE, HOME EQUITY LINE OF CREDIT, https://www.chase.com/index.jsp?pg_name=ccpmapp/home_equity/products/page/line_of_credit (last visited Aug. 30, 2010).

**ANSWER TO PARAGRAPH 3:**   Chase admits that it has extended credit to hundreds of thousands of homeowners across the country through HELOCs.  Chase admits that a HELOC agreement is a loan of money, in the form of a line of credit, where the borrower's home serves as collateral.   Chase admits that HELOCs can be used for home improvements,

consolidating credit card debts, education, paying for private school or college tuition, automobile purchases or medical bills. Chase lacks information sufficient to form a belief as to whether the Plaintiffs used their HELOCs for these purposes or other purposes and as to the "typical" use of a HELOC. Chase denies the remaining allegations of this paragraph.

4.      Given that failure to repay the loan or meet loan requirements may result in foreclosure, lenders generally require that the borrower maintain a certain level of equity in the home as a condition of providing a HELOC. At the time of HELOC origination, Chase assessed the value of the respective properties of Plaintiffs and the Class members. Chase calculated the amount of the credit limit on Plaintiffs' and Class members' HELOC accounts based upon these values and the amount of available unencumbered equity in the homes. Chase drafted form contracts to govern these accounts and the rights and obligations of the parties during the term of the HELOC accounts (the "HELOC Agreements"). Each of the Plaintiffs and Class members were required to, and did, execute a form HELOC Agreement in order to obtain their HELOC with Chase.[2] A true and accurate copy of each of the HELOC Agreements governing the relationship between Chase and the named Plaintiffs is attached hereto as Group Exhibit A.

FN2: Some of the HELOCs at issue in this litigation originated with Washington Mutual Bank, ("WAMU") which was placed into receivership in 2008 and subsequently sold to Chase. Likewise, other HELOCs at issue in this litigation were originated with Bank One, a Chase predecessor.

**ANSWER TO PARAGRAPH 4:**     Chase admits that a copy of each named Plaintiff's HELOC Agreement is attached to Plaintiffs' Complaint as Group Exhibit A. Chase admits that some of the Plaintiffs' HELOCs and those of the purported class were originated by Washington Mutual Bank and Bank One and many other originating lenders. Chase further admits that it drafted HELOC Agreements to govern the rights and obligations of the lender and borrower during the term of the HELOC, and that borrowers who obtained a HELOC from Chase executed a HELOC Agreement. Chase denies the remaining allegations of this paragraph.

*The Uniform HELOC Agreements*

5.      The HELOC Agreements provide Plaintiffs and Class members with the contractual right to draw on a credit account at their own direction and discretion. For each one year "Draw Period," the HELOC Agreements require Class members to pay Chase an "Annual Participation Fee" ("Annual Fee") as

consideration for their right to draw funds on their HELOC accounts. (Exh. A.) When a draw is made, the HELOC Agreements require Plaintiffs and the Class members to pay back the outstanding balance plus interest to compensate Chase for lending the funds.

**ANSWER TO PARAGRAPH 5:** Chase admits that the HELOC Agreements attached to the Plaintiffs' Complaint as Group Exhibit A provide Plaintiffs with the right to draw on their HELOC account during the Draw Period. Chase further admits that with the exception of Mayes, Plaintiffs' HELOC Agreements requires Plaintiffs to pay Chase an Annual Participation Fee of during the Draw Period and any extension of the Draw Period. Chase further admits that when Plaintiffs and other borrowers draw from a HELOC account, the HELOC Agreement requires them to pay back the amounts drawn with interest. Chase denies the remaining allegations of this paragraph.

6. In addition, under the HELOC Agreements, Chase may suspend additional extensions of credit or reduce the credit limits on a HELOC if the value of the property securing the credit line declines "significantly below" its original appraised value for purposes of the HELOC account. According to the HELOC Agreements, events that could potentially trigger a suspension or reduction in credit include, for example, a decline such that the amount of available equity in the home is reduced by fifty percent.

**ANSWER TO PARAGRAPH 6:** Chase admits that Plaintiffs' HELOC Agreements permit Chase to refuse to make additional extensions of credit and/or to reduce Plaintiffs' credit limit if the value of the property securing the loan declined significantly below its original appraised value for purposes of the HELOC account. Chase further admits that the Plaintiffs' HELOC Agreements provide as an example that the HELOCs could be suspended or reduced if the difference between the credit limit and the available equity is reduced by fifty percent, or a smaller decline depending on the individual circumstances. To the extent this paragraph attempts to characterize the contents of the Plaintiffs' HELOC Agreements, Chase refers the

agreements to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the agreements.

7.    Such contractual provisions track TILA and Regulation Z, which prohibit lenders from suspending HELOCs or reducing credit limits on HELOC accounts unless the value of the home securing the credit line has actually declined significantly below the appraised value. 12 C.F.R. § 226.5b(f)(3)(vi)(A). The Federal Reserve Board's Official Staff Commentary to Regulation Z (the "Official Staff Commentary) interprets "significant decline" as being based on the level of available equity in the property—that is, significant decline is interpreted in the Official Staff Commentary as a decline in value such that "the initial difference between the credit limit and the available equity (based on the property's appraised value for the purposes of the plan) is reduced by fifty percent." *See* Official Staff Commentary,12 C.F.R. § 226.5b(f)(3)(vi)A, note 6; http://www.fdic.gov/regulations/laws/rules/6500-2200.html (last visited Aug. 23, 2010).

        **ANSWER TO PARAGRAPH 7:**    Chase admits that the language of the HELOC

Agreements includes language that is contained in Regulation Z.   Chase admits that this

paragraph purports to quote and summarize portions of TILA, Regulation Z, and the Federal

Reserve Board's Official Staff Commentary to Regulation Z, but denies these allegations to the

extent inconsistent with Regulation Z, and the Federal Reserve Board's Official Staff

Commentary to Regulation Z, and denies that the allegations of this paragraph fully and

accurately describe Chase's obligations under TILA, Regulation Z, the Official Staff

Commentary, and the terms of Plaintiffs' HELOC Agreements.   To the extent this paragraph

attempts to characterize the contents of Regulation Z and the Staff Commentary to Regulation Z,

Chase refers those materials to the Court for determination of the contents and the import

thereof.  Chase denies the remaining allegations of this paragraph.

8.    In addition, the Official Staff Commentary provides that a bank may not impose "triggering events" or responses that the regulation expressly addresses in a manner different from that provided in the regulation." Namely, "a contract cannot contain a provision allowing the creditor to freeze a line due to an insignificant decline in property value since the regulation allows that response only for a significant decline." *See* Official Staff Commentary,12 C.F.R. §

226.5b(f)(3)(i), note 2.

**ANSWER TO PARAGRAPH 8:** Chase admits that this paragraph purports to quote portions of the Federal Reserve Board's Official Staff Commentary to Regulation Z, but denies these allegations to the extent inconsistent with TILA, Regulation Z, and the Federal Reserve Board's Official Staff Commentary to Regulation Z, and denies that the allegations of this paragraph fully and accurately describe Chase's obligations under TILA, Regulation Z, the Official Staff Commentary, and the terms of Plaintiffs' HELOC Agreements.

*Chase's Mass HELOC Reductions and Suspensions Based on Secretive and Unreliable Computer Estimates*

9. During the peak of the housing bubble when housing prices were rising, Chase, WAMU and other lenders freely issued HELOCs without significant concern for delinquencies or default. However, Chase either failed to consider or ignored that the long-term trend of rising housing prices could not last forever. By 2008, the housing and credit bubble began to burst and, in response, Chase knew it would have to revoke credit previously issued and/or force low-interest HELOC borrowers into higher interest alternatives. Chase therefore began to unilaterally suspend and reduce the credit limits on its HELOC accounts, without first appraising the homes securing the HELOCs to determine if the appraised value had declined at all, let alone "significantly declined."

**ANSWER TO PARAGRAPH 9:** Chase denies the allegations of this paragraph.

10. Rather, Chase "estimated" the value of the homes of Plaintiffs and the Class members using faulty and inaccurate "automated valuation models" ("AVMs") which unreasonably undervalued homes so as to falsely trigger Chase's right to freeze or reduce credit limits under its HELOC accounts. As a result, Chase reduced the credit limits and/or froze the HELOC accounts of many homeowners, including Plaintiffs, whose property had not declined significantly.

**ANSWER TO PARAGRAPH 10:** Chase admits that it utilized AVMs to determine the value of borrowers' properties, and that it suspended or reduced certain borrowers' HELOCs where the value demonstrated a significant decline. Chase denies the remaining allegations of this paragraph.

11. Chase was aware that its AVMs were inaccurate and unreliable and based on flawed statistical modeling, and Chase further failed to take necessary steps to

ensure or verify the reliability or accuracy of these AVMs, such as validating them on a periodic basis to mitigate the potential valuation uncertainty; properly documenting the validation's analysis, assumptions, and conclusions; appropriately back-testing representative samples of the valuations against market data on actual sales; and accounting fairly for improvements, property type or geographic comparables.

**ANSWER TO PARAGRAPH 11:**    Chase denies the allegations of this paragraph.

12.    The AVM s used by Chase were an unreliable and inaccurate means for valuing the properties of Plaintiffs and the Class members, and Chase, thus, lacked a sound factual basis for concluding that the value of their homes had declined significantly when it reduced and suspended HELOCs of Plaintiffs and Class members.

**ANSWER TO PARAGRAPH 12:**    Chase denies the allegations of this paragraph.

13.    In addition to relying on faulty and unreliable "estimates," Chase created its own set of triggering events contrary to federal law. For many of the Class members, Chase suspended or reduced HELOCs when it determined that the value of the property decreased by 5% and/or that a customer had a high combined loan -to-value ("LTV") ratio[3] and also suspended or reduced accounts based on changes to its own in internal LTV ratio policy. Further, Chase did not accurately calculate or consider the level of available equity in the Class members' properties. Chase failed or refused to consider the available level of equity in the home that resulted from a pay down of the primary mortgage or an increase in the value of the property since the time that the HELOC was originated.

FN3 A combined LTV ratio is the ratio between the encumbrances on a property (*e.g.*, a first mortgage and a HELOC) and the value of the property. The difference between the value of the property and the total encumbrances on the property constitutes the available equity in the property. Thus, the lower the LTV ratio, the more available equity in the property and, consequently, the less risky the loan.

**ANSWER TO PARAGRAPH 13:**    Chase admits that it suspended and reduced HELOCs where the borrowers' properties had significantly declined in value, including but not limited to instances where the property value decreased by at least 5% and the borrower had a high combined LTV ratio.  Chase further admits that a combined LTV ratio is the ratio of the encumbrances on a property to the value of the property.  Chase denies the allegations of this paragraph.

*Chase Sends Uniform Notices to Plaintiffs and Class Members*

14. To inform them that it was summarily reducing or suspending their HELOC accounts, Chase sent two-page form letters to Plaintiffs and the Class members.

**ANSWER TO PARAGRAPH 14:** Chase admits that it sent Plaintiffs' and other borrowers letters informing them that it was reducing or suspending their HELOCs. Chase denies the remaining allegations of this paragraph.

15. These letters state that suspensions and reductions were occurring because home values were falling in many parts of the country, and that through an unidentified internal valuation method, Chase estimated that the property's "updated valuation no longer supports the full amount of [the] Credit Line." *See* "Important Information about your Home Equity Line of Credit" received by Plaintiffs, true and accurate copies of which are attached as Group Exhibit B.

**ANSWER TO PARAGRAPH 15:** Chase admits that the letters providing notice of suspension or reduction of borrowers' HELOCs generally inform borrowers that the valuation of their property no longer supports the full amount of the credit line. To the extent this paragraph attempts to characterize the contents of the letters, Chase refers Group Exhibit B to the Consolidated Amended Complaint to the Court for determination of the contents and the import thereof, and denies the allegations in to the extent inconsistent with the letters. Chase denies the remaining allegations of this paragraph.

16. The letters sent to Plaintiffs and other Class members do not disclose the initial value of the property, the amount by which the property has purportedly decreased, the methodology used to compute the decline in home value, or the value needed for account reinstatement.

**ANSWER TO PARAGRAPH 16:** Chase admits that the letters providing initial notice of suspension or reduction of borrowers' HELOCs did not include the value of borrowers' properties at origination, the amount by which the property decreased, the methodology used to determine the amount by which the property's value declined, or the value of the property required for reinstatement. To the extent this paragraph attempts to characterize the contents of

8

the letters, Chase refers Group Exhibit B to the Consolidated Amended Complaint to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letters.

17. Rather, on a second page entitled "Frequently Asked Questions" or Answers to questions you may have," the letters generically state that Chase used an industry standard method (not an on-site appraisal) to obtain an updated value of the subject property. The letters state that Chase used a "proven valuation method" to arrive at the estimated home values and that it is confident that such valuations are accurate. (Exh. B.)

**ANSWER TO PARAGRAPH 17:**   Chase admits that the letters providing initial notice of suspension or reduction of borrowers' HELOCs generally include a page listing answers to frequently asked questions, and that the letters generally inform borrowers that Chase used an industry standard valuation method to value their property.   To the extent this paragraph attempts to characterize the contents of the letters, Chase refers Group Exhibit B to the Consolidated Amended Complaint to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letters.

*Chase's Purported Appeal Process*

18. The form letters sent to Plaintiffs and other Class members state further that if the homeowner disagrees with Chase's valuation and would like his or her account reinstated, his or her only option is to order and pay for an appraisal conducted by an appraisal company of Chase's choosing. (Exh. B.)

**ANSWER TO PARAGRAPH 18:**   Chase admits that the letters providing initial notice of suspension or reduction of borrowers' HELOCs generally provide borrowers with information on Chase's appeal process.   To the extent this paragraph attempts to characterize the contents of the letters, Chase refers Group Exhibit B to the Consolidated Amended Complaint to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letters.

19. However, when a customer attempts to initiate this so-called "appeal process," Chase continues to withhold information that is material and necessary for the customer to determine whether an appeal should be pursued, such as the actual valuation of the real property securing the HELOC at the time of the HELOC origination or the most recent credit limit increase, the balance of any first mortgage at those times, and/or the true present value of the property. Chase also conceals or falsely claims it is unable to disclose the method and/or the standards used to determine these values.

**ANSWER TO PARAGRAPH 19:**    Chase denies the allegations of this paragraph.

20. Chase's chosen appraisal company, to whom it refers homeowners who are considering an appeal, charges hundreds of dollars for appraisals. Moreover, in many of its account suspension form letters, Chase expressly states that the borrower will be solely responsible for the cost of the appraisal and that reinstatement of the credit line would be solely at Chase's discretion. As a result, and as intended by Chase, many of Chase's HELOC customers were discouraged from seeking an appraisal or simply lacked the funds to do so. Furthermore, some Chase HELOC customers that obtained appraisals were either not reimbursed or fully reimbursed for such appraisals.

**ANSWER TO PARAGRAPH 20:**    Chase admits that companies hired by Chase to perform appraisals in connection with Chase's appeal process charge for their services. Chase also admits that its letters providing initial notice of suspension or reduction of borrowers' HELOCs inform borrowers that they will be responsible for the cost of the appraisal and that any reinstatement will be at Chase's discretion. Chase denies that the letters expressly state the borrower will be solely responsible; the letters state if Chase reinstates the full credit line, it will credit the amount of the appraisal back to the borrower. To the extent this paragraph attempts to characterize the contents of the letters, Chase refers the letters to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letters. Chase denies the remaining allegations of this paragraph.

***Chase Failed to Reinstate Suspended or Reduced HELOC Accounts Even Though Chase Was Aware That the Value of the Homes Did Not Significantly Decline***

21. For many of the Plaintiffs and Class members who did obtain an on-site appraisal, including an appraisal by Chase's own chosen appraisal company, the results of the appraisals confirmed that their homes had not significantly

declined in value. In fact, in many instances, the appraisals showed that the value of the homes had actually decreased only marginally, did not decrease at all, or, in fact, actually *increased*. Notwithstanding these results and Chase's so-called "appeals" process, Chase failed to reinstate their HELOCs and/or fully reimburse them for the appraisal fees.

**ANSWER TO PARAGRAPH 21:** Chase admits that certain borrowers who obtained appraisals that provided estimates of property value that suggested that the value of the property did not significantly decline. Chase denies that it did not reinstate borrower credit lines where an acceptable appraisal provided an estimate of property value that suggested that the value of the borrower's property did not significantly decline. Chase admits that Plaintiff Cavanagh was not refunded the entire cost of his appraisal, but denies the remaining allegations of this paragraph.

### Chase Continued to Assess Annual Fees After Suspending Plaintiffs' HELOCs

22. With respect to those members of the Class whose rights to draw against their HELOC accounts had been suspended, Chase did not refund the balance of the Annual Fee applicable to the portion of the Draw Period during which the borrower had no access to his or her credit line. Chase continued (and continues to this day) to charge these Class members an Annual Fee despite these borrowers not having access to their credit lines as a result of the unlawful and unjustified account suspensions.

**ANSWER TO PARAGRAPH 22:** Chase notes that the Court dismissed Plaintiffs' claims regarding Annual Fees in its Memorandum Opinion and Order of June 30, 2011, (Dkt. No. 75). Chase admits that it did not refund any portion of an Annual Fee after a borrower's HELOC account was suspended. Chase denies the remaining allegations of this paragraph.

## PARTIES

23. **Plaintiff William Cavanagh:** In or around February 2008, Cavanagh obtained a HELOC from Chase in the amount of $400,000 secured by his primary residence in Edina, Minnesota. Cavanagh obtained his HELOC primarily for personal and household purposes. In approximately January 2009, Chase sent Cavanagh a letter indicating that it had suspended his line of credit and that he could not make any further draws against the account. (Exh. B.)

11

**ANSWER TO PARAGRAPH 23:**    Chase admits the allegations of the first and third sentences of this paragraph.  Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of this paragraph, and therefore denies those allegations.

24. **Plaintiffs Robert and Maria Frank:** In or around April 2003, the Franks obtained a HELOC in the amount of $100,000 secured by their primary residence in Auburn, California. The Franks obtained their HELOC primarily for personal and household purposes, including paying for household repairs, taxes, and personal purchases. In approximately April 2009, Chase sent the Franks a letter indicating that it had reduced their line of credit to $13,100. (Exh. B.)

**ANSWER TO PARAGRAPH 24:**    Chase admits the allegations of the first and third sentences of this paragraph.  Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of this paragraph, and therefore denies those allegations.

25. **Plaintiff Shannon Hackett:** In or around May 2004, Hackett obtained a HELOC in the amount of $100,000 secured by her primary residence in Evanston, Illinois. Hackett obtained the HELOC primarily for personal, family, and household purposes, including home renovations and the purchase of a family automobile. In approximately November 2009, Hackett received a letter from Chase indicating that it had suspended her line of credit and that she could not make any further draws against the account. (Exh. B.)

**ANSWER TO PARAGRAPH 25:**    Chase admits the allegations of the first and third sentences of this paragraph.  Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of this paragraph, and therefore denies those allegations.

26. **Plaintiff Michael Malcolm:** In or around March 2006, Malcolm obtained a HELOC in the amount of $122,000 secured by his primary residence in Mountain View, California. Malcolm obtained his HELOC primarily for personal and household purposes. In approximately August 2009, Malcolm received a letter from Chase indicating that it had suspended his line of credit

and that he could not make any further draws against the account. (Exh. B.)

**ANSWER TO PARAGRAPH 26:** Chase admits the allegations of the first and third sentences of this paragraph. Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of this paragraph, and therefore denies those allegations.

27. **Plaintiff Daryl Mayes:** In or around November 2006, Mayes obtained a HELOC in the amount of $17,000 secured by his primary residence in Arlington, Texas. Mayes' obtained his HELOC primarily for personal, family, and household purposes, including home renovations. In approximately March 2009, Mayes received a letter from Chase indicating that it had suspended his line of credit and that he could not make any further draws against the account. (Exh. B.)

**ANSWER TO PARAGRAPH 27:** Chase admits the allegations of the first and third sentences of this paragraph. Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of this paragraph, and therefore denies those allegations.

28. **Plaintiff Michael Walsh:** In or around August 2003, Walsh obtained a HELOC in the amount of $100,000 secured by his primary residence in Garden Grove, California. Walsh obtained his HELOC primarily for personal, family and/or household purposes, including household items and personal expenses. In approximately April 2009, Walsh received a letter from Chase indicating that it had reduced his line of credit to $16,300, an amount just over his outstanding balance at the time. (Exh. B.)

**ANSWER TO PARAGRAPH 28:** Chase admits the allegations of the first and third sentences of this paragraph. Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of this paragraph, and therefore denies those allegations.

29. **Plaintiff Robert Wilder:** In or around July 2003, Wilder obtained a HELOC in the amount of $250,000 secured by his primary residence in Scottsdale, Arizona. Wilder obtained his HELOC primarily for personal, family and/or household purposes, including home repairs and personal expenses. In approximately April

2009, Wilder received a letter from Chase indicating that it had suspended his line of credit and that he could not make any further draws against the account. (Exh. B.)

**ANSWER TO PARAGRAPH 29:** Chase admits the allegations of the first and third sentences of this paragraph. Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of the second sentence of this paragraph, and therefore denies those allegations.

30. **Defendant JPMorgan Chase Bank, N.A.:** Defendant Chase is a national banking association with its main office located at 1111 Polaris Parkway, Columbus, Ohio 43240. Chase is one of the country's largest banks and has offices and branches throughout the country.

**ANSWER TO PARAGRAPH 30:** Chase admits that it is a national banking association organized under the laws of the Untied States with its principal place of business at 1111 Polaris Parkway, Columbus, Ohio 43240. Chase admits the allegations in the second sentence of this paragraph.

31  As previously noted, in 2008, Chase purchased WAMU, which previously had been placed into receivership by the FDIC. In connection with that purchase, Chase specifically assumed all mortgage servicing rights and obligations of WAMU, including WAMU's HELOC accounts. At the time that some of the Plaintiffs and Class members entered into HELOC Agreements, WAMU was a national banking association with its main office located at 2273 North Green Valley Parkway, Henderson, Nevada 89014. WAMU is now operated by Chase as a subsidiary and/or division.

**ANSWER TO PARAGRAPH 31:** Chase admits that on September 25, 2008, the Office of Thrift Supervision seized Washington Mutual Bank ("WaMu") and placed it into a receivership of the Federal Deposit Insurance Company ("FDIC"). Chase further admits that on September 25, 2008, Chase entered into a Purchase and Assumption Agreement with the FDIC acting in its corporate capacity as well as receiver for WaMu under which Chase agreed to purchase certain WaMu assets and servicing obligations, including certain Plaintiffs and

purported class members' HELOCs.  Chase admits that at the time certain Plaintiffs and

purported class members entered into their HELOC agreements, WaMu was a federal savings

association with its main office located at 2273 North Green Valley Parkway, Henderson,

Nevada 89014.  Chase admits that for a period following the purchase of WaMu assets from the

FDIC, Chase continued to utilize the WaMu brand, but Chase no longer utilizes the WaMu

brand.  Chase denies the remaining allegations of this paragraph.

32.     Chase also merged with or otherwise acquired the assets and assumed the
        liabilities of Bank One on July 1, 2004. Following the merger, Chase serviced
        and, at all relevant times, was considered the lender with respect to all HELOC s
        transferred to Chase as part of this merger transaction.

**ANSWER TO PARAGRAPH 32:**     Chase admits that it merged with Bank One Corp.

on July 1, 2004 and that following the merger, Chase is the successor by merger and serviced the

HELOC agreements with Bank One.

### JURISDICTION AND VENUE

33.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 1640(e)
        as this action arises in part under Regulation Z of TILA, 15 U.S.C. § 1647, 12
        C.F.R. § 226.5(b). This Court has supplemental subject matter jurisdiction over
        the pendent state law claims under 28 U.S.C. § 1367. The Court also has subject
        matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because there are at least
        100 class members in the proposed classes, the combined claims of proposed
        class members exceed $5,000,000, exclusive of interest and costs, and there are
        numerous class members who are citizens of states other than Chase's state of
        citizenship, which is Ohio.

**ANSWER TO PARAGRAPH 33:**     Chase admits that this Court has jurisdiction

pursuant to 28 U.S.C. 1331 and 1640(e) because this action arises in part under TILA, and

pursuant to 28 U.S.C. §1332(d)(2) because this case is filed as a class action, there are at least

100 class members in the proposed classes, the plaintiffs allege that the amount in controversy

exceeds $5,000,000, Plaintiffs are citizens of states other than Chase's state of citizenship, which

for diversity purposes is Ohio.  Chase denies the remaining allegations of this paragraph.

34. Venue is proper in this District pursuant to the June 7, 2010 Transfer Order entered by the United States Judicial Panel on Multidistrict Litigation ordering transfer to and coordination in this District. In addition, venue is proper pursuant to 28 U.S.C. § 1391(a) because at least one plaintiff resides here, Chase has hundreds, if not thousands of customers in this District, Chase receives substantial fees from consumers who hold accounts in Illinois and in this District, and a substantial part of the events or omissions giving rise to the claims accrued in this District.

**ANSWER TO PARAGRAPH 34:** Chase admits that venue is proper in this Court pursuant to the June 7, 2010 Transfer Order entered by the United States Panel on Multidistrict Litigation. Chase further admits that venue is proper in this Court pursuant to 28 U.S.C. §1391(c) because Plaintiffs allege that at least one plaintiff resides in the District, and Chase regularly transacts business in this District. Chase denies that the events that purportedly give rise to the claims in this action occurred in the county Illinois and denies the remaining allegations of this paragraph.

35. This Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged herein took place in Illinois, Chase is authorized to do business in Illinois, Chase has sufficient minimum contacts with Illinois, and/or Chase intentionally avails itself of markets in Illinois through the promotion, marketing and sale of credit and mortgage products and services in Illinois, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

**ANSWER TO PARAGRAPH 35:** Chase admits that the Court has personal jurisdiction over Chase because Chase conducts business in this District, but denies any wrongdoing and denies the remaining allegations of this paragraph.

## THE PLAINTIFFS' EXPERIENCES

### William Cavanagh

36. In or around February 2008, Chase and Cavanagh entered into a HELOC Agreement under the terms of which Chase provided Cavanagh with a $400,000 line of credit secured by a mortgage on his primary residence. Chase's valuation of Cavanagh's property at the time the HELOC was granted was $950,000. At the time the HELOC was originated, there was $650,000 in available equity in Cavanagh's home.

**ANSWER TO PARAGRAPH 36:**   Chase admits that in February 2008, Cavanagh entered into a HELOC Agreement with Chase for a $400,000 line of credit secured by the property located at 24 Woodland Road, Minneapolis, MN 55424.  Chase denies the remaining allegations of this paragraph.

37.  In or around January 2009, Chase mailed Cavanagh a letter indicating that it was "suspending future draws" against Cavanagh's HELOC as of January 10, 2009. (Exh. B.) The letter stated that this decision was based on "a proven valuation method [used] to estimate your home's value at $736,290." No further explanation or rationale for this statement was provided.

**ANSWER TO PARAGRAPH 37:**   Chase admits that it sent Cavanagh a letter dated January 10, 2009.  To the extent this paragraph attempts to characterize the contents of the letters, Chase refers the letters to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letters.  Chase denies the remaining allegations of this paragraph.

38.  Following his receipt of the notice, Cavanagh contacted Defendant's customer service representatives seeking an explanation for the decision to suspend his HELOC.

**ANSWER TO PARAGRAPH 38:**   Chase admits that after it sent Cavanagh the January 10, 2009 letter, Cavanagh contacted Chase customer service.  Chase lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph, and therefore denies those allegations.

39.  Following unsuccessful attempts to have this HELOC reinstated, Cavanagh was forced to hire his own property appraiser at his own expense and was able to prove that his home had not decreased in value, and in fact had actually *increased* in value to $1.1 million. After several additional weeks of waiting, Chase ultimately reinstated the HELOC. However, Cavanagh was never fully reimbursed for the cost of the appraisal.

**ANSWER TO PARAGRAPH 39:**   Chase admits that Cavanagh hired a property appraiser at his own expense, that the appraisal estimated the property value at $1.1 million, and

that Chase reinstated Cavanagh's HELOC. Chase further states that it reimbursed Cavanagh for the appraisal up to the limit of the amount approved for the appraisal company Chase requires borrowers to use when seeking reinstatement. However, Cavanagh used a different appraisal company that charged Cavanagh more for the appraisal, therefore Chase did not reimburse Cavanagh for the difference. Chase denies the remaining allegations of this paragraph.

40. Cavanagh's HELOC with Defendant was his primary line of credit, and the wrongful suspension resulted in several months of lost access to his bargained-for line of credit.

**ANSWER TO PARAGRAPH 40:** Chase denies that Cavanagh's suspension was wrongful. Chase admits that Cavanagh did not have access to HELOC credit for several months. Chase lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph, and therefore denies those allegations.

41. Additionally, Defendant's suspension of Cavanagh's HELOC increased the ratio of credit used to the amount of credit he had available, thereby increasing Cavanagh's Credit Utilization Rate ("CUR"), a major component of his credit rating, which may have damaged Cavanagh's credit score and increased the cost of credit to him.

**ANSWER TO PARAGRAPH 41:** Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph, and therefore denies those allegations.

***Robert M. and Maria I. Frank***

42. In April 2003, WAMU and the Franks entered into a HELOC Agreement under the terms of which WAMU provided the Franks a $100,00 line of credit secured by their home. WAMU's valuation of their home at the time of the HELOC origination was $389,000. At that time, the balance of the Franks' primary mortgage on the property was $177,000. After entering into the HELOC Agreement, the Franks paid down the principal on their primary mortgage from $177,000 to $115,734. The outstanding balance of Plaintiffs' primary mortgage as of Chase's April 2009 HELOC reduction was $122,000.

**ANSWER TO PARAGRAPH 42:**    Chase admits the allegations of the first sentence of this paragraph.  Chase admits that the original amount of the senior lien loan was $177,006.90.  Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph, and therefore denies those allegations.

43.   In April 2009, Defendant mailed the Franks a letter indicating that it had reduced the Franks' credit limit from $100,000 to $13,100. The letter was dated April 17, 2009 and stated that, effective the day before, April 16, 2009, Chase was lowering the credit limit on Plaintiffs' HELOC account. The letter stated that Chase identified a decline in the value of Plaintiffs' property securing the HELOC and that this new value no longer supported the full credit line. (Exh. B.) The letter further stated that "[t]his reduction was not based on [Plaintiffs'] payment record and results exclusively from a change in property value." *See id.* No further explanation or rationale for this statement was provided.

**ANSWER TO PARAGRAPH 43:**    Chase admits that it sent the Franks a letter dated April 17, 2009.  To the extent this paragraph attempts to characterize the contents of the letters, Chase refers the letters to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letters.  Chase denies the remaining allegations of this paragraph.

44.   Following receipt of this notice, the Franks contacted Chase's customer service representatives by phone and in writing on numerous occasions and repeatedly requested the basis for the decision to reduce their HELOC credit limit, the values used to compute the decline, and a copy of the paperwork in Chase's possession upon which the values were based. The Franks also sent a complaint to the Office of the Comptroller of the Currency (the "OCC").

**ANSWER TO PARAGRAPH 44:**    Chase admits that after it sent the Franks the April 17, 2009 letter, the Franks contacted Chase's customer service by phone and in writing.  Chase lacks information sufficient to form a belief as to the truth or falsity of the allegation that the Franks sent a complaint to the OCC, and therefore denies that allegation.  Chase denies the remaining allegations of this paragraph.

45. In response, a customer service representative at Chase responded that Chase was entitled to lower HELOC credit limits when the value of the property decreased by 5%. The customer representative also indicated that in its determination to reduce the Franks' HELOC, Chase did not consider that the Franks had paid down a portion of the principal balance on their primary mortgage. The customer service representative also explained that Chase changed its LTV ratio standards from 80% (which was the policy in place at the time of the origination of the Franks' HELOC) to 60%.

**ANSWER TO PARAGRAPH 45:**  Chase admits that a Chase customer service representative told the Franks that their HELOC had been reduced because their property value had decreased by at least 5%.  Chase denies the remaining allegations of this paragraph.

46. Chase indicated that it obtained a "computer generated estimate" (presumably an AVM) of the present value of the subject property of $345,600. The customer service representative did not provide the Franks with any information concerning the processes by which the "computer generated estimate" was calculated, nor did she provide the Franks with any typical valuation details such as comparable properties used to assess the value of the subject property.

**ANSWER TO PARAGRAPH 46:**  Chase admits that a Chase customer service representative told the Franks that their property had been valued at $345,600 using an AVM. Chase denies the remaining allegations of this paragraph.

47. Chase's computer-generated estimate of $345,600 (which represents a decline in the valuation of the property of only 11%) does not qualify as a "significant decline" allowing for reduction of the HELOC limit. As of the time of account origination in April 2003, there was $112,000 in available equity in the property. As of the time Chase reduced the Franks' HELOC in April 2009, the amount of available equity in the property –based on Chase's own computer-generated valuation – was $123,600. Thus, there was actually an *increase* in the property's available equity. Consequently, the Franks' property did not significantly decline in value, and no account suspension was warranted.

**ANSWER TO PARAGRAPH 47:**  Chase denies the allegations of this paragraph.

48. On September 16, 2009, the Franks submitted a formal request to Chase for reinstatement of their original HELOC limit. To date, Chase has not provided a response.

**ANSWER TO PARAGRAPH 48:**  Chase denies the allegations of this paragraph.

49. The Franks' HELOC with Chase was their primary line of credit. Chase's unreasonably low valuation of the Franks' home and reduction of the credit line denied them access to their full bargained-for credit, dramatically decreased the amount of credit they had available, and may have adversely impacted their credit scores.

**ANSWER TO PARAGRAPH 49:** Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations that the Franks' HELOC was their primary line of credit, and denies the remainder of the allegations of this paragraph.

### Shannon Hackett

50. In May 2004, a Chase representative telephoned Hackett and offered to enter into a HELOC Agreement under the terms of which Chase would provide Hackett a $100,000 line of credit secured by Hackett's home in Evanston, Illinois. Hackett agreed and signed a HELOC Agreement. (Exh. A.)According to Chase's customer service representative, Chase valued her property at $445,000 at the time the HELOC was originated by using some kind of automated valuation of the property.

**ANSWER TO PARAGRAPH 50:** Chase admits that Hackett spoke with a Chase representative in May 2004 regarding obtaining a HELOC. Chase further admits that Hackett signed a HELOC Agreement for $100,000 secured by property located in Evanston, Illinois. Chase further admits that at the time Hackett's HELOC was originated, Chase valued her property at $445,000 using an AVM. Chase lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph, and therefore denies those allegations.

51. At the time of HELOC origination, the balance on Hackett's primary mortgage, also held by Chase, was $283,125. Accordingly, the total amount of available, unencumbered equity in Hackett's property was $61,857:

**$445,000 (home value) -$100,000 (HELOC) -$283,125 (first mortgage) = $61,857.**

**ANSWER TO PARAGRAPH 51:** Chase admits that at the time of HELOC origination, the balance on Hackett's senior lien mortgage was approximately $283,125 ($283,441), therefore the amount of available equity was approximately $61,857 ($61,559).

52. In December 2008, Chase reduced Hackett's HELOC limit from $100,000 to $57,000 because of a purported decline in her home value to $400,000. Hackett never received any notice of her HELOC reduction and only learned of the reduction in February 2010.

**ANSWER TO PARAGRAPH 52:**    Chase admits the allegations in the first sentence of this paragraph.  Chase lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations, and therefore denies those allegations.

53. On November 5, 2009, Hackett received an undated letter from Chase indicating that it had suspended Hackett's HELOC from future draws effective October 30, 2009. The letter stated that the suspension was due to the fact that the subject property value of $358,000, a value determined purportedly using "an industry standard method," "no longer supports the full amount of [the] Line of Credit." (Exh. B.)

**ANSWER TO PARAGRAPH 53:**    Chase admits that it sent Hackett and nonparty John Bates ("Mr. Bates") an undated letter stating that it was suspending future draws on the account effective October 30, 2009.  To the extent this paragraph attempts to characterize the contents of the letters, Chase refers the letters to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.

54. Following receipt of the letter, Hackett immediately telephoned Chase's customer service department and requested reinstatement of her HELOC due to the unreasonably low valuation of her property. Chase responded that in order for Chase to even consider reinstatement, Hackett must order and pay for the full on-site appraisal of the subject property utilizing the appraisal company of Chase's choosing.

**ANSWER TO PARAGRAPH 54:**    Chase admits that following the receipt of the suspension letter from Chase, Hackett contacted Chase customer service regarding the suspension on or about November 4, 2009.  Chase further admits that the customer service representative advised Hackett about the appeal process and stated that Hackett must utilize Chase's chosen appraisal company, LSI.  Chase denies the remaining allegations of this paragraph.

55. Hackett reluctantly ordered and paid for the appraisal from Chase's chosen appraisal company, which was done on November 9, 2009. The appraisal report valued the property at $400,000, $42,000 more than the value rendered by Chase's AVM -- its "proven valuation method." On December 9, 2009, in accordance with the terms of the appeals process outlined in the suspension letter, Hackett forwarded the appraisal report to Chase, along with her written request for the HELOC reinstatement.

**ANSWER TO PARAGRAPH 55:**    Chase admits that it received an appraisal report from Hackett dated November 11, 2009 that valued the property at $400,000 and a request for reinstatement.  Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations in regarding when and how Hackett ordered and paid for the appraisal, and when Hackett sent the appraisal to Chase, and therefore denies those allegations.  Chase denies the remaining allegations of this paragraph.

56. On January 7, 2010, Hackett received an undated letter from Chase stating that Chase had re-evaluated its decision to freeze Hackett's HELOC and, based on the information Hackett provided, Chase declined to reinstate the HELOC because her "home value is insufficient to support any line of credit." *See* Rejection of Reinstatement letter, a true and accurate copy of which is attached hereto as Exhibit C.

**ANSWER TO PARAGRAPH 56:**    Chase admits that it sent Hackett and Mr. Bates an undated letter stating that Chase was unable to reinstate her account because the home value was insufficient to support any line of credit.  To the extent this paragraph attempts to characterize the contents of the letters, Chase refers the letters to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.

57. Chase refused to reinstate Plaintiff's HELOC despite the significant disparity in property value between Chase's AVM and the actual on-site appraisal of the property and despite the fact that no sound factual basis existed for the suspension of Plaintiff's HELOC in the first place, given that there was no decline in property value from the previous December 2008 valuation of the property. Finally, Chase's statement that Plaintiff's new home value ($400,000) was insufficient to support *any* line of credit directly contradicted its prior

statement that Plaintiff's home value of $400,000 was sufficient to support a $57,000 credit line.

**ANSWER TO PARAGRAPH 57:**    Chase admits that it did not reinstate Hackett's

HELOC.  Chase denies the remaining allegations of this paragraph.

58.  In February 2010, after Chase refused to reinstate her HELOC, Hackett learned that, previously in December 2008, Chase had reduced her HELOC from $100,000 to $57,000. Upon learning that fact, she requested that Chase send her the notice of reduction that she should have received in 2008.

**ANSWER TO PARAGRAPH 58:**    Chase admits that in December 2008, Hackett's

credit line was reduced from $100,000 to $57,000.  Chase further admits that in February 2010,

Hackett requested a reprint of the 2008 notice of reduction.  Chase lacks information sufficient to

form a belief as to the truth or falsity of the remaining allegations of this paragraph, and therefore

denies those allegations.

59.  After speaking with at least three customer service representatives, she was assured that the notice of her HELOC reduction to $57,000 would be mailed to her promptly. Instead, three weeks later, Hackett received another copy of the October 2009 notice of the HELOC suspension. Hackett again called Chase customer service and again requested the December 2008 notice of reduction and inquired if Chase could just fax it to her. A customer service representative assured Hackett that he would fax the notice promptly. The representative never mentioned that there would be any charge associated with sending Hackett a fax.

**ANSWER TO PARAGRAPH 59:**    Chase admits that in February 2010, Hackett

requested from Chase customer service a reprint of the notice of credit line reduction effective

December 2008.  Chase denies the remaining allegations of this paragraph.

60.  In March 2010, Hackett received from Chase a fax copy of the undated notice of her 2008 HELOC reduction, a true and accurate copy of which is attached hereto as Exhibit D. The 2008 notice stated that Chase had "used a proven valuation method" that estimated Hackett's home value to be $400,000. (Exh. D.) The notice further stated that this new valuation did not support the full $100,000 HELOC and therefore it was being reduced to $57,000. (Exh. D.)A few days after receipt of the fax, Hackett became aware that Chase had charged to her primary mortgage account a $30 fee for faxing the HELOC reduction notice.

**ANSWER TO PARAGRAPH 60:**  Chase admits that on March 9, 2010, it faxed Hackett a copy of the letter reducing her credit line from $100,000 to $57,000.  To the extent the second and third sentences of this paragraph attempt to characterize the contents of the letter, Chase refers the letters to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.  Chase denies that it charged Hackett a $30 fee for faxing the HELOC reduction notice and denies the remaining allegations of this paragraph.

61. Chase suspended Hackett's HELOC and failed to reinstate it despite Regulation Z's requirement that lenders suspend HELOCs only when the value of the property securing the HELOC declines "significantly." Hackett's home value, however, only declined 10% since origination of the HELOC and did not decline at all since Chase evaluated it in December 2008. Moreover, the available equity in Hackett's home did not decrease by a "significant" amount. Indeed, the balance of Hackett's primary mortgage at the time of the HELOC suspension was $258,460, which Chase, as Plaintiff's first mortgage lender, knew or should have known. Therefore, the available equity in the subject property at the time Chase suspended the HELOC was $41,540:

    **$400,000 (home value according to Chase's on-site appraiser) Đ$100,000 (credit limit at origination) - $258,460 (the first mortgage balance) = $41,540(available equity)**

    **ANSWER TO PARAGRAPH 61:**  Chase denies the allegations of this paragraph.

62. This represents only a 32.8% decline in the available equity (from $61,857 at the time of the HELOC origination to $41,540 at the time of the HELOC suspension), which is well below the 50% threshold example set forth in Regulation Z and is not a "significant decline" under TILA and Regulation Z. Hence, Chase was fully secured on both liens, as the $400,000 home value was enough to support the primary mortgage and the full HELOC, and still leave $41,540 in equity to spare -- more than enough to give Chase comfort that the HELOC was secure.

    **ANSWER TO PARAGRAPH 62:**  Chase denies that the decline in Hackett's property value and available equity was not significant, and denies the remaining allegations of this paragraph.

63. Alternatively, the reduction of Plaintiff's HELOC to $57,000 in December 2008 capped Chase's exposure at $57,000, meaning that, as of October 2009, the available equity had actually increased from $61,857 to $84,540:

**$400,000 (home value according to Chase's on-site appraiser) -**
**$57,000 (actual credit limit at the time of the suspension) - $258,460**
**(the first mortgage balance) =**

**= $84,540 (available equity)**

**ANSWER TO PARAGRAPH 63:**    Chase denies the allegations of this paragraph.

64. Chase's suspension of the credit limit on Hackett's HELOC denied Hackett access to bargained-for credit, increased the ratio of credit Plaintiff used to the amount of credit she had available to her, and may have damaged her credit score and increased the cost of credit available to her. Additionally, Plaintiff had to pay $385 for the appraisal to prove that Chase had undervalued her property. Finally, Chase did not refund Plaintiff a $25 Annual Fee for using the HELOC, even after her HELOC account was unlawfully suspended.

**ANSWER TO PARAGRAPH 64:**    Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of this paragraph, and therefore denies those allegations.  Chase admits that Hackett paid $385 for the appraisal of her home in November 2009.  Chase further admits that it did not refund the Annual Fee after suspending her HELOC.  Chase denies the remaining allegations of this paragraph.

### Michael Malcolm

65. In or around March 2006, Chase and Plaintiff Malcolm entered into a HELOC Agreement under the terms of which Chase provided Malcolm with a $122,000 line of credit secured by his home. Chase valued the home at $1,000,000 at the time the HELOC was originated.

**ANSWER TO PARAGRAPH 65:**    Chase admits the allegations of this paragraph.

66. In or around August 2009, Chase mailed Malcolm a letter indicating that it had suspended Malcolm's account from future draws. The letter was undated and stated that the HELOC was being suspended effective August 7, 2009 because a valuation of $826,000 from an AVM no longer supported the full amount of the credit line. (Exh. B.)

**ANSWER TO PARAGRAPH 66:**    Chase admits that it sent Malcolm an undated letter stating that Chase was suspending future draws against his account as of August 7, 2009.

26

To the extent this paragraph attempts to characterize the contents of the letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.

67. Following receipt of the notice, Malcolm contacted Chase's customer service representatives and requested reinstatement of his HELOC.

**ANSWER TO PARAGRAPH 67:**    Chase admits that on or about August 18, 2009, after Chase sent Malcolm the suspension letter, Malcolm contacted Chase customer service to discuss the action.  Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore denies those allegations.

68. Chase's representatives responded by offering the "appeals process." As part of this process, Chase informed Malcolm that he had to order and pay for an appraisal from an appraisal service chosen by Chase. Once the appraisal was completed, Malcolm was to send the completed appraisal and a formal request for reinstatement to Chase. In its initial notice, Chase stated that "[a]ny reinstatement of the credit line will be at our discretion...." (Exh. B.)

**ANSWER TO PARAGRAPH 68:**    Chase admits that on or about August 18, 2009, its customer service representative advised Malcolm about the appeals process.  To the extent this paragraph attempts to characterize the contents of the suspension letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.

69. Malcolm reluctantly ordered and paid for the appraisal using Chase's chosen appraisal service. The appraisal, which Malcolm forwarded to Chase on or around August 27, 2009, showed that the value of the property had *increased* from the date the HELOC had first been opened by 7%, from $1,000,000 to $1,070,000. Despite the fact that its own chosen appraisal service showed the value had actually increased, Chase only reinstated Malcolm's HELOC after the filing of his lawsuit. Moreover, Chase has not reimbursed Malcolm for the $385 appraisal fee.

**ANSWER TO PARAGRAPH 69:**    Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of this paragraph, and therefore

denies those allegations.  Chase admits that it received an appraisal from Malcolm dated August

25, 2009 which valued the property at $1,070,000.  Chase denies the remaining allegations of

this paragraph.

> 70.  Malcolm's HELOC with Chase was his primary line of credit. Defendant's
> unlawful and unjustified suspension of Malcolm's HELOC denied him access to
> his bargained-for credit and may have adversely impacted his credit score.

**ANSWER TO PARAGRAPH 70:**    Chase lacks information sufficient to form a belief

as to the truth or falsity of the allegations in the first sentence of this paragraph, and therefore

denies those allegations.  Chase admits that it reinstated Malcolm's HELOC effective October 2,

2009.  Chase denies the remaining allegations of this paragraph.

***Daryl Mayes***

> 71.  In November 2006, Plaintiff Mayes entered into a HELOC Agreement with
> WAMU which provided him with a $17,000 HELOC secured by his home in
> Arlington, Texas. (Exh. A.) Mayes' home was valued at $172,000 at the time of
> HELOC origination.

**ANSWER TO PARAGRAPH 71:**    Chase admits the allegations of this paragraph.

> 72.  At the time of HELOC origination, the balance on Mayes' primary mortgage, also
> held by WAMU, was $120,310. Accordingly, the total amount of available
> equity in Mayes' property at the time of HELOC origination was $34,690:
>
> **$172,000 (home value) - $17,000 (HELOC) - $120,310 (first
> mortgage) = $34,690.**
>
> Therefore, at the time of HELOC origination, the combined LTV ratio
> on Mayes' home was 79.8%.

**ANSWER TO PARAGRAPH 72:**    Chase admits that at the time of HELOC

origination, the balance on Mayes' senior lien mortgage was approximately $120,310 ($120,

307.60), therefore the amount of available equity was approximately $34,690 ($34,692.40) and

the resulting LTV ratio was approximately 79.8% (79.83%).

> 73.  Sometime in late March 2009, Mayes received a letter from Chase indicating
> that it had suspended Mayes' HELOC from future draws effective March 26,

2009. The letter stated that "a recent review of your account identified a decline in the value of the property securing your HELOC" and that "a proven valuation method" showed that the new "valuation no longer supports the amount of your Line of Credit." (Exh. B.) The letter did not say what that new valuation was, what the purported decline in home value was, or the method used to determine the new value.

**ANSWER TO PARAGRAPH 73:**    Chase admits that WaMu sent Mayes a letter dated

March 27, 2009 stating that it was suspending additional draws on his account as of March 26,

2009.  To the extent this paragraph attempts to characterize the contents of the letter, Chase

refers the letter to the Court for determination of the contents and the import thereof, and denies

the allegations to the extent they are inconsistent with the letter.

74.    Defendant offered Mayes the appeals process to dispute the unidentified valuation. As with the other Plaintiffs, Mayes was directed to order and pay for an on-site appraisal performed by the company of Chase's choosing and forward the written appraisal to Chase with a request for reinstatement. (Exh. B.) The letter describing the appeals process did not state what home value was needed to achieve reinstatement.

**ANSWER TO PARAGRAPH 74:**    Chase admits that the March 27, 2009 letter to

Mayes offered an appeal process.  To the extent this paragraph attempts to characterize the

contents of the letter, Chase refers the letter to the Court for determination of the contents and the

import thereof, and denies the allegations to the extent they are inconsistent with the letter.

75.    Following the receipt of this letter, Mayes telephoned Defendant's customer service and requested an explanation and information regarding his HELOC suspension. Mayes considered appealing the suspension but needed to know material information to decide whether to expend time and resources on the appeal, since the appraisal fee was not refundable. The customer service representatives, however, were unhelpful and could not provide any meaningful answers such as the value needed for reinstatement or how that value was obtained.

**ANSWER TO PARAGRAPH 75:**    Chase admits that after it sent the March 27, 2009

letter, Mayes contacted Chase customer service.  Chase denies the remaining allegations of this

paragraph.

76. After repeated telephone calls from Plaintiff, Chase finally sent Mayes a Collateral Valuation Report (the "Valuation Report") that showed that sometime in March 2009, the AVM had determined his property to be valued at $151,000. The Valuation Report is attached hereto as Exhibit E. A true and accurate copy of the Valuation Report specifically stated that it was based solely on electronic records and that it had not been prepared by a licensed appraiser. (Exh. E.)

**ANSWER TO PARAGRAPH 76:**  Chase admits that on June 20, 2009, WaMu sent Mayes a Collateral Valuation Report showing that an AVM was used to value the collateral at $151,000.  Chase further admits that a true and accurate copy of the Collateral Valuation Report is attached to Plaintiffs' Complaint as Exhibit E.  To the extent this paragraph attempts to characterize the contents of the report, Chase refers the report to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the report.

77. Upon receiving the Valuation Report, Mayes immediately called Chase's customer service department and disputed this unreasonably low valuation. On March 16, 2009 done 10 days prior to receiving the notice of his HELOC suspension had a full on-site interior and exterior appraisal of Mayes' property had been conducted by an independent licensed appraisal company for the purposes of refinancing Mayes' primary mortgage with Chase. The appraisal report valued the property at $165,000, which is $14,000 or nearly 10% more than the value estimated by Chase's AVM at essentially the same time.

**ANSWER TO PARAGRAPH 77:**  Chase admits that on or after June 20, 2009, Mayes contacted Chase customer service to dispute the HELOC suspension.  Chase further admits that an appraisal report dated March 16, 2009 valued Malcolm's property at $165,000. Chase denies the remaining allegations of this paragraph.

78. Over the next several months, Mayes placed six more calls to Chase customer service. During those calls, the customer service representatives agreed that Mayes' home value was $165,000, but nevertheless refused to reinstate his HELOC claiming that Chase's new policy required a combined LTV ratio of 70% (as compared to a policy of 80% at the time of the origination of Plaintiff's HELOC) and that Mayes' combined LTV ratio did not comply with the new standard.

**ANSWER TO PARAGRAPH 78:** Chase admits that after June 20, 2009, Mayes made additional calls to Chase customer service. Chase denies the remaining allegations of this paragraph.

79. Unable to have his HELOC reinstated, on October 22, 2009, Mayes filed a complaint with the OCC, which was forwarded by the OCC to Chase.

**ANSWER TO PARAGRAPH 79:** Chase admits that on November 17, 2009, it received a copy of the complaint filed by Mayes with the OCC on October 22, 2009. Chase further admits that Mayes' HELOC was not reinstated prior to that date.

80. On December 8, 2009, Chase responded to the OCC complaint and sent Mayes a letter, again denying reinstatement of his HELOC. *See* the December 8, 2009 letter, a true and accurate copy of which is attached hereto as Exhibit F. The December 8 letter stated that while Chase had received and reviewed an independent appraisal report of the subject property submitted by Mayes, the reinstatement was not warranted because Chase's new policy mandated a maximum combined LTV ratio of 70% and Mayes did not satisfy this new standard due to the purported decline in the value of his property. (Exh. F.)

**ANSWER TO PARAGRAPH 80:** Chase admits that on December 8, 2009, it sent Mayes a letter declining to take further action on his HELOC. Chase further admits that a true and accurate copy of the December 8, 2009 letter is attached to Plaintiffs' Complaint as Exhibit F. To the extent this paragraph attempts to characterize the contents of the letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.

81. Despite the disparity in property value between Chase's AVM and the actual appraisal of the property, despite the fact that no sound factual basis existed for the suspension of Mayes' HELOC in the first place (given that there was only a 4%, or $7,000, decline in property value), and despite the fact that the HELOC Agreement between WAMU and Mayes did not allow such a suspension based on a change in Chase's own internal combined LTV ratio policy, Chase has not reinstated Plaintiff's HELOC.

**ANSWER TO PARAGRAPH 81:**    Chase admits that it has not reinstated Mayes' HELOC.  Chase denies the remaining allegations of this paragraph.

82.  Additionally, as of the time of the account suspension, Mayes has paid down his first mortgage by over $6,000 since the HELOC origination. Thus, as Mayes' first mortgage lender, Defendant knew or should have known that Mayes' first mortgage balance was $114,094 at the time of the HELOC suspension.

**ANSWER TO PARAGRAPH 82:**    Chase denies the allegations of this paragraph.

83.  In fact, at the time of the HELOC suspension in March 2009, the available equity in the subject property had decreased by only 2.2%, from $34,690 at the time of the HELOC origination to $33,906:

**$165,000 (home value) - $17,000 (HELOC) -
$114,094 (first mortgage balance at the time of the HELOC
suspension) = $33,909.**

**ANSWER TO PARAGRAPH 83:**    Chase denies the allegations of this paragraph.

84.  Defendant acted unlawfully even without regard to Plaintiff's paydown of his first mortgage. Even without considering the increase in equity caused by the $6,000 paydown, the equity in the subject property had decreased by only 20% since account origination:

**$165,000 (home value) - $17,000 (HELOC) -
$120,310 (first mortgage balance at the time of the HELOC
suspension) = $27,690.**

**ANSWER TO PARAGRAPH 84:**    Chase denies the allegations of this paragraph.

85.  In either case, the decrease in Plaintiff's available equity was not significant within the meaning of Regulation Z. Further, no provision in the HELOC Agreement allowed Chase to suspend a HELOC based on a change in its LTV ratio policy that occurred subsequent to account origination.

**ANSWER TO PARAGRAPH 85:**    Chase denies the allegations of this paragraph.

86.  Mayes' HELOC with Chase was his primary line of credit. Defendant's unlawful and unjustified suspension of Mayes' HELOC denied him access to his bargained-for credit and may have adversely impacted his credit score and increased the cost of credit to him.

**ANSWER TO PARAGRAPH 86:** Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of this paragraph, and therefore denies those allegations. Chase denies the remaining allegations of this paragraph.

*Michael Walsh*

87. In or around August 2003, WAMU and Walsh entered into a HELOC Agreement under the terms of which WAMU provided Walsh a $100,000 line of credit secured by his home in Garden Grove, California. WAMU's valuation of Walsh's property at the time the HELOC was originated was $490,000.

**ANSWER TO PARAGRAPH 87:** Chase admits the allegations in the first sentence of this paragraph. Chase denies the remaining allegations of this paragraph.

88. On April 20, 2009, Chase mailed Walsh a letter indicating that it had reduced Walsh's credit limit from $100,000 to $16,300 Ð an amount just above the outstanding balance on the credit line at the time. The letter was dated April 17, 2009 and stated that, effective the day before, April 16, 2009, Chase was lowering his credit limit "due to a substantial decline in the value of the property securing the Account." (Exh. B.) No further explanation or rationale for this statement was provided.

**ANSWER TO PARAGRAPH 88:** Chase admits that on April 17, 2009, WaMu sent Walsh a letter stating that it was reducing Walsh's credit line to $16,300 effective April 16, 2009 due to a decline in value of the property securing his HELOC. To the extent this paragraph attempts to characterize the contents of the letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.

89. After receiving the notice, Walsh contacted Chase's customer service representatives on numerous occasions and repeatedly requested the basis for the decision to reduce his HELOC credit limit, the values used to compute the decline, and a copy of the paperwork upon which the values were based. During these calls, the different members of Chase's customer service department gave Walsh varying and conflicting stories, explanations and values.

**ANSWER TO PARAGRAPH 89:** Chase admits that after receiving the April 17, 2009 letter, Walsh contacted Chase customer service on more than one occasion regarding his HELOC reduction. Chase denies the remaining allegations of this paragraph.

90. For example, on or about May 5, 2009, a customer service representative stated that the value of the subject matter property had fallen below $475,000 in contravention of the HELOC Agreement. However, the HELOC Agreement contains no such provision requiring the property to maintain a value above $475,000. During the call, the customer service representative further indicated to Walsh that Chase is entitled to lower HELOC limits when the property value declines by 5%, despite no such allowance in TILA or Regulation Z and despite Regulation Z's and the HELOC Agreement's illustration that permits such reductions when the available equity has been reduced by 50%. Official Staff Commentary, 12 C.F.R. § 226.5b(f)(3)(i).

**ANSWER TO PARAGRAPH 90:** Chase admits that a Chase customer service representative informed Walsh that his HELOC agreement permitted the credit line reduction. Chase denies the remaining allegations of this paragraph.

91. During a subsequent telephone call on or about May 15, 2009, a different customer service representative indicated that the reduction occurred because the original value of the property was $502,589 (not $490,000) and that an AVM performed in April 2009 showed the property value to have fallen to $466,300. Despite the fact Chase's own AVM purportedly showed the property to be worth $466,300, during that same telephone call the customer service representative notified Walsh, inexplicably, that he would need an appraisal value of $412,353 to reinstate his HELOC — that is, Chase informed Walsh that its own AVM had valued his property at $54,000 *more* than what would be needed to keep his HELOC open.

**ANSWER TO PARAGRAPH 91:** Chase admits that on May 15, 2009, a Chase customer service representative informed Walsh of the AVM valuation of the property and the appraisal value required for reinstatement of his HELOC. Chase denies the remaining allegations of this paragraph.

92. The value of Walsh's property at the time of the origination of the HELOC was $490,000 and thus the value of $502,589 quoted by Chase's representatives, was incorrect, unsubstantiated and arbitrary. Ultimately, utilizing either initial

property value, $502,589 or $490,000, Chase improperly and arbitrarily reduced Walsh's credit line because, by Chase's own AVM valuation, the property only declined in value from 5-7%. Moreover, based on Chase's own AVM valuation, the property is worth $466,300, or $54,000 more than the value purportedly needed for reinstatement.

**ANSWER TO PARAGRAPH 92:**   Chase admits that the AVM valuation at the time Walsh's credit line was reduced was $466,300.  Chase denies the remaining allegations of this paragraph.

93.  Walsh's HELOC with Chase was his primary line of credit. Defendant's reduction of the credit limit on Walsh's HELOC deprived Walsh of access to his bargained-for credit line, dramatically increased the ratio of credit Walsh used to the amount of credit he had available and may have damaged his credit score and increased the cost of credit to him.

**ANSWER TO PARAGRAPH 93:**   Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of this paragraph, and therefore denies those allegations.  Chase denies the remaining allegations of this paragraph.

*Robert Wilder*

94.  In or around July 2003, Bank One (Chase's predecessor) and Wilder entered into a HELOC Agreement under the terms of which Bank One provided Wilder a $250,000 line of credit secured by a mortgage on his home in Scottsdale, Arizona. Bank One's valuation of Wilder's property at the time of the HELOC origination was $900,000.

**ANSWER TO PARAGRAPH 94:**   Chase admits the allegations of this paragraph.

95.  In April 2009, Chase mailed Wilder a letter indicating that it had suspended Wilder's account from future draws effective April 17, 2009. The letter, received April 22, 2009, was undated and stated that the suspension was due to the fact that a valuation of $811,800 no longer supported the full amount of the credit line. (Exh. B.)

**ANSWER TO PARAGRAPH 95:**   Chase admits that on it sent Wilder an undated letter stating that it was suspending future draws on his account effective April 17, 2009.  To the extent this paragraph attempts to characterize the contents of the letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to

the extent they are inconsistent with the letter. Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations relating to when Wilder received this letter, and therefore denies those allegations.

96. Upon receipt of the notice, Wilder contacted Chase's customer service representatives by phone and in writing. Wilder also sent a complaint to the OCC.

**ANSWER TO PARAGRAPH 96:** Chase admits that in April 2009, Wilder contacted Chase customer service representatives by phone and in writing. Chase also admits that on April 30, 2009, Wilder filed a complaint with the OCC.

97 Chase responded by telephone and in writing that Chase is entitled, in high LTV ratio situations, to lower HELOC credit limits or suspend accounts when the value of the property is reduced by 5%. Chase took such action despite no such 5% allowance in TILA or Regulation Z, despite Regulation Z's and the HELOC Agreement's illustration that permits such reductions only when the available equity in the property has been reduced by 50%, and despite Regulation Z's prohibition against a creditor including any "triggering events" or responses that the regulation expressly addresses in a manner different from that provided in the regulation. Official Commentary, 12 C.F.R. §§ 226.5b(f)(3)(i) and 226.5b(f)(3)(vi)(A).

**ANSWER TO PARAGRAPH 97:** Chase admits that on May 14, 2009, it responded in writing to Wilder regarding his OCC complaint. Chase's May 14, 2009 letter explained that pursuant to TILA, Regulation Z, and the Federal Reserve Board Commentary, in high loan-to-value situations, Chase recognizes a substantial decline when the property value has declined by five percent. To the extent this paragraph attempts to characterize the contents of the letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter. Chase denies the remaining allegations of this paragraph.

98. Chase neither disclosed to Wilder how it determined that a high LTV situation existed nor how it determined that Wilder's LTV ratio was "high." Additionally,

Wilder's combined LTV ratio at the HELOC origination was, at most, 78%. And based on the valuation of the property as determined by Chase's chosen appraisal company, the combined LTV ratio as of the time of the account suspension was at most 68%. Neither of these LTV ratios could be considered "high" by any reasonable objective standard.

**ANSWER TO PARAGRAPH 98:** Chase admits the allegations in the first sentence of this paragraph. To the extent this paragraph attempts to characterize the contents of the letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter. Chase denies the remaining allegations of this paragraph.

99. Chase further indicated that it obtained the $811,800 valuation by utilizing an AVM obtained from First American CoreLogic, Inc., a Santa Ana, California company. Chase stated, "Since the process by which [First American CoreLogic] derives its AVM values is a proprietary algorithm that is not shared with us, we are unable to provide typical valuation details such as comparable properties used to assess value."

**ANSWER TO PARAGRAPH 99:** Chase admits that in its May 14, 2009 letter, it explained to Wilder that it obtained the valuation of his property by using an AVM from First American CoreLogic, and that because the process by which First American CoreLogic derives its AVM values is a proprietary algorithm that is not shared with Chase, Chase was unable to provide Wilder with typical valuation details such as comparable properties used to assess value. To the extent this paragraph attempts to characterize the contents of the letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.

100. As part of Chase's purported "appeals process," Chase informed Wilder he had to order and pay for an appraisal from the appraisal service of Chase's choosing. Wilder was told to send the completed appraisal and a formal request for reinstatement to Chase. In its notice, Chase stated, "Any reinstatement of the credit line will be at our discretion...." (Exh. B.)

**ANSWER TO PARAGRAPH 100:** Chase admits that its notice of suspension letter to Wilder explained the appeals process, including that he would be responsible for paying the appraisal fee. To the extent this paragraph attempts to characterize the contents of the letter, Chase refers the letter to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the letter.

101. Wilder reluctantly ordered the appraisal using Chase's chosen appraisal service. The appraisal, which Wilder forwarded to Chase on or around June 16, 2009, showed the value of the property had *increased* from the date the HELOC had first been opened from $900,000 to $970,000. Despite the fact its own chosen appraisal company showed the value had actually increased by 8% (a property value of $158,000 more than Chase' AVM), and despite the fact the available equity had increased even more due to reductions in the balance of the primary mortgage, Chase refused to reinstate Wilder's HELOC. Only after the filing of his lawsuit did Wilder receive notice that his HELOC had been reinstated.

**ANSWER TO PARAGRAPH 101:** Chase admits that it received an appraisal ordered by Wilder dated June 3, 2009 which valued his property at $970,000. Chase further admits that it reinstated Wilder's HELOC effective July 14, 2009. Chase denies the remaining allegations of this paragraph.

102. Wilder's HELOC with Defendant was his primary line of credit. Defendant's unreasonably low valuation of Wilder's home and unjustified suspension of his HELOC denied Wilder access to his bargained-for line of credit, dramatically decreased the amount of credit he had available, and may have adversely impacted Wilder's credit score and increased the cost of credit to him.

**ANSWER TO PARAGRAPH 102:** Chase lacks information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of this paragraph, and therefore denies those allegations. Chase denies the remaining allegations of this paragraph.

## CLASS ALLEGATIONS

103. Plaintiffs bring this action pursuant to both Fed. R. Civ. P. 23(b)(2) and Rule 23(b)(3), on behalf of themselves and other similarly situated. Plaintiffs seek certification of a National Class and Subclasses as follows:

- The **National Class**, which is defined as:

  All residents or citizens of the United Stated who have or had a HELOC with Chase (including Chase's predecessors and/or successors), and whose HELOC was suspended or reduced based on a claim by Chase that the property securing the HELOC had experienced a significant decline in value during any time when Chase's suspension and reduction processes, policies, and systems were insufficient to allow Chase to accurately determine whether the property had actually experienced a significant decline in value.

- The **California Subclass**, which is defined as:

  All residents or citizens of California, or residents or citizens of states that have consumer fraud or consumer protection statutes substantially similar to California, who have or had a HELOC with Chase (including Chase's predecessors and/or successors), and whose HELOC was suspended or based on a claim by Chase that the property securing the HELOCs had experienced a significant decline in value during any time when Chase's suspension and reduction processes, policies, and systems were insufficient to allow Chase to accurately determine whether the property had actually experienced a significant decline in value.

- The **Illinois Subclass**, which is defined as:

  All residents or citizens of Illinois, or residents or citizens of states that have consumer fraud or consumer protection statutes substantially similar to Illinois, who have or had a HELOC with Chase (including Chase's predecessors and/or successors), and whose HELOC was suspended or reduced based on a claim by Chase that the property securing the HELOC had experienced a significant decline in value during any time when Chase's suspension and reduction processes, policies, and systems were insufficient to allow Chase to accurately determine whether the property had actually experienced a significant decline in value.

- The **Minnesota Subclass**, which is defined as:

  All residents or citizens of Minnesota, or residents or citizens of states that have consumer fraud or consumer protection statutes substantially similar to Minnesota, who have or had a HELOC with Chase (including Chase's predecessors and/or successors), and whose HELOC was suspended or reduced based on a claim by Chase that the property securing the HELOC had experienced a significant decline in value during any time when Chase's suspension and reduction processes, policies, and systems were insufficient to allow Chase to accurately determine whether the property had actually experienced a significant decline in value.

  **ANSWER TO PARAGRAPH 103:** Chase admits that Plaintiffs brings this action on

behalf of a purported class. Chase denies the remaining allegations of this paragraph, denies

that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, and denies that any class should be certified.

104. Excluded from the Class and Subclasses are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Chase, its subsidiaries, parent companies, successors, predecessors, and any entity in which Chase or its parent companies have a controlling interest and their current or former employees, officers and directors; 3) persons who properly execute and file a timely request for exclusion from the Class; and 4) the legal representatives, successors or assigns of any such excluded persons.

**ANSWER TO PARAGRAPH 104:** Chase admits that Plaintiffs brings this action on

behalf of a purported class. Chase denies the remaining allegations of this paragraph, denies

that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, and denies that any class should be certified.

105. Plaintiffs reserve the right to modify or amend the Class and/or Subclass definitions as may become necessary following discovery.

**ANSWER TO PARAGRAPH 105:** This paragraph contains a reservation of rights by

Plaintiffs and therefore no response is required. To the extent a response is required, Chase

denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for

certifying a class under Federal Rule of Civil Procedure 23, and denies that any class should be

certified.

106. **Numerosity:** The exact number of the members of the Class is unknown and is not available to Plaintiffs, but it is clear that individual joinder is impracticable. Chase suspended or reduced HELOCs and sent notice of such suspensions and reductions to thousands of HELOC customers, and a substantial percentage of such customers fall into the definition of the Class and Subclasses. Class members can be easily identified through Defendant's records.

**ANSWER TO PARAGRAPH 106:** Chase denies that the class as defined is

ascertainable and therefore denies that joinder of purported class members is impracticable.

Chase denies the remaining allegations of this paragraph, denies that Plaintiffs have met the

requirements for certifying a class under Federal Rule of Civil Procedure 23, and denies that any

class should be certified.

107. **Commonality:** Common questions of fact and law exist as to all members of the Class and Subclasses and predominate over the questions affecting only individual members. These common questions include:

    a.    What were Chase's criteria and policies for reducing and suspending the credit limits on its HELOCs and whether such criteria and policies violated TILA and Regulation Z and/or breached the HELOC Agreements;

    b.    What were Chase's criteria and policies for reinstating suspended or reduced HELOCs and whether such criteria or policies violated TILA and Regulation Z and/or breached the HELOC Agreements;

    c.    What were Chase's methods for valuing the homes securing the HELOCs; d.Whether the AVMs relied upon by Chase were inaccurate and/or unreliable;

    e.    Whether Chase violated TILA and Regulation Z by suspending or reducing HELOCs in the absence of a significant decline in the value of the properties securing its borrowers' HELOCs;

    f.    Whether Chase breached its HELOC Agreements by suspending or reducing HELOCs in the absence of a significant decline in the value of the properties securing its borrowers' HELOCs;

    g.    Whether Chase's criteria, policies and actions with respect to HELOC suspensions and reductions and reinstatement of such suspended or reduced HELOCs breached the implied covenant of good faith and fair dealing;

    g.    Whether Chase's HELOC suspensions and reductions violated various provisions of state consumer protection laws; and

    h.    Whether Plaintiffs and the Class members are entitled to relief and the nature of such relief.

**ANSWER TO PARAGRAPH 107:** Chase denies that purported common questions of

fact and law exist and that they predominate over individual questions, denies the remaining

allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a

class under Federal Rule of Civil Procedure 23, and denies that any class should be certified.

108. **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class, as Plaintiffs and other Class members sustained damages arising out of

the wrongful conduct of Defendant, based upon the same transactions that were made uniformly with Plaintiffs and the Class. The state and federal laws under which Plaintiffs' claims arise are not in conflict in any other state in any material way.

**ANSWER TO PARAGRAPH 108:** Chase denies that Plaintiffs' claims are typical of the claims of purported absent class members, denies the remaining allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, and denies that any class should be certified.

109. **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and have retained counsel competent and experienced in complex class actions. Plaintiffs have no interest antagonistic to those of the Class and Defendant has no defenses unique to Plaintiffs.

**ANSWER TO PARAGRAPH 109:** Chase denies that Plaintiffs will fairly and adequately represent the interests of the class, denies the remaining allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, and denies that any class should be certified.

110. **Predominance and Superiority:** This action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's actions. It would be virtually impossible for the individual members of the Class to obtain effective relief from the misconduct of Defendant. Even if the members of the Class themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Amended Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**ANSWER TO PARAGRAPH 110:** Chase denies that a class action is a superior method to adjudicate this purported controversy, denies the remaining allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, and denies that any class should be certified.

111. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole. Defendant's policies challenged herein apply and affect members of the Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct, not on facts or law applicable only to Plaintiffs.

**ANSWER TO PARAGRAPH 111:** Chase denies that it acted or refused to act on grounds generally applicable to any purported class, denies that any injunctive or declaratory relief is appropriate, denies the remaining allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, and denies that any class should be certified.

## CLAIMS FOR RELIEF

### COUNT I
### DAMAGES FOR VIOLATION OF TILA AND REGULATION Z
### (on Behalf of All Plaintiffs and the National Class)

112. Plaintiffs incorporate the above paragraphs 1 through 111 as if fully set forth herein.

**ANSWER TO PARAGRAPH 112:** Chase incorporates its answers to each of the foregoing paragraphs as though fully set forth herein.

*Chase Suspended and Reduced Credit Limits on HELOC Accounts in the Absence of a Significant Decline in the Value of the Properties Securing the Accounts and Failed to Reinstate the HELOCs When Warranted*

113. TILA and Regulation Z prohibit Defendant from changing any of the terms of a HELOC Agreement, including the credit limit. 15 U.S.C. § 1647(c)(1); 12 C.F.R. § 226.5b(f)(3). There is an exception for any period in which "[t]he value of the dwelling that secures the [HELOC] declines significantly below the

dwelling's appraised value" for the purpose of the plan which permits Defendant to reduce the credit limits on its HELOCs. 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5(b)(f)(3)(vi)(A).

**ANSWER TO PARAGRAPH 113:**   Chase admits that this paragraph purports to quote portions of TILA and Regulation Z, but denies these allegations to the extent inconsistent with TILA, Regulation Z, and the Federal Reserve Board's Official Staff Commentary to Regulation Z, and denies that the allegations of this paragraph fully and accurately describe Chase's obligations under TILA, Regulation Z, the Official Staff Commentary, and the terms of Plaintiffs' HELOC Agreements.

114. TILA and Regulation Z prohibit Chase from reducing the credit limits or freezing its HELOCs unless the values of the homes securing the credit line have actually declined significantly. "Significant decline" for purposes of 12 C.F.R. § 226.5b(f)(3)(vi)(A) has been interpreted as a decline in home value so that the amount of available equity in the property based on the property's appraised value for the purposes of the plan is reduced by fifty percent. The Official Staff Commentary to Regulation Z further states that Regulation Z "does not require a creditor to obtain an appraisal before suspending credit privileges [but] a significant decline must occur before suspension can occur." On August 26, 2008, the Office of Thrift Supervision issued official guidance that warned it would violate Regulation Z, for example, to "reduce the credit limits of all HELOC accounts in a geographic area in which real estate values are generally declining without assessing the value of the collateral that secures each affected HELOC account." (Emphasis in original). *See* August 26, 2008 OTS Letter, *Home Equity Line of Credit Account Management Guidance*, 2-3.

**ANSWER TO PARAGRAPH 114:**   Chase admits that this paragraph purports to quote portions of TILA, Regulation Z, and the Federal Reserve Board's Official Staff Commentary to Regulation Z, and guidance from the Office of Thrift Supervision, but denies these allegations to the extent inconsistent with TILA, Regulation Z, the Federal Reserve Board's Official Staff Commentary to Regulation Z, and Office of Thrift Supervision guidance, and denies that the allegations of this paragraph fully and accurately describe Chase's obligations under TILA,

Regulation Z, the Official Staff Commentary, Office of Thrift Supervision guidance, and the

terms of Plaintiffs' HELOC Agreements.

115. Defendant violated TILA and Regulation Z by reducing or freezing Plaintiffs' and Class members' HELOCs in the absence of a "significant decline" in the value of the property securing each account. At the time that Chase suspended or reduced their HELOC accounts, the value of Plaintiffs' and Class members' homes had not "significantly" declined relative to the value at the time of the HELOC origination. In fact, the value of many of the Class members' homes declined only marginally, did not decline at all, or actually increased between the time of HELOC origination and Chase's unilateral suspension or reduction.

**ANSWER TO PARAGRAPH 115:** Chase denies that it violated TILA and Regulation

Z by reducing or freezing HELOCs, denies the remaining allegations of this paragraph, denies

that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

### *Chase Uses Unreasonable, Unreliable and Grossly Inaccurate Valuation Models Which Inaccurately Value Class Members' Homes*

116. Defendant knowingly and intentionally used a variety of dubious formulas and unreliable data to manipulate the values of Chase's HELOC account holders' homes in order to justify the blanket reductions on HELOC limits.

**ANSWER TO PARAGRAPH 116:** Chase denies the allegations of this paragraph.

117. The valuation methodology used or relied upon by Chase was flawed because the AVMs relied upon or utilized by Chase were based on flawed statistical modeling that knowingly resulted in and permitted the unreasonable undervaluation of a substantial number of properties.

**ANSWER TO PARAGRAPH 117:** Chase denies the allegations of this paragraph.

118. Defendant's valuation methodology was further flawed in that Defendant or its agents, acting either in concert with Chase or under Chase's direction and control, failed to, among other acts or omissions: (1) disclose the value of the property at the origination of the HELOCs, the value necessary to reinstate the HELOCs, and the reasoning behind the use of those values; (2) validate the AVMs on a periodic basis to mitigate the potential valuation uncertainty; (3) properly document the validation's analysis, assumptions, and conclusions; (4)

appropriately back-test representative samples of the valuations against market data on actual sales; (5) account fairly for improvements, property type or geographic comparables; and/or (6) take other necessary steps to reasonably verify the accuracy of the valuations. These acts or omissions constitute violations of TILA and Regulation Z insofar as they were used by Chase to justify suspensions and reductions of Plaintiffs' and the Class members' HELOCs in the absence of an actual significant decline in the values of their homes.

**ANSWER TO PARAGRAPH 118:**  Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

119. Chase knew that its AVMs were flawed and inaccurate and produced valuations that were unreliable. Because Chase was aware of the flaws in its AVMs, including its reliance on dubious formulas and unreliable data, Chase knew or should have known that its valuation of the property of each Plaintiff and Class member was flawed and unreliable and that it lacked a sound factual basis for suspending and/or reducing Plaintiffs' and the other Class members' HELOCs.

**ANSWER TO PARAGRAPH 119:**  Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

120. Additionally, Chase also knew or should have known that the AVM valuations of Plaintiffs' and Class members' properties were flawed and inaccurate because the valuations differed significantly from the valuations determined by more accurate and reliable onsite appraisals, including appraisals conducted by Chase's own chosen appraisal company.

**ANSWER TO PARAGRAPH 120:**  Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

*Chase Failed to Consider the Level of Available Equity in Plaintiffs ' and Class Members' Homes in Concluding that the Values of Their Homes Declined Significantly*

121. Chase further violated TILA and Regulation Z by failing to first determine the level of available equity in Plaintiffs' and Class members' respective homes before concluding that the values of the properties actually declined significantly. Chase could have and should have determined the balance of the Class members' respective primary mortgages in order to determine the level of available equity in the properties and, thus, whether such available equity significantly declined since the time of account origination. Moreover, because Chase was the primary mortgage lender for many Class members, Chase knew that those Class members had paid down the balance of their first mortgage since the HELOC origination, thereby increasing the available, unencumbered equity in their homes by that amount. Chase knowingly disregarded this information in determining to suspend and reduce the HELOCs of Plaintiffs and Class members.

**ANSWER TO PARAGRAPH 121:**  Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

*Chase Used Unlawful Triggering Events for Suspending and Reducing HELOCs*

122. The Official Staff Commentary to Regulation Z, 12 C.F.R. 226.5b(f)(3)(i), provides that a bank may not impose "triggering events" or responses that the regulation expressly addresses in a manner different from that provided in the regulation." Namely, "a contract cannot contain a provision allowing the creditor to freeze a line due to an insignificant decline in property value since the regulation allows that response only for a significant decline." *Id.*

**ANSWER TO PARAGRAPH 122:**  Chase admits that this paragraph purports to quote portions of the Federal Reserve Board's Official Staff Commentary to Regulation Z, but denies these allegations to the extent inconsistent with TILA, Regulation Z, and the Federal Reserve Board's Official Staff Commentary to Regulation Z, and denies that the allegations of this paragraph fully and accurately describe Chase's obligations under TILA, Regulation Z, the Official Staff Commentary, and the terms of Plaintiffs' HELOC Agreements.

123. In direct violation of this provision, Chase unlawfully suspended and reduced

Plaintiffs' and Class members' HELOC accounts in response to a 5% decrease in the value of the subject properties. For example, Plaintiffs Walsh, Wilder and the Franks were each told by Chase's customer service representatives that Chase was entitled to suspend or reduce their respective HELOCs because their home values had decreased by 5%..

**ANSWER TO PARAGRAPH 123:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

124. However, TILA and Regulation Z do not provide for any such 5% standard for HELOC suspensions or reductions, and TILA and Regulation Z do not permit a lender to unilaterally determine that a decline in property value is "significant" simply because it is over 5%.

**ANSWER TO PARAGRAPH 124:** Chase denies the allegations of this paragraph.

125. In addition, Chase invoked unlawful triggering events, in violation of Regulation Z, by claiming that its new policy setting more stringent combined LTV ratio requirements justified the suspension and reduction of the HELOCs falling outside the new combined LTV ratio standard. For example, Plaintiff Mayes was told by a Chase customer service representative that Chase could not reinstate his HELOC because Chase's new policy required a combined LTV ratio of 70% (as compared to a policy of 80% at the time of the origination of his HELOC) and that his combined LTV ratio did not comply with the new standard. However, TILA and Regulation Z do not perm it a lender's subsequent change to its own LTV ratio lending policy to constitute a legitimate ground for suspending or reducing a HELOC absent a significant decline in value of the property securing the HELOC.

**ANSWER TO PARAGRAPH 125:** Chase denies the allegations of this paragraph.

126. Defendant further violated TILA and Regulation Z by claiming the ability to freeze accounts or reduce credit limits in so-called high LTV ratio situations without disclosing how or when it considers a borrower's situation to constitute a high LTV ratio.

**ANSWER TO PARAGRAPH 126:** Chase denies the allegations of this paragraph.

127. Chase's violations of TILA and Regulation Z damaged Plaintiffs and the Class members. These damages occurred in the form of annual fees, appraisal fees, the

increased price of credit, adverse effects on credit scores, loss of interest, and other damages.

**ANSWER TO PARAGRAPH 127:**    Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

128. Plaintiffs, on their own behalves and behalf of other Class members, seek reinstatement of their HELOCS and actual damages under 15 U.S.C. § 1640(a)(1), statutory damages under 15 U.S.C. § 1640(a)(2) (B), and costs of the action, together with reasonable attorneys' fees under 15 U.S.C. § 1640(a)(3).

**ANSWER TO PARAGRAPH 128:**    Chase admits that Plaintiffs, on their own behalf and on behalf of a putative class, seek the stated relief, but Chase denies that Plaintiffs are entitled to any relief, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."   Chase denies the remaining allegations of this paragraph.

## COUNT II

### DECLARATORY RELIEF UNDER TILA AND REGULATION Z
### (In The Alternative To Count I
### on Behalf of all Plaintiffs and the National Class)

129. Plaintiffs incorporate paragraphs 1 through 128 above as if fully set forth herein.

**ANSWER TO PARAGRAPH 129:**    Chase incorporates its answers to each of the foregoing paragraphs as though fully set forth herein.

130. Plaintiffs bring this Count in the alternative to Count I and seek declaratory relief in the event this Court finds at any time that damages or other remedies under TILA, as prayed for in Count I, would be inadequate to fully compensate Plaintiffs and the Class members or would otherwise be inadequate to fully address Chase's ongoing or future violations of TILA with respect to its existing and future borrowers.

**ANSWER TO PARAGRAPH 130:**  Chase admits that Plaintiffs purport to bring this Count in the alternative to Count I, but denies that Plaintiffs are entitled to any relief, denies the remaining allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

131  Plaintiffs and Defendant have adverse legal interests, and there is a substantial controversy between Plaintiffs and Defendant of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to whether Chase's mass suspensions and reductions of HELOCs violate TILA and Regulation Z.

**ANSWER TO PARAGRAPH 131:**  Chase denies the allegations of this paragraph.

132. Plaintiffs, on their own behalves and on behalf of the other Class members, request that the Court declare, pursuant to 28 U.S.C. § 2201, that Defendant violated TILA and Regulation Z by: (i) using unreasonable and grossly inadequate valuation methods; (ii) using unlawful triggering events to suspend or reduce the HELOCs; (iii) suspending or reducing the HELOCs despite the lack of a significant decline in the value of properties securing the HELOCs, and (iv) failing to reinstate the HELOCs when the reinstatement was warranted.

**ANSWER TO PARAGRAPH 132:**  Chase admits that Plaintiffs, on their own behalf and on behalf of a putative class, seek the stated relief, but Chase denies that Plaintiffs are entitled to any relief, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."  Chase denies the remaining allegations of this paragraph.

## COUNT III

**BREACH OF CONTRACT**
**(on Behalf of all Plaintiffs and the National Class)**

133. Plaintiffs incorporate paragraphs 1 through 132 above as if fully set forth herein.

**ANSWER TO PARAGRAPH 133:**  Chase incorporates its answers to each of the foregoing paragraphs as though fully set forth herein.

134. Plaintiffs and the other Class members obtained HELOCs from Chase or its predecessor entities by signing HELOC Agreements, which are valid contract s between Defendant and each Class member.

**ANSWER TO PARAGRAPH 134:**  Chase admits that Plaintiffs and other borrowers obtained HELOCs from Chase, Chase predecessors, or from other lenders whose loans were ultimately acquired by Chase.  Chase further admits that these borrowers signed HELOC Agreements, which are valid contracts.  Chase denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

135. The governing HELOC Agreements contain a term that purports to give Chase discretion to suspend the HELOC or reduce the credit limit if "the value of the Property [securing the HELOC] declines significantly below its original appraised value."

**ANSWER TO PARAGRAPH 135:**  Chase admits that Plaintiffs' HELOC Agreements generally provide that Chase may suspend or reduce borrowers' HELOCs if the value of the property securing the HELOC declines significantly from the value of the property at origination. To the extent this paragraph attempts to characterize the contents of these agreements, Chase refers the agreements to the Court for determination of the contents and the import thereof, and denies the allegations to the extent they are inconsistent with the agreements.

136. The credit limit under the Class members' HELOC Agreements, as well as the conditions under which Chase could purportedly suspend or reduce credit limits, were material terms of the contract between Class members and Chase.

**ANSWER TO PARAGRAPH 136:**  Chase admits that the credit limit and the conditions under which Chase could suspend or reduce that credit limit were material terms of the HELOC Agreements between Chase and Plaintiffs.  Chase denies the remaining allegations

of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

137. Chase materially breached the terms of the HELOC Agreements by suspending or reducing the credit limit of Plaintiffs' and other Class members' HELOCs where no significant decline in value had first occurred.

**ANSWER TO PARAGRAPH 137:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

138. Chase further breached the HELOC Agreements by basing its suspension and reduction decisions on flawed, inaccurate and unreliable AVMs that knowingly resulted in and permitted the unreasonable undervaluation of Class members' properties.

**ANSWER TO PARAGRAPH 138:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

139. Additionally, Chase also breached the HELOC Agreements by failing or refusing to consider the level of available equity in the properties securing the HELOCs and by failing or refusing to consider the balance of Class members' primary mortgages. Chase failed or refused to consider borrowers' primary mortgage balances even when it had knowledge of such information and even when the available equity did not decline significantly, or actually increased.

**ANSWER TO PARAGRAPH 139:** Pursuant to the Court's June 30, 2011 Order, this claim has been dismissed, therefore no response is required. To the extent answer is required, Chase denies the allegations of this paragraph.

140. Chase further breached the HELOC Agreements by suspending or reducing

HELOCs based on grounds not permitted by the terms of the HELOC Agreements, including Chase's use of improper triggering events, such as a 5% decline in value of the subject property, a high LTV ratio, and/or adopting new and more stringent combined LTV ratio standards subsequent to the origination of the HELOCs.

**ANSWER TO PARAGRAPH 140:**   Chase denies the allegations of this paragraph.

141. In addition, under the terms of the HELOC Agreement, Plaintiffs and the Class members paid Chase an Annual Fee in exchange for access to the bargained-for credit lines. This Annual Fee, along with other fees and closing costs, were part of Plaintiffs' and the Class members' contractual obligations under the terms of the HELOC Agreements. (Exh. A.) Chase has materially breached the terms of the HELOC Agreements by continuing to assess Plaintiffs and Class members an Annual Fee for use of the HELOC accounts that had been unlawfully suspended.

**ANSWER TO PARAGRAPH 141:**   Pursuant to the Court's June 30, 2011 Order, this claim has been dismissed, therefore no response is required.   To the extent answer is required, Chase admits that with the exception of Mayes, the remaining Plaintiffs' HELOC Agreement provide for the payment of an Annual Participation Fee.   Chase further admits that the Annual Participation Fee, where applicable, and other requirements were part of Plaintiffs' obligations under the HELOC Agreements.   Chase denies the remaining allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

142. Further, Chase breached its HELOC Agreements by charging borrowers a significant fee for faxing HELOC suspension and reductions notices, despite such a fee not being disclosed in or provided for in the HELOC Agreements.

**ANSWER TO PARAGRAPH 142:**   Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

143. Plaintiffs and the other Class members made all payments due to Chase and otherwise fully performed under their HELOC Agreements with Chase.

**ANSWER TO PARAGRAPH 143:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

144. As a result of Chase's contract breaches, Plaintiffs and the Class members have suffered damages in the form of being denied the full use of their HELOCs, appraisal fees, annual fees, the increased price of credit, lost interest, attorneys' fees, adverse effects on credit scores, and other damages.

**ANSWER TO PARAGRAPH 144:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

145. Plaintiffs, on their own behalf and on behalf of the Class members, seek actual and compensatory damages for Defendant's breach of contract in the amount to be determined at trial, plus reinstatement of the HELOCs that were suspended or reduced in breach of the HELOC Agreements, as well as interest, attorneys' fees and costs.

**ANSWER TO PARAGRAPH 145:** Chase admits that Plaintiffs, on their own behalf and on behalf of a putative class, seek the stated relief, but Chase denies that Plaintiffs are entitled to any relief, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members." Chase denies the remaining allegations of this paragraph.

## COUNT IV

### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
### (on Behalf all Plaintiffs and the National Class)

146. Plaintiffs incorporate paragraphs 1 through 145 above as if fully set forth herein.

**ANSWER TO PARAGRAPH 146:**  Chase incorporates its answers to each of the foregoing paragraphs as though fully set forth herein.

147. Plaintiffs and the other Class members obtained HELOCs from Chase under the terms of the HELOC Agreements. These HELOC Agreements constitute valid contracts between the Class members and Chase.

**ANSWER TO PARAGRAPH 147:**  Chase admits that Plaintiffs and other borrowers obtained HELOCs from Chase, Chase predecessors, or from other lenders whose loans were ultimately acquired by Chase.  Chase further admits that these borrowers signed HELOC Agreements, which are valid contracts.  Chase denies the remaining allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

148. Implied in the terms of each of these HELOC Agreements was a covenant of good faith and fair dealing. This implied covenant prevents Defendant from engaging in conduct, and exercising its discretion, in a manner that frustrates the Class members' rights to the benefits of the contracts or that would injure the right of the Class members to receive the benefits of their HELOC Agreements.

**ANSWER TO PARAGRAPH 148:**  Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

149. The credit limit, and the grounds on which Defendant could purportedly exercise its discretion to suspend or reduce credit limits, were material terms of the Class

members' HELOC Agreements.

**ANSWER TO PARAGRAPH 149:**  Chase admits that the credit limit and the grounds on which Chase could suspend or reduce that credit limit were material terms of the HELOC Agreements between Chase and Plaintiffs.  Chase denies the remaining allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

150. Defendant breached the implied covenant of good faith and fair dealing by intentionally and pretextually undervaluing the properties securing the HELOCs through the use of inaccurate and unreliable AVMs to justify its blanket suspensions and reductions of the HELOCs. Chase's failure to exercise its discretion in good faith is evidenced by its policy and practice of freezing and reducing HELOC accounts without a sound factual basis and with the knowledge that it was relying on inaccurate and unreliable AVMs.

**ANSWER TO PARAGRAPH 150:**  Chase denies the allegations of this paragraph.

151. Defendant also breached the implied covenant of good faith and fair dealing by exercising its discretion to suspend or reduce HELOCs without first determining the level of available equity in the respective properties, despite Chase having, or having easy access to, the requisite knowledge for such a determination. Such a failure or refusal to consider the level of available equity in the Class members' properties further demonstrates that Chase's account suspensions and reductions were pretextual and in bad faith.

**ANSWER TO PARAGRAPH 151:**  Chase denies the allegations of this paragraph.

152. Defendant also breached the covenant of good faith and fair dealing by exercising its discretion to charge Class members a $30 fee for faxing them a two-page notice of Chase's decision to reduce or suspend their HELOCs. In the case of Plaintiff Hackett, Chase assessed this outrageous fax fee despite Chase breaching its obligation to mail notice of the suspension to Hackett in the first place. This fee was not disclosed by Chase to the Class members and was imposed in bad faith to both increase revenue and to discourage Class members from challenging the HELOC suspensions and reductions.

**ANSWER TO PARAGRAPH 152:**  Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

> 153. Additionally, Defendant breached the implied covenant of good faith and fair dealing by suspending and reducing HELOC credit limits in bad faith to protect the value of assets as collateral against default where there was no or minimal risk to Defendant because there was no significant decrease, or there was actually an increase, in the borrowers' combined LTV ratio or in the available equity in the homes of Plaintiffs and Class members.

**ANSWER TO PARAGRAPH 153:** Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

> 154. Additionally, Chase acted in bad faith by issuing suspension and reduction notices that fail to provide information sufficient for its customers to determine whether they should spend the time and resources to get an appraisal and seek reinstatement.

**ANSWER TO PARAGRAPH 154:** Chase denies the allegations of this paragraph.

> 155. The notices do not identify the updated property value as determined by Chase, but simply state that this undisclosed new value "no longer supports the full amount of [Plaintiffs'] line of credit." Other than simply stating that the updated property value was obtained through a "standard method within the industry," the notice does not disclose(a) how Chase determines or defines "significant decline" in value, including any analysis of the level of available equity in the property; (b) the methods used by its AVMs to calculate the property values; (c) the value of the property at the time of the HELOC origination; or(d)the value needed for reinstatement, so that Plaintiffs and the other Class members could determine whether it was in their interest to obtain an appraisal on their homes or otherwise challenge Defendant's action and seek reinstatement of the credit limits.

**ANSWER TO PARAGRAPH 155:** Chase denies that Plaintiffs have met the

requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any

class should be certified, and therefore denies that there are any "Class members." To the extent

this paragraph attempts to characterize the contents of letters Chase sent to Plaintiffs, Chase

refers the Court to those letters for determination of the contents and the import thereof. Chase

denies the remaining allegations of this paragraph.

156. Defendant refused to provide this critical information to Plaintiffs and Class members. To the extent Defendant found ambiguities in the above-referenced values, Defendant construed these ambiguities in its favor and to the detriment of Plaintiffs and Class members.

**ANSWER TO PARAGRAPH 156:** Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

157. Defendant further breached the covenant of good faith and fair dealing by pushing onto Class members the burden of obtaining and paying upfront for appraisals, rather than require a request for reinstatement from the borrower, and then perform its own investigation and only charge those bona fide fees so incurred, as required by Regulation Z.

**ANSWER TO PARAGRAPH 157:** Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

158   Defendant did not actually incur such fees in investigating whether to freeze or reduce Plaintiffs' and Class members' HELOCs. Defendant's intentional shifting of the burden in this manner discourages Class members from seeking reinstatement and was intentionally designed by Defendant to discourage Class members from seeking reinstatement and receiving the full benefit of their HELOC Agreements.

**ANSWER TO PARAGRAPH 158:** Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Class members."

159. Defendant's reliance on inaccurate and unreliable AVMs, deprivation of critical information and shifting of the reinstatement appraisal burden onto borrowers were policies and practices designed and executed in bad faith to pretextually suspend or reduce credit lines and discourage borrowers from seeking reinstatement so as to maximize the number and extent of suspended or reduced credit lines.

**ANSWER TO PARAGRAPH 159:** Chase denies the allegations of this paragraph.

160. Defendant wrongfully and in bad faith exercised its discretion under the HELOC Agreement in a manner that constituted a breach of the implied covenant of good faith and fair dealing, and its decisions and actions were designed to frustrate the Class members' rights to receive the full benefits of the HELOC Agreements.

**ANSWER TO PARAGRAPH 160:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

161. Defendant's breach of the implied covenant of good faith and fair dealing unjustly enriched Defendant, and caused Plaintiffs and the Class members to incur damages. These damages stem from denial of the full use of HELOCs, faxing fees, appraisal fees, annual fees, the increased price of credit, adverse effects on credit scores, loss of interest, and other damages.

**ANSWER TO PARAGRAPH 161:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

162. Plaintiffs, on their own behalf and on behalf of the other Class members, seek damages for Defendant's breach of the implied covenant of good faith and fair dealing, plus reinstatement of the HELOCs that were suspended or reduced in breach of the implied covenants, interest, attorneys' fees, and costs in an amount to be determined at trial.

**ANSWER TO PARAGRAPH 162:** Chase admits that Plaintiffs, on their own behalf and on behalf of a putative class, seek the stated relief, but Chase denies that Plaintiffs are

entitled to any relief, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members." Chase denies the remaining allegations of this paragraph.

### COUNT V

**RESTITUTION FOR UNJUST ENRICHMENT**
**(In The Alternative To Counts Three and Four**
**on Behalf of all Plaintiffs and the National Class)**

163. Plaintiffs incorporate paragraphs 1 through 132 above as if fully set forth herein.

**ANSWER TO PARAGRAPH 163:** Chase incorporates its answers to each of the foregoing paragraphs as though fully set forth herein.

164. In the event this Court finds that no contract provision expressly governs the issues raised in this Amended Complaint, Chase has knowingly received and retained benefits from Plaintiffs and the Class members under circumstances that would render it unjust to allow Chase to retain such benefits.

**ANSWER TO PARAGRAPH 164:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

165. By (i) utilizing inaccurate and unsubstantiated valuation models that did not provide particularized and accurate valuations of the properties of each Class member and by (ii) discouraging Class members from seeking reinstatement by withholding critical information, by having an illegitimate appeals process and by requiring them to obtain and pay upfront for appraisals in order to seek reinstatement of their HELOCs (rather than require a request for reinstatement from the borrower, then perform its own investigation and only charge those bona fide fees so incurred, as required by Regulation Z), Chase knowingly received and appreciated the benefits of up-to-date on-site appraisals on properties in which it has security interests. Such appraisals are more accurate than the AVM estimates utilized by Chase, and it would be unjust for Chase to obtain and keep the benefit of the updated, accurate appraisals without Chase bearing the cost of such appraisals.

**ANSWER TO PARAGRAPH 165:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

166. Additionally, Chase has been unjustly enriched by retaining monies that should otherwise have been made available to customers as part of their HELOCs. Chase unlawfully and inappropriately reduced or froze the credit limits of the Class members, thus allowing Chase to utilize monies for its own purposes rather than for extending credit to Class members as previously promised.

**ANSWER TO PARAGRAPH 166:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

167. Chase was further unjustly enriched because, at the Class members' expense, its unlawful account suspensions and reductions resulted in a decrease in the level of monies that it was required to keep in reserve, thus permitting Chase to benefit from the time value of the additional funds and to free-up such additional funds for its own use, including extending different, more profitable loans to consumers at higher interest rates. It is unjust to allow Chase to keep such a benefit in light of its actions in violation of TILA and Regulation Z and in light of the significant harm its actions caused the Class members.

**ANSWER TO PARAGRAPH 167:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

168. Finally, Plaintiffs and the Class members have conferred a benefit upon Defendant by paying annual fees to Defendant. Defendant's receipt and retention, in full, of the annual fees is unfair and unjust in light of its undue and illegal reduction and freezing of the HELOC accounts of Plaintiffs and the Class members and denying them the full bargained-for use of the HELOC accounts. Chase has been unjustly enriched by failing to refund, and continuing to assess,

an annual fee despite unlawfully reducing or freezing the HELOC accounts of Plaintiffs and the Class members and preventing the full use of the HELOC accounts.

**ANSWER TO PARAGRAPH 168:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

169. As an actual and proximate result of its actions, Chase has received and retained a benefit at the expense and detriment of Plaintiffs and the Class members in the form of appraisal fees, the value of the credit unlawfully not extended to the Class members, and collected annual fees.

**ANSWER TO PARAGRAPH 169:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members."

170. Plaintiffs seek disgorgement and restitution of all revenue and profits gained through Chase's unjust enrichment at the expense of the Class members, reinstatement of all unlawfully suspended and reduced HELOCs, plus interest and attorneys' fees, in an amount to be determined at trial.

**ANSWER TO PARAGRAPH 170:** Chase admits that Plaintiffs, on their own behalf and on behalf of a putative class, seek the stated relief, but Chase denies that Plaintiffs are entitled to any relief, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members." Chase denies the remaining allegations of this paragraph.

## COUNT VI

**VIOLATION OF CALIFORNIA'S UCL, CAL. BUS. & PROF. CODE § 17200**
**(on Behalf of Plaintiffs, Frank, Walsh,**
**Wilder, Malcolm and the California Subclass)**

171  Plaintiffs incorporate paragraphs 1 through 170 above as if fully set forth herein.

**ANSWER TO PARAGRAPH 171:**  Chase  incorporates  its  answers  to  each  of  the

foregoing paragraphs as though fully set forth herein.

172.  Chase has violated the "unlawful" prong of the UCL in that Chase's conduct was
undertaken in violation of TILA and Regulation Z, as set forth above.

**ANSWER TO PARAGRAPH 172:**  Chase denies the allegations of this paragraph.

173.  Chase's suspension and reduction of the credit limit for Plaintiffs' and other
Subclass members' HELOCs violated TILA and Regulation Z. With respect to
the Subclass, Chase's conduct was unfair, as the AVMs used to determine the
values of the properties securing such HELOCs were, as alleged above,
inaccurate and unreliable. Furthermore, Chase developed policies, used
standards and exercised its discretion to suspend or reduce credit limits and
refuse to reinstate such suspended or reduced credit lines when significant
declines in home values had not occur red. These unlawful and unfair acts and
practices constitute unfair competition in violation of the UCL.

**ANSWER TO PARAGRAPH 173:**  Chase  denies  the  allegations  of  this  paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Subclass members."

174.  Chase has violated the "fraudulent" prong of the UCL in that Chase made a false
statement of material fact in its uniform notices of HELOC suspension/reduction
letters to Plaintiffs and the California Subclass members. (Exh. B.) In these
notices, Defendant represented that Plaintiffs' and Subclass members' HELOCs
had been suspended or reduced because the value of their properties "no longer
supports the full amount of [their HELOCs]." (Exh.B.)

**ANSWER TO PARAGRAPH 174:**  Pursuant to the Court's June 30, 2011 Order, this

claim has been dismissed, therefore no response is required.

175. This representation was false for the reasons set forth throughout this Amended Complaint. Plaintiffs' and Subclass members' properties had, in fact, not significantly declined in value. Likewise, in the same notices, Chase misrepresented that it had the authority under the HELOC Agreement to suspend or reduce Plaintiffs' and Subclass members' HELOCs when, in reality, it lacked such authority. Chase maintained the account suspensions and reductions, and refused to reinstate the credit lines even after being made specifically aware –often by its own chosen appraisal company –that the Subclass members' properties had not significantly declined in value and/or that the level of available equity in the properties had not significantly declined. Thus, Chase maintained these account suspensions and reductions based on its knowingly false representation that the Subclass members' properties no longer supported the full amount of the HELOCs.

**ANSWER TO PARAGRAPH 175:** Pursuant to the Court's June 30, 2011 Order, this claim has been dismissed, therefore no response is required.

176. Chase knew or should have known at the time of making these representations that such representations were false, that Chase's AVMs were flawed and inaccurate, that Plaintiffs and the Subclass members properties had not significantly declined in value, and that Chase had not calculated the level of available equity in the properties. Despite this knowledge, Chase acted anyway and profited by reducing the amount of money it needed to reserve so as to meet its outstanding HELOC commitments Ð thereby gaining the use and enjoyment of those monies no longer reserved and forcing low-interest HELOC borrowers into higher interest alternatives.

**ANSWER TO PARAGRAPH 176:** Pursuant to the Court's June 30, 2011 Order, this claim has been dismissed, therefore no response is required.

177. Chase made these misrepresentations intentionally as part of an unfair and deceptive scheme to falsely trigger its right to suspend Plaintiffs' and the Subclass members' HELOCs and to discourage borrowers from challenging Chase's decision.

**ANSWER TO PARAGRAPH 177:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Subclass members."

178. Chase's conduct was also unfair because Chase pretextually suspended and

reduced credit lines based on flawed and inaccurate AVMs and without properly considering the level of available equity in the properties and then took steps to discourage borrowers from appealing the suspensions. As part of its efforts to discourage borrowers' efforts at appeal, Chase deprived borrowers of critical information needed to determine whether to seek credit line reinstatement, including (a) what Defendant considered to be the value of the property as of the date of the HELOC origination; (b) how Defendant determines or even defines "significant decline in value;" (c) the methods or factors used by the AVM models; and (d) the value needed for reinstatement. Such omission of critical and necessary information discouraged many HELOC borrowers from appealing the unlawful suspensions of their HELOCs.

**ANSWER TO PARAGRAPH 178:**   Chase denies the allegations of this paragraph.

179. Chase's conduct was further unfair because it shifted onto borrowers the burden of requesting and paying for an appraisal upfront, in contravention of Regulation Z. Defendant's deprivation of critical information and shifting of the reinstatement burden onto the borrowers was an intentional contravention of Regulation Z specifically designed to discourage borrowers from seeking reinstatement and thereby minimize Defendant's credit exposure.

**ANSWER TO PARAGRAPH 179:**   Chase denies the allegations of this paragraph.

180. Chase's violations of the UCL caused Plaintiffs and the Subclass members to pay money to Chase in the form of fees, lost interest, and lost access to bargained-for credit resulting in Chase having access to the time value of the suspended/reduced funds.

**ANSWER TO PARAGRAPH 180:**   Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Subclass members."

181. As a direct and proximate result of Chase's systematically unlawful credit reductions and account suspensions, Plaintiffs and the Subclass members have suffered adverse effects on their credit scores, annual and appraisal fees, as well as attorneys' fees and other damages.

**ANSWER TO PARAGRAPH 181:**   Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any "Subclass members."

182. Plaintiffs, on behalf of themselves and other Subclass members, seek an order preliminarily and permanently enjoining Chase's unlawful, unfair and deceptive conduct alleged herein and an order requiring the reinstatement of those HELOCs unlawfully, unfairly and/or deceptively suspended or reduced. Plaintiffs also seek individual restitution of property gained by such unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well as interest, attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

**ANSWER TO PARAGRAPH 182:** Chase admits that Plaintiffs, on their own behalf and on behalf of a putative class, seek the stated relief, but Chase denies that Plaintiffs are entitled to any relief, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Class members." Chase denies the remaining allegations of this paragraph.

## COUNT VII

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/2, *et seq.*
### (Unfair Business Practices)
### (on Behalf of Plaintiff Hackett and the Illinois Subclass)

183. Plaintiffs incorporate paragraphs 1 through 182 above as if fully set forth herein.

**ANSWER TO PARAGRAPH 183:** Chase incorporates its answers to each of the foregoing paragraphs as though fully set forth herein.

184. Defendant's wrongful acts, as set forth throughout this Amended Complaint, constitute unfair business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 *et. seq.* ("Illinois Consumer Fraud Act").

**ANSWER TO PARAGRAPH 184:** Chase denies the allegations of this paragraph.

185 Defendant's unfair acts have occurred in commerce and have caused , and will continue to cause, serious injury to members of the Illinois Subclass.

**ANSWER TO PARAGRAPH 185:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Subclass members."

186. Chase's conduct was unfair, as the AVMs it utilized to determine the values of the subject properties of the Class members securing the HELOCs were inaccurate and unsubstantiated so as to make their use unfair and readily subject to manipulation.

**ANSWER TO PARAGRAPH 186:** Chase denies the allegations of this paragraph.

187. Chase intentionally utilized faulty and unreliable AVMs in order to undervalue the property values of its customers and provide a false and improper basis for reducing credit limits. Additionally, Chase intentionally failed or refused to consider the level of available equity in the properties, despite Regulation Z's requirement that Chase consider the equity and despite having actual knowledge or easy access to such knowledge of the existence of sufficient equity in the property.

**ANSWER TO PARAGRAPH 187:** Chase denies the allegations of this paragraph.

188. Chase's conduct was also unfair because Chase charged Hackett and Illinois Subclass members a $30 fee for faxing a two-page notice that Chase was obligated to provide under Regulation Z in the first place. This fee, in addition to being outrageous and oppressive, was not disclosed by Chase and was not warranted by the HELOC Agreements. Chase's collection of the fee for providing Hackett and Illinois Subclass members with information that they were entitled to receive under Regulation Z, was an unfair business practice that caused them damages.

**ANSWER TO PARAGRAPH 188:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Subclass members."

189. Chase's conduct was also unfair because Chase pretextually suspended and reduced credit lines based on flawed and inaccurate AVMs and without properly considering the level of available equity in the properties and then took steps to

discourage borrowers from appealing the suspensions. As part of its efforts to discourage borrowers efforts at appeal, Chase deprived borrowers of critical information needed to determine whether to seek credit line reinstatement, including (a) what Defendant considered to be the value of the property as of the date of the HELOC origination; (b) how Defendant determines or even defines "significant decline in value;" (c) the methods or factors used by the AVM models; and (d) the value needed for reinstatement. Such omission of critical and necessary information discouraged many HELOC borrowers from appealing the unlawful suspensions of their HELOCs.

**ANSWER TO PARAGRAPH 189:** Chase denies the allegations of this paragraph.

190. Chase's conduct was further unfair because it shifted onto borrowers the burden of requesting and paying for an appraisal upfront, in contravention of Regulation Z. Defendant's deprivation of critical information and shifting of the reinstatement burden onto the borrowers was an intentional contravention of Regulation Z specifically designed to discourage borrowers from seeking reinstatement and thereby minimize Defendant's credit exposure.

**ANSWER TO PARAGRAPH 190:** Chase denies the allegations of this paragraph.

191. These acts and practices constitute unethical, immoral, unscrupulous, and oppressive conduct, which offends public policy and caused members of the Illinois Subclass substantial injury in violation of the Illinois Consumer Fraud Act.

**ANSWER TO PARAGRAPH 191:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Subclass members."

192. As a direct and proximate result of the unfair and unconscionable practices of Defendant set forth above, the Illinois Subclass members have been denied access to their bargained-for credit lines and have suffered adverse effects on their credit scores, annual and appraisal fees, as well as attorneys' fees and other damages.

**ANSWER TO PARAGRAPH 192:** Chase denies the allegations of this paragraph, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any "Subclass members."

193. Hackett, on her own behalf and on behalf of the Illinois Subclass seeks actual and compensatory damages, penalties, attorneys' fees, and costs as set forth in §10(a) of the Illinois Consumer Fraud Act, 815 ILCS 505/10(a), in an amount to be determined at trial. In addition, Hackett, on her own behalf and on behalf of the other Illinois Subclass members, also seeks an order enjoining Defendant from further violations of the Illinois Consumer Fraud Act, as well as reinstatement of those HELOCs unlawfully and unfairly suspended or reduced by Defendant.

**ANSWER TO PARAGRAPH 193:**  Chase admits that Plaintiffs, on their own behalf and on behalf of a putative class, seek the stated relief, but Chase denies that Plaintiffs are entitled to any relief, denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies that any class should be certified, and therefore denies that there are any "Subclass members."  Chase denies the remaining allegations of this paragraph.

## COUNT VIII

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
(Deceptive Business Practices)
(on Behalf of Plaintiff Hackett and the Illinois Subclass)

194  Plaintiffs incorporate paragraphs 1 through 193 above as if fully set forth herein.

195. Defendant's wrongful acts, as set forth throughout this Amended Complaint, constitute deceptive business practices, false pretense, misrepresentations, and concealment or omission of material facts with the intent that consumers will rely on the misrepresentations, concealment or omissions in violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2 *et. seq.*

196. Defendant's deceptive acts have occurred in commerce and have caused, and will continue to cause, serious injury to Hackett and the Illinois Subclass members.

197. Chase made a false statement of material fact in its HELOC suspensions/reductions notices sent to Hackett and members of the Illinois Subclass. (Exh. B.) In these notices, Defendant represented that the Illinois

Subclass members' HELOCs have been suspended "because of the significant decline in [their] property value." (Exh. B.) These representations were false because, as alleged throughout this Amended Complaint, the values of Hackett's and the Illinois Subclass members' properties had not significantly declined. Similar letters containing nearly identical –and false –representations were sent to the members of the Illinois Subclass. Chase knew or should have known at the time of making these representations that such representations were false, that Chase's AVMs were faulty and inaccurate, that Plaintiffs' and the Illinois Subclass members' properties had not declined in value significantly, and that Chase lacked a sound factual basis for concluding otherwise.

198  Nevertheless, Chase made these misrepresentations intentionally in an effort to falsely trigger its right to suspend the Illinois Subclass members' HELOCs. Chase knew and intended that its customers would rely on its misrepresentations, and such misrepresentations were likely to deceive reasonable HELOC borrowers into believing that their home values did in fact decline significantly and that their HELOC suspensions or reductions were proper, and were further likely to prevent or limit appeals of Chase's HELOCs suspensions and reductions.

199.  Chase also made false statements of material fact in its letters to Hackett and the Illinois Subclass members in response to their appeal submissions. (Exh. C.) In that letter, Defendant stated:

> As requested, we have re-evaluated the decision to freeze your credit line. Based upon the additional information you supplied, we are unable to reinstate your account at this time because your home value is insufficient to support *any* line of credit.

(Exh. C.) (Emphasis added.) This representation was false because "the additional information" that Plaintiff "supplied" showed that her home values did not significantly decline in value, and was sufficient to support her HELOC. Chase knew or should have known at the time of making these representations that such representations were false. Chase maintained the account suspensions and reductions, and refused to reinstate the credit lines even after being made specifically aware –often by its own chosen appraisal company –that the Illinois Subclass members' properties had not significantly declined in value and/or that the level of available equity in the properties had not declined.

200.  For example, on appeal, Chase's own chosen appraisal company found that Chase's AVM had under-valued Hackett's property by $45,000, and Chase was made clearly aware not only of the inaccuracy of its AVM but also of the fact that Hackett had partially paid down her primary mortgage. Thus, Chase denied reinstatement and maintained these account suspensions and reductions based on its knowingly false representation that Hackett's and the Subclass members' properties no longer supported the full amount of the HELOCs.

201. Nevertheless, Chase made these misrepresentations intentionally in an effort to keep Hackett's and the Illinois Subclass members' HELOCs suspended or reduced. Identical or similar letters were sent to the other Class members whose home values were sufficient to support at least some line of credit. Chase knew and intended that its customers would rely on its misrepresentations, and such misrepresentations were likely to deceive reasonable HELOC borrowers into believing that their home values did not in fact support any line of credit at all and/or that HELOC suspension was proper and/or that, even if the home value did not significantly decline in value, there was nothing that could be done to have the account reinstated.

202. As a direct and proximate result of the deceptive, unscrupulous and unconscionable practices of Defendant set forth above, the Illinois Subclass members have been denied access to their bargained-for credit lines and have suffered adverse effects on their credit scores, annual and appraisal fees, as well as attorneys' fees and other damages.

203. Hackett, on her own behalf and on behalf of the Illinois Subclassmembers, seeks actual and compensatory damages, penalties, attorneys' fees, and costs as set forth in §10(a)of the Illinois Consumer Fraud Act, 815 ILCS 505/10(a), in an amount to be determined at trial. In addition, Hackett, on her own behalf and on behalf of the other Illinois Subclass members, also seeks an order enjoining Defendant from further violations of the Illinois Consumer Fraud Act, as well as reinstatement of those HELOCs unlawfully and deceptively suspended or reduced by Defendant.

**ANSWER TO PARAGRAPHS 194-203:** Pursuant to the Court's June 30, 2011 Order, this claim has been dismissed, therefore no response is required.

## COUNT IX

### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT, MINN STAT. § 325F.69
### (on Behalf of Plaintiff Cavanagh and the Minnesota Subclass)

204. Plaintiffs incorporate paragraphs 1 through 203 above as if fully set forth herein.

205. Minn. Stat. § 325F.69, subdivision 1 (2008) provides:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

206. The term "merchandise" within the meaning of Minn. Stat. § 325F.69 includes loans. *See* Minn. Stat. § 325F.68, subdivision 2 (2008).

207. Material omissions constitute violations of Minnesota's consumer protection statutes. Cavanagh and members of the Minnesota Subclass need not affirmatively establish subjective reliance upon an omission.

208. Defendant's conduct described herein constitutes multiple, separate violations of Minn. Stat. § 325F.69, subdivision 1. Defendant has engaged in deceptive and fraudulent practices, and made false and misleading statements, with the intent that Cavanagh and the members of the Minnesota Subclass rely on them in connection with the sale of Defendant's services. By failing to disclose and omitting material facts, Defendant has further engaged in deceptive and fraudulent practices in violation of the Minnesota Consumer Fraud Act, and has caused the Minnesota Subclass members damages.

209. Specifically, Defendant made false statements of fact in its HELOC suspension/reduction notices sent to Cavanagh and members of the Minnesota Subclass. In these notices, Defendant represented to Cavanagh that "we've used a proven valuation method to estimate your home's value" and "that valuation no longer supports the full amount of your Line of Credit, so we are suspending future draws against your account." (Exh. B.) These representations were false because, as alleged throughout this Amended Complaint, Chase did not use a "proven" valuation method, but rather a knowingly flawed and inaccurate method, and in fact knew the values of the Minnesota Subclass members' properties had not significantly declined. Similarly, letters containing nearly identical – and false –representations were sent to the members of the Minnesota Subclass. Chase knew or should have known at the time of making these representations that such representations were false, that Chase's AVMs were not "proven" but were faulty and inaccurate, that Cavanagh's and the Minnesota Subclass members'properties had not suffered a significant decline in value, and that Chase lacked a sound factual basis for concluding otherwise.

210. Chase made these misrepresentations in an effort to falsely trigger its right to suspend the HELOCs of Cavanagh and other members of the Minnesota Subclass. Chase knew and intended that its customers would rely on its misrepresentations. Chase intended for and knew that its misrepresentations would deceive reasonable HELOC borrowers into believing that their home values did in fact decline significantly and that their HELOC suspensions and reductions were proper.

211. By failing to disclose and omitting the material facts described above, Defendant has further engaged in deceptive and fraudulent practices in violation of the Minnesota Consumer Fraud Act, and has caused the Minnesota Subclass members damages, including denial of access to bargained-for credit, adverse effects on credit scores, and other damages.

212. Cavanagh, on his own behalf and on behalf of the Minnesota Subclass, seeks an order preliminarily and permanently enjoining Defendant's deceptive and fraudulent practices alleged herein, requiring Defendant to restore unlawfully and deceptively suspended or reduced HELOC credit limits, and requiring Defendant to cease freezing and reducing HELOCs in violation of Regulation Z. Cavanagh also seeks statutory and actual damages, individual restitution of property gained by such deceptive and fraudulent practices, attorneys' fees, interests and costs pursuant to Minn. Stat. §8.31, subd. 3a.

**ANSWER TO PARAGRAPHS 204-212:** Pursuant to the Court's June 30, 2011 Order,

this claim has been dismissed, therefore no response to these allegations is required.

## COUNT X

### VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. § 325D.44
### (on Behalf of Plaintiff Cavanagh and the Minnesota Subclass)

213. Plaintiffs incorporate paragraphs 1 through 212 above as if fully set forth herein.

**ANSWER TO PARAGRAPH 213:** Chase incorporates its answers to each of the

foregoing paragraphs as though fully set forth herein.

214. Minn. Stat. § 325D.44, subdivision 1 (2008) provides, in part:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
* * *
(5) represents that goods or services have . . . characteristics . . . [or] benefits . . . that they do not have. . .
* * *
(7) represents that goods or services are of a particular standard, quality, or grade. . . if they are of another;
* * *
(9) advertises goods or services with intent not to sell them as advertised;
* * *
 (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

**ANSWER TO PARAGRAPH 214:** Chase admits that this paragraph purports to quote

portions of the Minnesota Uniform Deceptive Trade Practices Act, but denies these allegations to

the extent inconsistent with Minnesota Uniform Deceptive Trade Practices Act, and denies that

the allegations of this paragraph fully and accurately describe Chase's obligations under the

Minnesota Uniform Deceptive Trade Practices Act.

215. Defendant's conduct set forth throughout this Amended Complaint constitutes multiple, separate violations of Minn. Stat. § 325D.44, subdivision 1. Defendant has engaged in deceptive practices by representing that services have characteristics and benefits that they do not have; representing that services are of a particular standard, quality, or grade when they are of another; advertising services with intent not to sell them as advertised; and engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding. In failing to disclose and omitting material facts, Defendant has further engaged in deceptive and fraudulent practices in violation of the Uniform Deceptive Trade Practices Act, and has caused members of the Minnesota Subclass damages.

**ANSWER TO PARAGRAPH 215:** Chase denies the allegations of this paragraph.

216. Specifically, Defendant engaged in deceptive trade practices by sending notices to Cavanagh and other members of the Minnesota Subclass that "we've used a proven valuation method to estimate your home's value" and "that valuation no longer supports the full amount of your Line of Credit, so we are suspending future draws against your account. (Exh. B.) As alleged throughout this Amended Complaint, the notices were deceptive because Chase did not use a "proven" valuation method, but rather a knowingly flawed and inaccurate method, and knew that the values of the Minnesota Subclass members' properties had not significantly declined. Similarly, letters containing nearly identical—and false—representations were sent to the members of the Minnesota Subclass.

**ANSWER TO PARAGRAPH 216:** Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Subclass members."

217. Chase engaged in these deceptive practices in an effort to falsely trigger its right to suspend the HELOCs of Cavanagh and the Minnesota Subclass members.

**ANSWER TO PARAGRAPH 217:** Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Subclass members."

> 218. Defendant's actions have damaged the Minnesota Subclass members, including in the form of denial of access to bargained-for credit, adverse effects on credit scores, and other damages.

**ANSWER TO PARAGRAPH 218:**  Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Subclass members."

> 219. Cavanagh, on his own behalf and on behalf of the Minnesota Subclass, seeks an order preliminarily and permanently enjoining Defendant's deceptive and fraudulent practices alleged herein, requiring Defendant to restore unlawfully and deceptively suspended or reduced HELOC credit limits, and requiring Defendant to cease freezing and reducing HELOCs in violation of Regulation Z. Cavanagh also seeks statutory and actual damages and individual restitution of property gained by such deceptive and fraudulent practices.

**ANSWER TO PARAGRAPH 219:**  Chase admits that Plaintiffs, on their own behalf

and on behalf of a putative class, seek the stated relief, but Chase denies the remaining

allegations of this paragraph, denies that Plaintiffs are entitled to any relief, denies that Plaintiffs

have met the requirements for certifying a class under Federal Rule of Civil Procedure 23, denies

that any class should be certified, and therefore denies that there are any "Subclass members."

> 220. In addition, because Chase willfully engaged in the foregoing trade practices knowing them to be deceptive, Cavanagh and the Minnesota Subclass are entitled to recover their costs and attorneys' fees under Minn. Stat. § 325D.45, subd. 2.

**ANSWER TO PARAGRAPH 220:**  Chase denies the allegations of this paragraph,

denies that Plaintiffs have met the requirements for certifying a class under Federal Rule of Civil

Procedure 23, denies that any class should be certified, and therefore denies that there are any

"Subclass members."

WHEREFORE, Defendant JPMorgan Chase Bank, N.A. respectfully requests entry of judgment in its favor on all claims asserted in Plaintiffs' Consolidated Amended Class Action Complaint and such further relief as the Court finds just and appropriate.

## AFFIRMATIVE OR OTHER DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Chase asserts the following defenses to the claims against it.

### FIRST DEFENSE
### (Compliance With Contract Terms)

Chase complied with all terms of Plaintiffs' HELOC Agreements and had a contractual and legal right to suspend the HELOC because of the significant decline in the value of Plaintiffs' properties. Further, nothing in the Plaintiffs' HELOC Agreements requires Chase to obtain an appraisal before suspending the HELOC because of a significant decline in the value of the property, and nothing in Plaintiffs' HELOC Agreements prohibited Chase from using AVMs to value Plaintiffs' properties.

### SECOND DEFENSE
### (TILA and Regulation Z Permit Chase
### To Suspend Plaintiffs' HELOCS Because Of A
### Significant Decline In Value)

Regulation Z applies to Plaintiffs' HELOCs. TILA and Regulation Z, as well as Plaintiffs' HELOC Agreements, provide that Chase can suspend their HELOCs where the value of their properties declines significantly below its original appraised value. Regulation Z does not require a lender to obtain an appraisal in order to suspend a HELOC because of a significant decline in the value of the property. Further, Regulation Z does not prohibit a lender from using AVMs to value borrowers' properties. Here, the decline in value of Plaintiffs' properties constituted a significant decline in the value of the properties. Accordingly, Chase's suspension and reduction of Plaintiffs' HELOCs was authorized by Regulation Z.

**THIRD DEFENSE**
**(Recoupment)**

In the event that the Court finds that Chase is liable to Plaintiffs and/or purported class members for any amount, Chase is not liable for the full amount of Plaintiffs' and purported class members' claims because Chase is entitled to recoup the amounts due to Chase from Plaintiffs and purported class members under their HELOCs.  Plaintiffs' and purported class members' claims against Chase arise from the same HELOC transactions as Chase's claims against Plaintiffs and purported class members for amounts due; therefore Chase is entitled to recoupment of those delinquent amounts.

**FOURTH DEFENSE**
**(Set-Off)**

In the event that the Court finds that Chase is liable to Plaintiffs and/or purported class members for any amount, Chase is not liable for the full amount of Plaintiffs' and purported class members' claims because Chase is entitled to set-off the amounts due to Chase from Plaintiffs and purported class members under their HELOCs.  To the extent Plaintiffs' and purported class members' claims against Chase arise from different transactions as Chase's claims against Plaintiffs and purported class members for amounts due, Chase is nonetheless entitled to set-off the delinquent amounts.

**FIFTH DEFENSE**
**(Compliance With TILA And Regulation Z**
**Bars Plaintiffs' California UCL Claim)**

Under California law, where legislation clearly permits the conduct, no claim can be maintained under the California Unfair Competition Law, California Business & Professions Code § 17200 *et seq.*  Some actions and conduct Plaintiffs complain of were specifically authorized by TILA, Regulation Z, and the Federal Reserve Board's Official Commentary to Regulation Z.  TILA and Regulation Z permit Chase to suspend borrowers' HELOCs when the

value of their properties declines significantly below its original appraised value.  Plaintiffs' claims are therefore barred by the UCL safe harbor to the extent they seek to hold Chase liable for conduct permitted by TILA and Regulation Z.

**RESERVATION OF RIGHTS**

Chase reserves its right to assert additional defenses that may be discovered in the course of these proceedings.  Chase further reserves the right to assert additional defenses, counterclaims, including defenses and counterclaims regarding the claims of absent class members in the event that this action is certified for class treatment.

Date:   August 12, 2011

Respectfully submitted,
JPMORGAN CHASE BANK, N.A.

By:    /s/ Tiffany L. Sorge Smith   
One of its attorneys

LeAnn Pedersen Pope (6186058)
Victoria R. Collado (6204015)
Michael G. Salemi (6279741)
Tiffany L. Sorge Smith (6293842)
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, 22nd Floor
Chicago, Illinois 60611-3607
Telephone:    (312) 840-7000
Facsimile:    (312) 840-7900

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on August 12, 2011, a true and correct copy of the foregoing document was filed electronically using the Court's Electronic Case Filing System. A Notice of Electronic Filing will be sent by electronic mail to all counsel of record by operation of the Court's Electronic Filing System.

By: ___/s/ Tiffany L. Sorge Smith___