# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In re: JP Morgan Chase Bank Home Equity Line of Credit Litigation | ) ) ) ) ) ) ) |

MDL No. 2167

Master Docket Case No. 10-cv-3647

Judge Rebecca R. Pallmeyer

## PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT

Jay Edelson
Steven L. Woodrow
Evan M. Meyers
Irina Slavina
EDELSON MCGUIRE LLC
350 N. LaSalle Drive, Suite 1300
Chicago, IL 60654
Tel: (312) 589-6379
Fax: (312) 589-6378
jedelson@edelson.com
swoodrow@edelson.com
emeyers@edelson.com
islavina@edelson.com

*Counsel for Plaintiffs and the Settlement Class*

(Additional Counsel appear on signature page)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iv

I. NATURE OF THE LITIGATION ................................................................ 4

   A. Class Counsel's Investigation Into Mass HELOC Suspensions ................... 4

   B. Coordinated Pre-Trial Proceedings and Appointment of Interim
      Co-Lead Counsel ........................................................................................ 5

   C. Plaintiffs' Consolidated Complaint ............................................................ 5

   D. The Court Denies Chase's Motion to Dismiss the Consolidated Complaint ... 7

   E. Preliminary Settlement Negotiations and Mediation .................................. 7

   F. Chase's Position ...................................................................................... 8

II. TERMS OF THE SETTLEMENT AGREEMENT ....................................... 9

   A. Class Definitions ..................................................................................... 9

      1. *The Class* .......................................................................................... 9

      2. *The Former Customer Subclass* ........................................................ 9

   B. The Settlement Benefits .......................................................................... 10

      1. *Proactive Account Reinstatements* ..................................................... 10

      2. *Notice of Right to Request Reinstatement* ........................................... 10

      3. *Enhanced Account Suspension/Reduction Notices* ............................. 10

      4. *Limitation on Use of AVMs* ............................................................... 11

      5. *Reimbursement of Appraisal Fee* ...................................................... 11

      6. *Limitation on Use of 5% Reduction Criterion* .................................... 11

      7. *Service Assurances* .......................................................................... 11

      8. *Future Changes in Law or Regulations* ............................................. 11

      9. *Benefits Specific to Former Customer Subclass Members* ................... 12

   C. Other Relief ........................................................................................... 12

1. *Payment of Notice and Administrative Fees* .................................................................. 12

2. *Compensation to the Class Representatives* ................................................................ 12

3. *Payment of Attorneys' Fees and Expenses* ................................................................. 12

D. **The Release** ............................................................................................................. 13

III. **THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS AND SUBCLASS** ............................................................................................................... 13

A. **The Proposed Settlement Class and Subclass are Ascertainable and Numerous** ..... 14

B. **The Settlement Class and Subclass Share Common Issues of Law and Fact** ........... 15

C. **The Proposed Class Representatives' Claims Are Typical** ........................................ 17

D. **Proposed Class Counsel and the Named Plaintiffs Have and Will Continue to Fairly and Adequately Represent the Interests of the Class and Subclass** ........................... 17

E. **The Proposed Settlement Class and Subclass Meet the Requirements of Rule 23(b)(2) and Rule 23(b)(3), respectively** .......................................................................... 19

1. *The Settlement Class Should Be Certified Under Rule 23(b)(2)* ................................ 19

2. *The Former Customer Subclass Should Be Certified Under Rule 23(b)(3)* ............... 21

a. Common questions of law and fact predominate .................................................. 21

b. This class action, and especially this class action settlement, is the superior method for adjudicating the Class and Subclass's HELOC suspension claims .... 22

IV. **THE COURT SHOULD CONFIRM THE APPOINTMENT OF CLASS COUNSEL** . 23

V. **THE PROPOSED SETTLEMENT FALLS WITHIN THE RANGE OF FINAL APPROVAL AND THUS WARRANTS PRELIMINARY APPROVAL** ....................... 24

A. **The Settlement Produces Exceptional Results for the Class, Especially When Compared with the Inherent Risk of Continued Litigation** ....................................... 25

B. **The Length and Extent of the Litigation Favors Settlement** ..................................... 28

C. **Proposed Class Counsel Readily Support the Settlement, Which Compares Favorably to Other Industry HELOC Class Action Settlements** ............................... 28

D. **The Stage of Proceedings and Discovery Conducted Warrant Approval** ................ 30

VI. **THE PROPOSED PLAN OF CLASS NOTICE** .............................................................. 31

ii

**A. U.S. Mail Notice**............................................................................................................ 31

**B. Internet Publication** ..................................................................................................... 32

**C. CAFA Notice**.................................................................................................................. 32

**VII. CONCLUSION** ................................................................................................................. 33

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................ *passim*

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)................................................................ 31

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ........................................................ 20

**United States Circuit Court of Appeals Cases**

*Armstrong v. Board of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980) ......... 24, 25

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).......................................................................... 24

*In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002).......................................... 22

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996).................................................................................. 25

*Lemon v. Int'l Union of Operating Eng'g.*, 216 F.3d 577 (7th Cir. 2000)................................ 21

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) .............................................. 22

*Payton v. County of Kane,* 308 F.3d 673 (7th Cir. 2002) ........................................................ 19

*Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993)................................ 14

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992)................................................................ 15

*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001) ........................................ 14

*Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748 (7th Cir. 2000) .................................. 13

**United States District Court Cases**

*Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328 (N.D. Ill. 2006)............................................ 21

*Franks v. MKM Oil, Inc.*,
    No. 10 CV 00013, 2012 WL 3903782 (N.D. Ill. Sept. 7, 2012)........................................ 14

*G.M. Sign, Inc. v. Group C Commc'ns, Inc.*,
    No. 08-CV-4521, 2010 WL 744262 (N.D. Ill. Feb. 25, 2010) ........................................ 14

*Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394 (N.D. Ill. 1987)........................................ 18

*Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344 (N.D. Ill. 2008)................................ 14

*Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802 (N.D. Ill. 2008) ..................... 15, 18

*Kessler v. Am. Resorts Int'l*, No. 05 C 5944, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007)........ 25

*Maxwell v. Arrow Fin. Servs., LLC*,
    No. 03 C 1995, 2004 WL 719278 (N.D. Ill. March 31, 2004) ........................................ 15

*Mezyk v. U.S. Bank Pension Plan,*
    No. 3:09-CV-384-JPG-DGW, 2012 WL 2913213 (S.D. Ill. July 16, 2012) ...........................14

*Radmanovich v. Combined Ins. Co. of Am.,* 216 F.R.D. 424 (N.D. Ill. 2003)........................17, 21

*Redd v. Arrow Fin. Servs., LLC,*
    No. 03 C 1341, 2004 WL 1117844 (N.D. Ill. Mar. 31, 2004) .................................................14

*Scholes v. Stone, McGure, & Benjamin,* 143 F.R.D. 181 (N.D. Ill. 1992) ...................................16

*Smith v. Nike Retail Servs., Inc.,* 234 F.R.D. 648 (N.D. Ill. 2006) .................................................15

*Whitten v. ARS Nat'l Servs. Inc.,*
    No. 00 C 6080, 2001 WL 1143238 (N.D. Ill. Sept. 27, 2001).......................................... 15-16

**Statutory Provisions**

28 U.S.C. § 1715…........................................................................................................................32

Fed. R. Civ. P. 23 .................................................................................................................*passim*

**Miscellaneous Authorities**

5 James Wm. Moore et al., Moore's Federal Practice (3d ed. 2001)............................................14

Conte & Newberg, 4 *Newberg on Class Actions* (4th Ed. 2002)...........................................24, 31

*Manual for Complex Litigation* §21.632 (4th ed. 2004) ........................................................13, 24

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL

The Parties have reached a proposed settlement to resolve this Multi-District Litigation

challenging JP Morgan Chase Bank, N.A.'s ("Chase" or "Defendant") Home Equity Line of

Credit ("HELOC") suspension and reduction practices. Coming on the heels of similar

settlements involving Wells Fargo and Citibank—that have received final and preliminary court

approval, respectively[1]—the proposed Class Action Settlement Agreement (*See* "Settlement

Agreement" or "Settlement," attached as Exhibit A) achieved in this case represents a clear

victory for homeowners—potentially restoring billions of dollars worth of affordable HELOC

credit to borrowers while providing generous cash relief to former customers.

Indeed, in the wake of the housing market collapse and ensuing taxpayer bailout, Chase (and

other major banks) moved quickly to systematically shut down their HELOC portfolios. A wave

of class action lawsuits followed claiming that the banks had overreached, using dubious

computer valuations and improper standards to suspend borrowers who, despite the downturn,

hadn't experienced a decline in property value like the bank had claimed. Following years of

contentious litigation and negotiations[2], these cases have resulted in landmark settlements that

---

[1]    *See Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-4152-CW (N.D. Cal.) (Wilken, J.)
(final approval granted to nationwide class settlement May 14, 2012); *In Re Citibank HELOC
Reduction Litig.*, No. 09-cv-0350-MMC (N.D. Cal.) (Chesney, J.) (preliminary approval
granted to nationwide settlement November 6, 2012).
[2]    As explained below, the Parties began discussing settlement early on in the case and were
greatly assisted by this Court's Order requiring face-to-face discussions. (*Hackett v. JP Morgan
Chase Bank, N.A.*, No. 09-cv-7986 (Dkt. 12) (N.D. Ill., Jan. 29, 2010).) The Parties were
substantially aided by the oversight of a professional mediator, the Honorable Wayne Andersen
(Ret.), of JAMS in Chicago. Judge Andersen has experience in mediating HELOC class action
settlements involving Chase, having served as the mediator for the settlement reached in
*Schulken v. Washington Mut. Bank*, 09-cv-2708-LHK (N.D. Cal.)—a class action that challenged
Chase's HELOC suspensions processed through its 4506-T Income Verification Program. (*See*
Declaration of Attorney Steven Woodrow attached hereto as Exhibit B ("Woodrow Decl.") ¶

have restored several billion dollars worth of affordable credit to homeowners while ushering in meaningful industry-wide reforms.

The proposed Settlement Agreement in this case is arguably the high water mark. The only HELOC litigation to have been centralized in an MDL, the Settlement seeks to resolve 11 class action lawsuits that were filed in 8 federal districts across the country, each of which had been litigated and centralized before this Court by the Judicial Panel on Multidistrict Litigation in 2010.[3] The Plaintiffs alleged that Chase suspended or reduced its borrowers' HELOCs in violation of the Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, its implementing regulation, Regulation Z, 12 C.F.R. § 226.5(b) *et. seq.*, California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (the "UCL"), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the "ICFA"), the Minnesota Uniform Deceptive Trade Practices Act (the "UDTPA"), Minn. Stat. § 83.20 *et seq.*, and in breach of the terms of its HELOC contracts. Principally, the Plaintiffs demanded restored access to their credit lines and changes in Chase's suspension and reduction practices, including the type of valuation models it

___

11.) On January 5, 2012, Judge Koh granted adversarial class certification to a Class and Subclass of Chase's HELOC borrowers. (*Schulken* Dkt. 184.) The subsequent settlement, which Judge Andersen helped the parties reach, received final approval November 13, 2012. (*Schulken* Dkt. 223.)

[3]    These actions are *Walsh v. JPMorgan Chase Bank, N.A.*, No. 09-cv-4387 (C.D. Cal., filed June 18, 2009); *Wilder v. JPMorgan Chase Bank, N.A.*, No. 09-cv-834 (C.D. Cal, filed July 17, 2009); *Frank v. Washington Mutual Bank, Henderson Nevada*, No. 09-cv-3408 (E.D. Cal., filed Dec. 17, 2009); *Yakas v. Chase Manhattan Bank USA, N.A.*, No. 09-cv-2964 (N.D. Cal, filed June 7, 2010); *Malcolm v. JPMorgan Chase Bank, N.A.*, No. 09-cv-4496 (N.D. Cal., filed Sept. 24, 2009); *Kimball v. Washington Mutual Bank, Henderson, Nevada*, No. 09-cv-1261 (S.D. Cal., filed June 10, 2009); *Hackett v. JPMorgan Chase Bank, N.A.*, No. 09-cv-7986 (N.D. Cal., filed Dec. 24, 2009); *Cavanagh v. JPMorgan Chase Bank, N.A.*, No. 09-cv-3389 (D. Minn., filed Nov. 25, 2009); *Mayes v. JPMorgan Chase Bank, N.A.*, No. 10-cv-157 (N.D. Tx., filed Mar. 5, 2010) (collectively "underlying class actions"). Additional tag-along cases that have been transferred include *Waterman v. JPMorgan Chase Bank, N.A.*, No. 10-cv-514-S (W.D. Ky., filed July 28, 2010) and *Crystal v. JP Morgan Chase Bank, N.A.,* No. 10-cv-06023-FB-RER (E.D.N.Y., filed Dec. 29, 2010).

could use. For borrowers who closed their accounts, the Plaintiffs further sought damages to help compensate for lost access and the costs of finding replacement credit.

The Settlement provides such relief directly. Under the agreement, Chase is to engage in "proactive reinstatements," a process that will invite thousands of Class Members to have their credit lines re-opened by Chase without the need to participate in the bank's formal appeals procedure. Likewise, discovery showed that Chase, after the underlying class actions were filed, made meaningful changes and refinements to its HELOC suspension and reduction practices that were more favorable to borrowers. As with the other settlements, Chase will send a notice to all Class members stating that they may request reinstatement under the bank's current improved standards. And as for members of the Former Customer Subclass, all former customers, irrespective of whether they incurred any fees in closing their Chase HELOCs, are eligible to receive a $35 cash award merely for filling out a claim form and checking a box indicating they incurred damages.

When viewed in relation to comparable settlements, the instant Agreement's reasonableness is further apparent. It builds upon the frameworks of those agreements and provides analogous relief aimed at restoring borrower access to affordable credit. Thus, given the models set by similar settlements that have received court approval, the Court should have little trouble granting preliminary approval here.

Accordingly, Plaintiffs move the Court to preliminarily approve the instant Settlement, certify the proposed Class and Subclass, appoint the Plaintiffs as Class Representatives, and Jay Edelson and Steven Woodrow of Edelson McGuire, LLC, Karin Fisch of Abbey Spanier Rodd & Abrams, LLP, and Brian Murray of Murray Frank, LLP as Class Counsel. For the convenience of the Court, proposed dates and deadlines leading to a final approval hearing are

provided in the proposed order separately submitted.

## I. NATURE OF THE LITIGATION

### A. Class Counsel's Investigation Into Mass HELOC Suspensions

In the wake of the financial crisis and collapse of the housing market in late 2008, Class Counsel began to receive hundreds of complaints from HELOC customers with accounts at various national lenders, including Chase, claiming that their lenders had unilaterally reduced or suspended their HELOCs without justification. (Woodrow Decl. ¶ 2.) These complaints triggered Class Counsel's in-depth investigation into HELOC suspension and reduction policies across the entire banking industry. This included a detailed review of TILA and its legislative history regarding HELOC account suspensions and reinstatements, Regulation Z, the Official Commentary from the Board of Governors of the Federal Reserve, and significant guidance from the Office of the Comptroller of the Currency ("OCC"), Federal Deposit Insurance Corporation ("FDIC"), and Office of Thrift Supervision ("OTS"), particularly those relating to HELOC suspensions in declining housing markets and the use of automated valuation methods and other modeling to assess collateral. (*Id.* ¶ 4.)

Class Counsel also spoke with hundreds of aggrieved homeowners who shared documents, including their HELOC contracts, bank correspondence and notices, financial records, appraisals, broker price opinions and other property valuations, tax returns, letters exchanged with Members of Congress, billing statements, loan origination documents, notes of phone conversations, first lien balance information, and a host of other relevant materials. (*Id.* ¶ 2.) This allowed Class Counsel to compare various banks' suspension policies and practices to determine which practices were in compliance with TILA, Regulation Z, and borrower HELOC contracts, and which were not. (*Id* ¶ 3.) Class Counsel also collaborated with federal and state lawmakers,

regulators, and other public officials in an effort to share information and bring to light the legal issues and impact of unjustified HELOC suspensions. (*Id*. ¶ 19.)

As a result of this investigation, Class Representatives and other borrowers whose HELOCs had been unilaterally suspended or reduced retained Class Counsel to prosecute the underlying class actions as well as additional actions against other national lenders, including Wells Fargo Bank, Citibank, National City Bank, GMAC Mortgage, and OneWest Bank. (*Id*. ¶ 18.)

### B. Coordinated Pre-Trial Proceedings and Appointment of Interim Co-Lead Counsel.

On June 7, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized the pending class action cases against Chase pursuant to 28 U.S.C. § 1407(a), finding the cases presented "civil actions involving one or more common questions of fact." (Dkt. 1.) On July 17, 2010, following a contested leadership fight between two competing Plaintiff groups, the Court appointed attorneys from the firms of Edelson McGuire, LLC, Abbey Spanier Rodd & Abrams, LLP, and Murray, Frank & Sailer LLP as interim co-lead class counsel. (Dkt. 37.) Attorneys from these firms now seek appointment as Settlement Class Counsel.

### C. Plaintiffs' Consolidated Complaint

On August 30, 2010, Plaintiffs filed their ten-count Consolidated Complaint alleging that Chase serially reduced and suspended its borrowers' HELOCs based on false claims that their homes had significantly declined in value. (Dkt. 41.) Plaintiffs allege, *inter alia*, that Chase relied on flawed automated valuation models ("AVMS")—computer algorithms that provide an estimated property value—to generate falsely low estimates of property values, which Chase in turn used to (improperly) justify its suspension or reduction of borrowers' HELOCs. In doing so, Plaintiffs collectively allege that Chase violated TILA and Regulation Z, the UCL, the ICFA, the UDTPA, and breached the terms of its HELOC contracts and/or the implied covenant of good

faith and fair dealing. The Consolidated Complaint coordinated the allegations of the Named

Plaintiffs in the Underlying Class Actions as follows:

- **Plaintiff Michael Walsh:** On June 18, 2009, Walsh filed a class action complaint against Washington Mutual Bank ("WaMu") and Chase in the United States District Court for the Central District of California, No. 09-cv-4387. (*Walsh* Dkt. 1.) Walsh alleged that Chase unlawfully reduced and suspended its borrowers' HELOCs without first actually assessing the value of their homes in violation of TILA, Regulation Z, and the UCL, and in breach of Chase's contract with its borrowers. (*Id.*) Prior to transfer, the parties fully briefed two of Chase's motions to dismiss. (*Walsh* Dkt. 9, 28.)

- **Plaintiff Robert Wilder:** On July 17, 2009, Wilder brought a putative class action in the United States District Court for the Central District of California, No. 09-cv-0834, alleging that Chase and First American Corelogic, Inc. ("CoreLogic") used faulty AVMs to falsely undervalue homes so as to trigger Chase's right to freeze HELOCs or lower credit limits. (Wilder Dkt. 1.) Prior to transfer, the parties brief two motions to dismiss (one from Chase and one from CoreLogic), both of which were granted in part. (*Wilder* Dkt. 26, 53.) Chase also filed its answer and affirmative defenses. (*Wilder* Dkt. 56.)

- **Plaintiff Michael Malcolm:** On September 24, 2009, Malcolm filed a putative class action complaint in the United States District Court for the Northern District of California, No. 09-cv-4496. (*Malcolm* Dkt. 1.) Malcolm alleged that Chase suspended his HELOC based upon a faulty AVM value and that an appraisal proved his home had actually *increased* in value. (*Id.*) Prior to transfer, the parties briefed two motions to dismiss and the case was transferred prior to the court issuing an order on Chase's second motion (the first having been granted and denied in part). (*Malcolm* Dkt. 38.)

- **Plaintiff William Cavanagh:** On November 25, 2009, Cavanagh brought a putative class action against Chase in the United States District Court for the District of Minnesota, No. 09-cv-3389. (*Cavanagh* Dkt. 1.) Cavanagh alleged that the bank suspended his HELOC by falsely claiming that his home had significantly declined in value so as to incorrectly trigger Chase's ability under TILA to suspend his HELOC. (*Id.*) As with Plaintiff Malcolm, an appraisal showed that Cavanagh's home had actually increased in value. (*Id.*) On April 8, 2010, the court denied Chase's motion to dismiss (which had been partially briefed) and stayed the proceedings pending a decision by the JPML. (*Cavanagh* Dkt. 26.)

- **Plaintiffs Robert and Maria Frank:** On December 8, 2009, the Franks filed a putative class action against WaMu and Chase in the United States District Court for the Eastern District of California, No. 09-cv-3408. (*Frank* Dkt. 1.) The Franks claimed that Chase unlawfully suspended and reduced its customers' HELOCs based on faulty valuation models and insignificant declines in property values. (*Id.*) On April 8, 2010, the court stayed proceedings in the action pending a decision by the

JPML and denied Chase's pending motion to dismiss without prejudice to it being renewed after the JPML's ruling on centralization. (*Frank* Dkt. 27.)

- **Plaintiff Shannon Hackett:** On December 24, 2009, Hackett brought a putative class action in this Court alleging, on behalf of a nationwide class, that Chase unlawfully suspended its borrowers HELOCs by using faulty AVMs to unreasonably undervalue homes so as to falsely trigger Chase's right to suspend HELOCs. (No. 09-cv-7896, *Hackett* Dkt. 1.) Prior to transfer, the Parties fully briefed a motion to dismiss and partially briefed a motion to strike. On December 27, 2010, following the filing of the Consolidated Complaint, this Court terminated Chase's motion to dismiss and Hackett's motion to strike affirmative defenses without prejudice. (*Hackett* Dkt. 41.)

- **Plaintiff Daryl Mayes:** On March 5, 2010, Mayes filed a putative class action complaint in the United States District Court for the Northern District of Texas, No. 10-cv-0157, alleging on behalf of a class of Texas residents that Chase reduced or suspended HELOCs based on false claims that the borrowers' homes had significantly declined in value. (*Mayes* Dkt. 1.) Mayes was denied reinstatement even though an appraisal revealed that his home had declined no more than $7,000 in value. (*Id.*) On April 29, 2010, prior to Chase filing an answer, the court stayed proceeding pending a decision by the JPML. (*Mayes* Dkt. 12.)

## D. The Court Denies Chase's Motion to Dismiss the Consolidated Complaint

On October 19, 2010, Chase moved to dismiss the Consolidated Complaint in its entirety. (Dkt. 49-51.) Following extensive briefing by the Parties, on June 30, 2011, the Court issued a comprehensive 42-page Order granting in part and denying in part Chase's Motion to Dismiss. (Dkt. 74-75.) The Court dismissed certain claims—including Plaintiffs' breach of contract and unjust enrichment claims to the extent they relied on Chase's imposition of annual fees on suspended accounts and Plaintiffs' fraud claims under California, Illinois, and Minnesota consumer protections statutes—but otherwise denied Chase's Motion. (*Id.*). Chase answered on August 12, 2011. (Dkt. 88.)

## E. Preliminary Settlement Negotiations and Mediation

The Parties engaged in initial settlement discussions early on to discuss the legal landscape generally and their respective views of the facts. (Woodrow Decl. ¶ 10.) Relying on discovery that had been conducted to date in the other cases, on May 16, 2011, prior to the Court ruling on

Chase's Motion to Dismiss, Plaintiffs' Counsel provided Chase a letter outlining potential terms for resolving the lawsuits. (*Id.*) Following the Court's ruling, the Parties agreed to a mediation process. (*Id.*) On December 14, 2011, the Parties met in Chicago for a mediation session with Judge Andersen, during which time Interim Class Counsel obtained additional information about the bank's HELOC reductions, suspension, and reinstatement practices as well as clarifications with respect to certain outstanding issues. (*Id.* ¶¶ 11-12.) The Parties used the mediation to build upon the general settlement structure outlined in the other nationwide settlements against Chase's industry competitors and to discuss additional forms of relief that could be made available to the Class members. (*Id.* ¶ 13.)

Following a full day of arm's length negotiations, the Parties made significant progress but were unable to reach a final agreement. (*Id.*) The Parties did agree, however, to continue working towards a resolution with Judge Andersen's help. (*Id.* ¶¶ 13-14.) During the several months that followed, and with Judge Andersen's oversight, the Parties negotiated and exchanged proposals and drafts of the settlement agreement. In May 2012, the Parties reached an agreement in principle with respect to the relief for Settlement Class and Subclass Members. (*Id.* ¶ 15.) Only after the Parties agreed upon the relief for the Settlement Class and Subclass did the Parties begin negotiating incentive awards for the named Plaintiffs and attorneys' fees for Interim Class Counsel. (*Id.*) Following a series of teleconferences with Judge Anderson, the Parties reached an agreement as to the incentive awards and attorneys' fees. (*Id.*)

Thereafter, the Parties spent several additional months memorializing the Settlement Agreement, which is presently before the Court.

**F. Chase's Position**

Chase has denied and continues to deny that it committed or attempted to commit any of the

wrongful acts alleged in Plaintiffs' pleadings, or that it has engaged in any other wrongdoing. (Settlement Agreement, Recital F.) Chase maintains that there was a significant decline in the property values of those customers whose HELOCs were reduced or suspended, that it complied with the HELOC contracts, TILA, Regulation Z, and all applicable state laws, that it has defenses to Plaintiffs' claims, and that it was and is prepared to defend the case. (*Id.*) Nevertheless, Chase has agreed to settle the case on the terms and conditions set forth in the Settlement. (*Id.*)

## II.   TERMS OF THE SETTLEMENT AGREEMENT

The key terms of the Settlement Agreement are briefly summarized as follows:

### A.  Class Definitions

For the purposes of this Settlement only, the Parties have agreed to the certification of the following Class and Subclass:

1.  *The Class*: The Class consists of all Chase HELOC customers nationwide who had their HELOCs suspended or reduced by Chase at any time between January 1, 2007 and September 30, 2012 based on Chase's determination that the property securing the HELOC had significantly declined in value. (Settlement Agreement § 1.7.)

2.  *The Former Customer Subclass*: The Former Customer Subclass ("Subclass") consists of all borrowers in the Class who closed their Chase HELOC accounts following a suspension or reduction of their HELOCs by Chase, and their account was still suspended or reduced for decline in property value when the borrower closed the account. (*Id.*)

Excluded from the Class and Subclass are Chase, the Claims Administrator, any corporate parent, subsidiary, and affiliate of Chase, any judge presiding over this case or over any of the Underlying Class Actions, and the immediate family members of any excluded person(s). (*Id.*)

9

**B.  The Settlement Benefits**

Chase has agreed to provide the following relief to the Settlement Class Members:

1.  *Proactive Account Reinstatements*: Chase agrees to proactively offer account reinstatement to those Class Members who satisfy Chase's internal property value and credit guidelines. (*Id.* § 3.1(a).) Chase will send a letter to any Class Member who Chase identifies as meeting these criteria advising that Chase is willing to reinstate his or her HELOC up to a limit set by Chase. (*Id.*) The Class Members may accept Chase's offer to reinstate the HELOC by checking a box indicating their acceptance and returning the letter. A Class Member who does not check the box and timely return the letter will not have his or her HELOC reinstated through the Proactive Account Reinstatement Process. (*Id.*)

2.  *Notice of Right to Request Reinstatement*: Within nine months of the Effective Date, Chase agrees to send a Notice of Right to Request Reinstatement, substantially in the form attached to the Settlement Agreement as Exhibit 2, to Class Members whose accounts are open and remain suspended or reduced because of a decline in property value and who have more than 90 days left in the draw period as of the Effective Date of Final Approval. (*Id.* § 3.1(b).) The Notice of Right to Request Reinstatement: (1) will explain that Chase has revised some of its standards for reinstating HELOC accounts and that Class Members may be considered for reinstatement or partial reinstatement under Chase's revised policies, (2) will remind Class Members that they have the right to request reinstatement, and (3) will explain how to exercise that right. (*Id.*)

3.  *Enhanced Account Suspension/Reduction Notices*: For the 12-month period following the Effective Date, Chase agrees to modify the notices that it sends to customers whose accounts Chase suspends or reduces based on a claim that the borrower's property has significantly

declined in value, to include the value an appraisal would need to state the property is worth in order for Chase to reinstate the HELOC. (*Id.* § 3.1(c).)

4. *Limitation on Use of AVMs*: For the 12-month period following the Effective Date, Chase will not rely upon Automated Valuation Models previously identified by Chase internally as Tier 3b, 4b, or 5b in determining whether to suspend or reduce any HELOC for a decline in property value. (*Id.* § 3.1(d).)

5. *Reimbursement of Appraisal Fee*: For the 12-month period following the Effective Date, Chase will provide refunds of any appraisal fees paid by customers who successfully appeal Chase's suspension or reduction of their HELOCs based on a significant decline in property value. (*Id.* § 3.1(e).)

6. *Limitation on Use of 5% Reduction Criterion*: For the 12-month period following the Effective Date, Chase has agreed to limit use of a 5% reduction in value criterion as an indication of a significant decline in property value to "high CLTV" situations, *i.e.*, when a borrower's combined loan-to-value ratio is 90% or more. (*Id.* § 3.1(f).)

7. *Service Assurances*: For the 12-month period following the Effective Date, Chase agrees to use only AVM models that have gone through its testing and validation processes. Chase further agrees to not materially change its customer service processes for notifying borrowers of account suspensions or reductions and addressing customer requests for reinstatement, unless the changes are beneficial to borrowers. (*Id.* § 3.1(g).)

8. *Future Changes in Law or Regulations*: To the extent Congress, the OCC, the Consumer Financial Protection Bureau, or any other relevant regulatory authority promulgates any law, regulation, interpretation, or clarification that would govern any conduct affected by the Settlement, those laws and regulatory provisions shall control. (*Id.* § 3.1(h).) Chase will maintain

11

the ability to modify its policies and practices based on amendments or clarifications of applicable law as enacted or interpreted by the courts, Congress, or federal regulators or as necessary for Chase to comply with any such amendment, interpretation, or clarification. (*Id.*)

9. *Benefits Specific to Former Customer Subclass Members*: Members of the Former Customer Subclass who submit complete and valid Claim forms attesting that they incurred damages as a result of their HELOC suspension may receive a cash payment in the amount of $35, payable by Chase. The Claims Administrator will cause checks to be sent to approved claimants within sixty (60) days following the Effective Date. (*Id.* § 3.2.)

**C. Other Relief**

In addition to the settlement benefits discussed above, Chase has agreed to provide the following relief:

1. *Payment of Notice and Administrative Fees*: All settlement administration expenses will be paid by Chase. (*Id.* § 7.3.)

2. *Compensation to the Class Representatives*: Chase has agreed to pay, subject to approval of the Court, a collective incentive award to the named Plaintiffs in the total amount of $31,500 divided in seven equal parts as follows: Mr. Cavanagh ($4,500), the Franks ($4,500 collectively), Ms. Hackett ($4,500), Mr. Malcolm ($4,500), Mr. Mayes ($4,500), Mr. Walsh ($4,500), and Mr. Wilder ($4,500). (*Id.* § 9.3.)

3. *Payment of Attorneys' Fees and Expenses*: Under the Settlement Agreement, Chase has agreed not to oppose proposed Class Counsel's request for $1,800,000 for attorneys' fees and reimbursement of expenses and agrees that these amounts are reasonable. (*Id.* § 9.1.) The requested fees and expenses are subject to Court approval and proposed Class Counsel will provide appropriate support for the request at least 2 weeks prior to the objection deadline.

### D.  The Release

In exchange for the relief provided above, and upon the entry of a final order approving this Settlement, Chase and each of its related affiliates and entities will be released from any claims, whether know or unknown, arising out of or relating to Chase's HELOC treatment policies, systems, standards, and procedures, including, without limitation, its HELOC account restrictions, credit limit reductions, and reinstatement standards and processes, that were or could have been alleged in the Complaint or the underlying class action complaints of the named Plaintiffs. (*See* Settlement Agreement §§ 1.28-1.30, § 4 for the full release.)

## III.  THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS AND SUBCLASS

Granting preliminary approval of a class action settlement requires class certification for settlement purposes. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Manual for Complex Litigation* §21.632 (4th ed. 2004). Federal Rule of Civil Procedure 23(a) provides that a class may be certified where: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000). As shown below, the proposed Settlement Class and Subclass meet each of Rule 23(a)'s requisites to certification.

Upon meeting Rule 23(a), the proposed class must also satisfy one of the three provisions of Rule 23(b). For the Class, certification is sought pursuant to Rule 23(b)(2). Rule 23(b)(2) provides that a class action can be maintained where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." For the Former

Customer Subclass, Plaintiffs seek certification under Rule 23(b)(3), which requires that common questions of law or fact predominate over issues affecting only individual members and that the maintenance of the lawsuit as a class action is superior to other methods for the fair and efficient adjudication of the controversy. *Amchem*, 521 U.S. at 615 (1997); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

When determining whether to certify a class action for settlement purposes, a court should accept the allegations of the plaintiff's complaint as true, but may consider matters beyond the pleadings to determine if the claims are suitable for resolution on a class-wide basis. *See Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993); *Redd v. Arrow Fin. Servs., LLC*, No. 03 C 1341, 2004 WL 1117844, at *1 (N.D. Ill. Mar. 31, 2004). In this case, both the pleadings and the discovery produced show that all of the prerequisites for certification are met with respect to the proposed Settlement Class and Subclass.

### A.  The Proposed Settlement Class and Subclass are Ascertainable and Numerous.

The first requirement for certification is that the proposed class is ascertainable. *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348 (N.D. Ill. 2008). A class must be "identifiable as a class, and membership must be determinable through application of objective criteria." *G.M. Sign, Inc. v. Group C Commc'ns, Inc.*, No. 08-CV-4521, 2010 WL 744262, at *2 (N.D. Ill. Feb. 25, 2010); *see also* 5 James Wm. Moore et al., Moore's Federal Practice*, ¶ 23.21[1] (3d ed. 2001) (same). Objective criteria includes a defendant's business records. *See, e.g., Franks v. MKM Oil, Inc.*, No. 10 CV 00013, 2012 WL 3903782, at *5 (N.D. Ill. Sept. 7, 2012) (class is "easily ascertainable" through "ADP pay records"); *Mezyk v. U.S. Bank Pension Plan*, No. 3:09-CV-384-JPG-DGW, 2012 WL 2913213, at *1 (S.D. Ill. July 16, 2012) (certification appropriate where "class members are ascertainable through Defendants' records").

Once ascertained, the class must be so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). No specific number is required to satisfy this factor, nor is a plaintiff required to state the exact number of class members. *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006). Generally, "[t]he court is permitted to make common-sense assumptions that support a finding of numerosity." *Maxwell v. Arrow Fin. Servs., LLC,* No. 03 C 1995, 2004 WL 719278, at *2 (N.D. Ill. March 31, 2004). A plaintiff need not provide an exact number, but membership must "be ascertained by reference to objective criteria and may be defined by reference to defendant's conduct." *Hinman v. M and M Rental Ctr., Inc.,* 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008).

Chase has already identified from its records: (1) the customers whose HELOCs it suspended or reduced based upon a claim by Chase that the borrower's home value had significantly declined, (2) the number of customers eligible for proactive reinstatement, and (3) the number of borrowers who closed their accounts following an adverse action and are eligible for the $35 payment. Each group consists of thousands[4] of HELOC customers. (Woodrow Decl. ¶ 9.) Thus, ascertainability and Rule 23 numerosity are readily satisfied.

**B.  The Settlement Class and Subclass Share Common Issues of Law and Fact.**

The second threshold to class certification requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is present where a "common nucleus of operative fact" exists, even if as to one question of law or fact, *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), and is often found where "defendants have engaged in

---

[4]    The precise number of former HELOC customers who fall into the Class and Subclass remains subject to the Court's Protective Order. (Dkt. 68.) Consistent with the Protective Order, proposed Class Counsel is prepared to share the numbers and any other information necessary with the Court during the preliminary approval hearing.

standardized conduct toward members of the proposed class." *Whitten v. ARS Nat'l Servs. Inc.*, No. 00 C 6080, 2001 WL 1143238, at *3 (N.D. Ill. Sept. 27, 2001) (internal quotations omitted). Commonality is a readily surmountable hurdle. *Scholes v. Stone, McGure, & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992).

In this case, the Settlement Class Members share common claims arising out of the same conduct—having had their HELOCs suspended by Chase allegedly in the absence of a significant decline in the value of their homes. Plaintiffs allege that in none of their cases did Chase actually determine that their home values had significantly declined. Indeed, Chase did just the opposite: it intentionally used faulty AVMs to falsely undervalue their properties.

Discovery has confirmed that Chase applied its standard "waterfall" logic to its HELOC portfolio, running borrowers through a common cascade of AVMs and treatment criteria prior to effectuating its suspensions and reductions. (Woodrow Decl. ¶ 6.) Plaintiffs challenged the design and results of these allegedly flawed processes and the use of these AVMs, claiming that they enabled the bank to suspend accounts in the absence of any legal basis as recognized by TILA and Regulation Z. The Class Members therefore share common legal issues concerning the requirements of TILA and Regulation Z under such circumstances, the language of their HELOC contracts and notices, and whether the bank determined that the Class Members' homes had significantly declined in value prior to suspending or reducing the accounts.

Chase employed uniform policies with respect to its HELOC suspension programs and all proposed Settlement Class Members were subjected to identical standards when Chase considered their HELOCs for possible suspension. Whether these policies and procedures ran afoul of TILA, Regulation Z, and the customers' HELOC agreements (which, like TILA, limit the instances where a creditor can suspend or reduce a HELOC) can be answered in a single

proceeding.

Likewise, with regard to the Former Customer Subclass members, common questions include those generally applicable to the Class, in addition to asking whether the borrowers closed their HELOCs following a suspension or reduction due to a purported decline in property value. Commonality is satisfied accordingly.

**C.  The Proposed Class Representatives' Claims Are Typical.**

Rule 23 next requires that Plaintiffs' claims be typical of those of the proposed Class. Fed. R. Civ. P. 23(a)(3). Typicality is closely related to the commonality requirement and is satisfied if plaintiffs' claims arise from "the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 432 (N.D. Ill. 2003) (internal quotations omitted). Factual differences will not preclude a finding of typicality; the claims of a named plaintiff need only share "the same essential characteristics" as those of the class. *Id.* Indeed, "'[s]imilarity of legal theory is more important than factual similarity.'" *Id.* (quotation omitted).

The proposed Class Representatives have suffered the same or similar injury as the rest of the Class and Subclass—their HELOCs were reduced or suspended based on allegedly false claims that their home values had significantly declined. And their injuries stem from the same conduct—Chase's allegedly improper HELOC suspension, reduction, and reinstatement procedures. No allegations are based on conduct unique to the Named Plaintiffs. Likewise, Hackett and Walsh closed their HELOCs and therefore have claims typical of former customers. As such, typicality is met here.

**D.  Proposed Class Counsel and the Named Plaintiffs Have and Will Continue to Fairly and Adequately Represent the Interests of the Class and Subclass.**

The final Rule 23(a) prerequisite requires that the representative parties have and will

continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. Plaintiffs, as class representatives, must establish that: (1) their claims are not antagonistic or in conflict with those of the proposed Class, (2) they have sufficient interests in the outcome of the case, and (3) they are represented by experienced, competent counsel. *Hinman*, 545 F. Supp. 2d at 807. It is persuasive evidence of the adequacy of proposed class counsel that they have been found adequate in other cases. *Gomez v. Ill. State Bd. of Educ.,* 117 F.R.D. 394, 401 (N.D. Ill. 1987).

The named Plaintiffs have no conflicts with the other Class and Subclass Members—their interests are entirely consistent. Everyone has allegedly experienced the suspension of their HELOCs due to a purported significant decline in their home values that they claim the bank essentially fabricated, under the pretext of an AVM. Likewise, Plaintiffs Hackett and Walsh have closed their Chase HELOCs and therefore represent the Subclass members eligible to file a claim for monetary relief. (Woodrow Decl. ¶ 16.) Plaintiffs' active participation in this litigation has included communicating extensively with Interim Class Counsel, providing numerous documents, reviewing and discussing drafts of briefs, and assisting in the legal and factual research to support their claims. (*Id.*) As such, each of the Plaintiffs has demonstrated that he or she has and will continue to protect the interests of the proposed Class. (*Id.*)

Likewise, proposed Class Counsel have regularly engaged in major complex litigation, and have extensive experience in consumer class action lawsuits, especially those related to the banking industry and HELOC litigation, that are similar in size, scope, and complexity to the present case. (*Id.* ¶¶ 17-18; *see also* Firm Resumes, attached hereto as Group Exhibit C.) Proposed Class Counsel are among the leading attorneys in the nation with respect to the

circumstances that trigger the ability of financial institutions to suspend or reduce HELOCs under TILA, Regulation Z, and their respective HELOC contracts. (*See* Dkt. 4.) Edelson McGuire, one of the co-lead firms, was also appointed class counsel in the litigation challenging Citibank's and Wells Fargo's HELOC suspension practices. *In re Citibank HELOC Reduction Litig.*, No. 09-cv-0350-MMC, Dkt. XX (N.D. Cal. Oct. 26, 2012); *Hamilton v. Wells Fargo Bank*, N.A., No. 09-cv-4152-CW, Dkt. 109 (N.D. Cal. May 14, 2012)[5]. Edelson McGuire lawyers have also prosecuted similar cases against other industry actors, including National City Bank, Bank of America, OneWest Bank, and GMAC Mortgage, (Woodrow Decl. ¶ 18), and the firm took the lead in responding to the Federal Reserve Board of Governors' request for public comment on proposed changes to Regulation Z's HELOC suspension rules (*Id.* ¶ 19).

Accordingly, the named Plaintiffs and proposed Class Counsel will adequately represent the proposed Class and Subclass and their interests.

### E. The Proposed Settlement Class and Subclass Meet the Requirements of Rule 23(b)(2) and Rule 23(b)(3), respectively.

The proposed Class and Subclass satisfy at least one of the three proscriptions set forth in Rule 23(b). *Payton v. County of Kane,* 308 F.3d 673, 680 (7th Cir. 2002). The primary relief secured for the Settlement Class is injunctive in nature, and, accordingly, certification of the Class is sought under Rule 23(b)(2). With respect to the Former Customer Subclass, the relief is predominantly money damages, warranting certification under Rule 23(b)(3).

#### 1. *The Settlement Class Should Be Certified Under Rule 23(b)(2).*

Certification of the Class under Rule 23(b)(2) is appropriate. Rule 23(b)(2) provides that a class action can be maintained where "the party opposing the class has acted or refused to act on

---

[5] Edelson McGuire lawyers were also appointed class counsel in the *Schulken* HELOC case against Chase. *Schulken*, 09-cv-2708-LHK (N.D. Cal. Jan. 5, 2012) (Dkt. 184).

grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." As the Supreme Court explained in *Dukes*, "the key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011).

Chase applied its HELOC treatment program uniformly, acting on grounds that applied to the Class as a whole. Under the terms of the Settlement Agreement, Chase's conduct is enjoined as to all of the Settlement Class Members, as opposed to just some of them. Because Chase's policies as applied to the Class as a whole were at the heart of this lawsuit, the Settlement secures reforms to these practices on behalf of all customers. The Settlement recognizes that Chase refined its HELOC policies following the initiation of these lawsuits in several ways that are more favorable to borrowers and secures Chase's agreement to refrain from making any changes to its practices that are less favorable for consumers. (Settlement Agreement § 3.1(g).)

Also, during the twelve-month period following approval of the Settlement Agreement, Chase has agreed to engage in proactive reinstatements, provide customers with notice of their respective rights to seek reinstatement, and to enhance its suspension and reduction notices to provide the information borrowers actually need to determine whether to appeal. (*Id.* § 3.1(a)-(c).) Chase has also agreed to refrain from using certain AVM tiers, to limit its use of 5% reduction in value as an indicator of significant decline to situations where a borrower's combined LTV is greater than 90%, and to continue reimbursing borrowers who successfully appeal Chase's suspensions or reductions for upfront appraisal charges. (*Id.* § 3.1(d)-(f).) Accordingly, because the relief sought by and afforded to the Settlement Class is injunctive in

nature, certification under Rule 23(b)(2) is appropriate for the Class.

2. *The Former Customer Subclass Should Be Certified Under Rule 23(b)(3).*

Rule 23(b)(3) provides that a class action can be maintained where (1) the questions of law and fact common to members of the class predominate over any questions affecting only individuals, and (2) the class action mechanism is superior to the other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *see also Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328, 331-32 (N.D. Ill. 2006). The circumstances surrounding the Former Customer Subclass readily meet this standard.

a. Common questions of law and fact predominate.

The focus of the predominance requirement is whether the proposed class is sufficiently cohesive to warrant adjudication by representation. *Amchem*, 521 U.S. at 623. "Each class member must share common questions of law or fact with the rest of the class, therefore making class-wide adjudication of the common questions efficient compared to the repetitive individual litigation of the same question." *Lemon v. Int'l Union of Operating Eng'g.*, 216 F.3d 577, 581 (7th Cir. 2000). While the common issues must predominate, they need not be exclusive. *Radamanovich*, 216 F.R.D. at 435.

For the Former Customer Subclass, the predominant issue asks whether Chase, through its HELOC suspension and reduction policies, actually determined that borrower home values had significantly declined or, instead, whether Chase suspended their accounts (using the same faulty AVM models and standards, as Plaintiffs allege) in the absence of a significant decline in value. This will determine for everyone whether Chase violated TILA and Regulation Z, ran afoul of state consumer protection statutes, and breached their HELOC contracts. And for the Subclass, the central factual issue likewise asks whether Chase's HELOC practices led to them closing

their accounts and, if so, whether they incurred damages.

Chase's policies and procedures with respect to HELOCs are universal, both in design and implementation, as to all Class and Subclass Members. As such, common questions drive this litigation and predominate over any individual issues.

      b.   This class action, and especially this class action settlement, is the superior method for adjudicating the Class and Subclass's HELOC suspension claims.

Certification of this suit as a class action is superior to any other method available to fairly, adequately, and efficiently resolve the claims of the Subclass Members. Superiority focuses on whether class treatment will increase efficiency in the litigation and is satisfied where class members have uniform claims governed by the same law. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002); *see also Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (in cases where "the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate . . . society may gain from the deterrent effect of financial awards" on a class basis.).

Absent a class action, and considering the fact that the Subclass includes hundreds of people, most Members of the proposed Subclass would find the cost of litigating their claims to be prohibitive and, moreover, such an influx of individual actions would be judicially inefficient. Also, as the matter presents a proposed settlement, issues of manageability attendant to trial are avoided. *See Amchem*, 521 U.S. at 620 (citation omitted) ("[C]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems."). Accordingly, common questions predominate and a class action is the superior method of adjudicating this controversy for the Former Customer Subclass in satisfaction of Rule 23(b)(3).

Hence, in addition to satisfying each of the elements of Rule 23(a), the proposed Class meets the requirements of Rule 23(b)(2) and the Subclass satisfies Rule 23(b)(3). As a result, this Court

should certify the proposed Class and Subclass for the purpose of effectuating this settlement.

## IV. THE COURT SHOULD CONFIRM THE APPOINTMENT OF CLASS COUNSEL

Following certification, Rule 23 requires a court to appoint class counsel that will fairly and adequately represent the class members. Fed. R. Civ. P. 23(g)(1)(B). In doing so, the Court must consider counsel's: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

This Court has already made a preliminary determination regarding proposed Class Counsel's suitability, ordering their appointment as Interim Co-Lead Class Counsel on July 16, 2010. (Dkt. 37.) Since that time, Class Counsel's experience with HELOC class actions has only intensified. Again, the members of the proposed Class Counsel group have been at the forefront of the HELOC suspension and reduction litigation since its onset. (Dkt. 4 at 4-6.) Prior to initiating litigation, proposed Class Counsel engaged in a far-reaching investigation in the HELOC suspension standards and practices of several of the nation's leading financial institutions, compared and contrasted the various banks' policies and practices, and determined which banks were in compliance with TILA and Regulation Z, and which were not. (Woodrow Decl. ¶ 3.)

Likewise, before the actions were centralized, proposed Class Counsel led or participated in briefing motions to dismiss in the *Wilder*, *Walsh*, *Hackett*, *Frank* and *Cavanagh* matters and engaged in extensive written discovery in the *Hackett* case—including analyzing thousands of documents produced by Chase and its primary AVM vendor, CoreLogic. (Woodrow Dec. ¶¶ 5-6.) Proposed Class Counsel also briefed several motions to strike affirmative defenses in the

cases. (*See, e.g., Hackett* Dkt. 34.) All told, Class Counsel have diligently investigated and prosecuted this matter, dedicating substantial resources to the litigation, and have successfully negotiated the settlement of this matter to the benefit of the proposed Class.

Accordingly, the Court should confirm its earlier ruling and appoint Jay Edelson and Steven L. Woodrow of Edelson McGuire, LLC, Karin Fisch of Abbey Spanier Rodd & Abrams, LLP, and Brian Murray of Murray Frank, LLP[6] as Class Counsel pursuant to Rule 23(g).

## V.  THE PROPOSED SETTLEMENT FALLS WITHIN THE RANGE OF FINAL APPROVAL AND THUS WARRANTS PRELIMINARY APPROVAL

The next step requires the Court to determine whether the Settlement falls within the range of final approval. It certainly does. Courts review proposed class action settlements using a well-established two-step process. Conte & Newberg, 4 *Newberg on Class Actions*, §11.25, at 38-39 (4th Ed. 2002); *see also Armstrong v. Board of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." *Newberg*, §11.25, at 38-39; *Armstrong*, 616 F.2d at 314. This is not a fairness hearing, but rather, a hearing "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong*, 616 F.2d at 314. The preliminary approval stage is an "initial evaluation" of the fairness of the proposed settlement based on the written submissions and informal presentation from the settling parties. *Manual for Complex Litigation,* § 21.632. If the Court

---

[6] Ms. Jacqueline Sailer has left the firm since she was appointed by this Court as Interim Co-Lead Class Counsel. (Dkt. 37.) Mr. Brian Murray has been involved in this litigation and is now seeking appointment as Class Counsel in her place.

finds a settlement proposal "within the range of possible approval," the case proceeds to the second step—the final fairness hearing. *Newberg*, §11.25, at 38-39.

There are strong judicial and public policies favoring the settlement of class actions. *Isby v. Bayh*, 75 F.3d 1191, 1198 (7th Cir. 1996). Although the standards on preliminary approval "are ultimately questions for the fairness hearing that comes after a court finds that a proposed settlement is within approval range, a more summary version of the same inquiry takes place at the preliminary phase." *Kessler v. Am. Resorts Int'l,* No. 05 C 5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (citing *Armstrong*, 616 F.2d at 314). Thus, the factors to be considered by the Court are: (1) the strength of the Plaintiffs' case compared to the amount of the settlement offer, (2) an assessment of the likely complexity of a trial, (3) the length and expense of the litigation, (4) the amount of opposition to settlement among affected parties, (5) the opinion of competent counsel, and (6) the stage of the proceedings and amount of discovery completed at the time of settlement. *Id.* (citing *Isby,* 75 F.3d at 1199).

Applying the six-factor test to the instant Settlement—which achieves industry leading reforms and will result in the restoration of significant sums of bargained-for, available credit— clearly demonstrates that it is well within the range of "fair, reasonable and adequate."

### A. The Settlement Produces Exceptional Results for the Class, Especially When Compared with the Inherent Risk of Continued Litigation.

First, the Settlement provides exceptional results for Class Members, especially when considered in light of the risk and complexity of litigation. As explained above, the mass wave of HELOC suspensions and reductions began to occur in 2008 in the wake of the financial and housing market collapse. (Woodrow Decl. ¶ 2.) Although Plaintiffs and their counsel are confident in the strength of their legal claims and that they would ultimately prevail at trial, they also recognize that litigation is inherently risky. (*Id.* ¶ 20.) The issues are novel—research has

25

failed to uncover a single class action proceeding to trial challenging a bank's HELOC suspension and reduction practices. Thus, when balanced against the strength of the settlement, it is apparent that the Settlement produces an exceptional result for Class Members. (*Id.*)

Class Members with suspended HELOCs generally seek reinstatement of their credit privileges, and the Settlement therefore focuses on achieving and maximizing such relief. (Settlement Agreement, §3.1(b).) First, Chase has committed to conducting proactive account reinstatements (*Id.* § 3.1(a)) that carry the potential of restoring billions of dollars worth of affordable credit to the Settlement Class Members. (Woodrow Decl. ¶ 8.) Second, discovery has shown that Chase has periodically made alterations to its HELOC treatment policies, including refinements that were made following the initiation of these lawsuits that are more beneficial to its customers. (*Id.* ¶ 7.) The Settlement assures these policies won't be walked back in any way less favorable to customers and features a Notice of Right to Seek Reinstatement that specifically apprises customers of these changes and of their ability to request reinstatement under Chase's current HELOC suspension criteria. Proposed Class Counsel anticipate based on their investigation that a significant percentage of suspended borrowers will respond by applying for reinstatement and that, of those who do, a meaningful number will be reinstated. (*Id.* ¶ 8.) Thus, like the proactive reinstatements, the notice will also lead to restored access to significant levels of credit.[7]

Third, for twelve months following Final Approval, the Settlement Agreement requires that Chase send enhanced HELOC suspension and reduction notices to its borrowers when Chase

---

[7]  Class counsel's investigation into the HELOC lending industry and both formal and informal discovery in this case indicates that Chase customers have a meaningful opportunity to receive reinstatement once they apply. In other words, customers who seek reinstatement have a significant rate of success such that encouraging more customers to seek reinstatement should result in restored credit lines. (Woodrow Decl. ¶ 8.)

suspends accounts based on its determination that its borrowers' homes have significantly declined in value. The enhanced notices must include the home value an appraisal would have to report to reinstate the HELOC. (Settlement Agreement, § 3.1(c).) This type of information is critical, as without it borrowers cannot make reasonably informed decisions as to whether they should invest the money upfront to appeal.

Fourth, Class Members will benefit from the Settlement's prohibition on the use of inaccurate AVMs—specifically, AVMs identified as Tier 3b, 4b, or 5b. (*Id.* § 3.1(d).) Class Members will likewise benefit from Chase's 12-month commitment to continue refunding appraisal fees paid by customers who successfully appeal a HELOC suspension based upon a property value decline. (*Id.*, § 3.1(e).) This will directly address situations, like those experienced by Plaintiff Cavanagh, where the AVM reported a grossly low value and an appraisal confirmed that the home value supports the full HELOC. (*Cavanagh* Dkt. 1.) Chase has also agreed to limit its use of a 5% reduction in property value as an indicator of "significant decline" to situations where the borrower's combined loan-to-value ratio is 90% or more. (Settlement Agreement, § 3.1(f).) This policy will directly impact borrowers like Plaintiff Wilder who—based on Chase's records—had a maximum combined LTV of 78% when his HELOC was suspended based on a supposed 5% drop. (*Wilder* Dkt. 1.)

Finally, Former Customer Subclass Members—who closed their Chase HELOC, will receive a cash payment of $35 upon filing a claim form attesting that they incurred damages as a result of their HELOC suspension.[8]

Given the uphill path the Class faced with respect to adversarial class certification, summary

---

[8] Again, the total sum being made available is significant and, given that it is subject to a protective order, can be readily made available to the Court at the preliminary approval hearing.

judgment, and trial—coupled with substantial evidence and testimony regarding Chase's

HELOC suspension policies and procedures and expert testimony regarding the sufficiency of

Chase's AVMs and other valuations, damages, and other complex issues—the Settlement

Benefits likely represent the best the Class could possibly have done had the litigation proceeded

on adversarial grounds.

**B. The Length and Extent of the Litigation Favors Settlement.**

The Parties have invested significant time and resources to this litigation both prior to and

following centralization. As will be explained in Class Counsel's papers filed in support of any

request for reasonable attorneys' fees, should the Settlement be preliminarily approved, Class

Counsel's lodestar—which is based on thousands of hours of attorney time—presently meets

(and will ultimately exceed) the fees requested. Class Counsel has also incurred significant costs

and expenses. Likewise, the Parties have spent considerable time negotiating, drafting, and

finalizing the Settlement Agreement and related documents. As further litigation would cost

several million dollars to prosecute given the size and scope of the case, the need for experts, and

the complexity of the claims—coupled with the reality that a trial would be unlikely to produce

more meaningful results for Class Members—this Court should find this factor weighs in favor

of approval.

**C. Proposed Class Counsel Readily Support the Settlement, Which Compares
    Favorably to Other Industry HELOC Class Action Settlements.**

Class Counsel readily support the Settlement, which as explained above achieves exceptional

results for Class Members. The Settlement is consistent with other HELOC settlements. *See*

*Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-4152-CW, Dkt. 109 (N.D. Cal., final approval

May 14, 2012); *Schulken v. Washington Mut. Bank*, No. 09-cv-2708-LHK (N.D. Cal., final

approval granted November 13, 2012 (Dkt. 223)); *In re Citibank HELOC Reduction Litig.*, No.

09-cv-0350 (N.D. Cal., preliminary approval granted Nov. 6, 2012 (Dkt. 173)).[9]

In *Wells Fargo*, the plaintiffs alleged that Wells Fargo unlawfully restricted their HELOCs by claiming either that their financial circumstances had worsened or that their home value had significantly declined. As is the case here, the agreement, which was finally approved by Judge Wilken on May 14, 2012, called for Wells Fargo to engage in proactive reinstatements and send class members a notice of right to request reinstatement. (Ex. D.) And like here, discovery showed the bank made beneficial changes following the initiation of the lawsuits, and the bank was prevented from changing its policies and procedures in a manner less favorable to borrowers. Finally, the settlement provides for a $150 cash payment to those former Wells Fargo borrowers who incurred "deferred origination fees" when closing their HELOC accounts. (*Id.*)

Similarly, in the *Citibank* settlement, the bank must provide a notice of right to seek reinstatement and has made improvements to its HELOC suspension notices. (Ex. F.) Like here, Citibank is required to make available the value a borrower needs for reinstatement so that customers can make an informed decision whether to appeal. (*Citibank* Settlement Agreement, § 3.1.) And like the Wells Fargo settlement and this case, Citibank, which made beneficial changes after the lawsuits against it were filed, has committed to ensuring those improved policies are not made less favorable to homeowners. Cash payments of $120 are also available for a subset of former customers who paid termination fees. (*Id.* § 3.2.)

While the relief to former customers here is facially lower than that offered in the *Wells Fargo* and *Citibank* deals, in those settlements only former customers who incurred deferred origination charges or early termination fees were eligible to receive a cash award. Here, *every* former customer may file a claim for an award. The award should help offset any damages

---

[9] True and accurate copies of the *Wells Fargo* final approval order, *Schulken* final approval order, and *Citibank* Settlement Agreement are attached as Exhibits D, E, and F.

incurred, such as insufficient funds fees, appraisal or application fees associated with obtaining a new HELOC, annual fees paid to their new lender, or any other fees incurred as a result of the HELOC suspension.

Accordingly, when compared to major settlements involving Chase's main competitors, the instant Settlement combines their best attributes and provides the broadest relief to the most people.[10]

**D. The Stage of Proceedings and Discovery Conducted Warrant Approval.**

Finally, the Settlement was the result of more than two-year hard-fought and contentious litigation, the production and review of thousands of documents in discovery, centralization of the actions before this Court, and over a year of hard-fought settlement negotiations. (Woodrow Decl. ¶¶ 2-15.) The discovery provided includes Chase's monthly HELOC line management reporting, detailed answers to interrogatories, deposition testimony, and additional confirmatory discovery produced in connection with the mediation process. (*Id.* ¶ 6.)

Most importantly, settlement discussions began after this Court ordered counsel to meet face-to-face. The Parties eventually participated in a lengthy mediation process overseen by Judge Andersen, during which they discussed the case and whether certain forms of relief were realistically available, eventually reaching an agreement. (Settlement Agreement, Recital E.); (Woodrow Decl. ¶¶ 11-15.) These negotiations spanned over an entire year—it was not a quick sell-out settlement for either party. (*Id.*) To the contrary, both sides communicated their willingness to go forward with litigation on multiple occasions and only reached an agreement

---

[10]  The *Schulken* settlement, which was finally approved by Judge Koh on November 13, 2012, resolved a subset of Chase's HELOC suspensions focused on the bank's former "income verification program." (Ex. E.) In light of Judge Koh's decision certifying a Class and Subclass under Rule 23(b)(3), the relief in that case involved cash relief set up through a claims process. (*Id.*)

after meaningful and protracted negotiations overseen by Judge Andersen. (*Id.* ¶¶ 13-14.)

Accordingly, the Parties are well-informed of the underlying issues in the matter and have devoted significant time to the development of the underlying factual and legal issues. This Settlement thus easily falls "within the range of possible approval," is fair, reasonable and adequate, and should be preliminarily approved.

## VI.  THE PROPOSED PLAN OF CLASS NOTICE

Once the settlement is preliminary approved, Rule 23 and Due Process require that "the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Rule 23(e)(1) similarly says, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Fed. R. Civ. P. 23(e)(1). Notice is "adequate if it may be understood by the average class member." Newberg, § 11:53 at 167. The substance of the notice to the settlement class must describe the nature of the action, the definition of the class to be certified, the class claims and defenses at issue, as well as explain that settlement class members may enter an appearance through counsel if so desired, request to be excluded from the settlement class, and that the effect of a class judgment shall be binding on all class members. *See* Fed. R. Civ. P. 23 (c)(2)(B).

In this case, the Settlement Agreement contemplates a comprehensive notice plan designed to reach as many potential Class Members as possible. (Settlement Agreement, § 5.)

### A.  U.S. Mail Notice

Within 30 days of entry of the Order granting preliminary approval, Chase is required to cause Notice to be sent to all Settlement Class Members via U.S. Mail to the last known address

in Chase's records, as updated using the National Change of Address registry. (*Id.* § 5.1(b).) The direct notice mailing will include the claim form for Former Customer Subclass Members. (*Id.*)

### B.  Internet Publication

Within 14 days of preliminary approval, the traditional "long form" notice will be posted to the Settlement Website at a domain name to be agreed upon by the Parties. (*See id.* § 5.1(a); Ex. 4 to the Settlement Agreement.) The long form notice describes the terms of the Settlement, gives notice to the Class Members of their right to seek reinstatement of the suspended or reduced HELOCs, and provides a mechanism for the Former Customer Subclass Members to download their claim forms online. (*Id.*) It also provides all information Class and Subclass Members need for objecting and requesting exclusion.

### C.  CAFA Notice

The Settlement Agreement further requires that Chase comply with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA"), by serving notice of the proposed Settlement along with all other required documentation to any appropriate state and federal government officials. (Settlement Agreement, § 5.2(c).) No later than 14 days before the Final Fairness Hearing, Chase and/or the Settlement Administrator are required by the Settlement Agreement to provide affidavits to Class Counsel confirming that the notices were sent in accordance with the Court's anticipated Order granting preliminary approval. (*Id.* § 5.3.)

The format and language of each form of notice has been drafted so that it is in plain language, is easy to read, and will be readily understood by the Members of the proposed Class and Subclass. (See Exs. 3 and 4 to the Settlement Agreement.) Accordingly, the proposed notice comports with Rule 23 and the requirements of Due Process and should be approved.

## VII.    CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court certify the Class and the Former Customer Subclass, appoint William Cavanagh, Robert M. Frank, Maria I. Frank, Shannon Hackett, Michael Malcolm, Daryl Mayes, Michael Walsh, and Robert Wilder as the Class Representatives and Shannon Hackett and Michael Walsh as Subclass Representatives, appoint Jay Edelson and Steven L. Woodrow of Edelson McGuire, LLC, Karin Fisch of Abbey Spanier Rodd & Abrams, LLP, and Brian Murray of Murray Frank, LLP as Class Counsel, grant preliminary approval of the proposed Settlement Agreement, approve the form and manner of notice described above, and grant such further relief the Court deems reasonable and just.

Dated: November 20, 2012                        Respectfully Submitted,

                                                 EDELSON MCGUIRE, LLC


                                                 /s/ Steven L. Woodrow

                                                 Jay Edelson, Esq.
                                                 Steven Lezell Woodrow, Esq.
                                                 Evan Meyers, Esq.
                                                 Irina Slavina, Esq.
                                                 EDELSON MCGUIRE, LLC
                                                 350 N. LaSalle Drive, Suite 1300
                                                 Chicago, IL 60654
                                                 Tel: (312) 589-6370
                                                 Fax: (312) 589-6378
                                                 jedelson@edelson.com
                                                 swoodrow@edelson.com
                                                 emeyers@edelson.com
                                                 islavina@edelson.com

                                                 Karin E. Fisch, Esq.
                                                 ABBEY SPANIER RODD & ABRAMS, LLP
                                                 212 East 39th Street
                                                 New York, NY 10016
                                                 Tel: (212) 889-3700
                                                 Fax: (212) 684-5191

kfisch@abbeyspanier.com

Brian Murray, Esq.
Murray Frank, LLP
75 Madison Avenue, 8th Floor
New York, NY 10016
Tel: (202) 682-1818
Fax: (212) 682-1892
bmurray@murrayfrank.com

Interim Co-Lead Counsel

**CERTIFICATE OF SERVICE**

    I, Irina Slavina, an attorney, hereby certify that on November 20, 2012, I electronically filed the foregoing *Plaintiffs' Motion for Preliminary Approval of Class Action Settlement* with the Clerk of the Court using the CM/ECF system. Notice of this filing is sent to all counsel of record by operation of the Court's electronic filing system.


                                   /s/ Irina Slavina