**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: JP Morgan Chase Bank Home Equity Line of Credit Litigation | ) ) ) ) ) ) ) | MDL No. 2167 <br><br> Master Docket Case No. 10-cv-3647 <br><br> Judge Rebecca R. Pallmeyer |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT**

Jay Edelson
Steven L. Woodrow
Evan M. Meyers
EDELSON MCGUIRE LLC
350 N. LaSalle Drive, Suite 1300
Chicago, IL 60654
Tel: (312) 589-6379
Fax: (312) 589-6378
jedelson@edelson.com
swoodrow@edelson.com
emeyers@edelson.com

*Counsel for Plaintiffs and the Settlement Class*

(Additional Counsel appear on signature page)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I.   INTRODUCTION .......................................................................................... 1

II.  HISTORY OF THE LITIGATION ................................................................ 2

III. KEY TERMS OF THE SETTLEMENT AGREEMENT ................................ 9

    A.  Class Definitions .................................................................................. 9

        1.  *Class* ............................................................................................ 9

        2.  *Former Customer Subclass ("Subclass")* ............................... 9

    B.  The Settlement Benefits ....................................................................... 9

        1.  *Proactive Account Reinstatements* ......................................... 9

        2.  *Notice of Right to Request Reinstatement* ............................ 10

        3.  *Enhanced Account Suspension/Reduction Notices* .............. 10

        4.  *Limitation on Use of AVMs* .................................................... 10

        5.  *Reimbursement of Appraisal Fee* .......................................... 11

        6.  *Limitation on Use of 5% Reduction Criterion* ..................... 11

        7.  *Service Assurances* .................................................................. 11

        8.  *Future Changes in Law or Regulations* ................................. 11

        9.  *Benefits Specific to Former Customer Subclass Members* .... 11

    C.  Payment of Notice and Administrative Expenses ............................. 12

    D.  Class Representative Incentive Award ............................................. 12

    E.  Payment of Reasonable Attorneys' Fees and Expenses .................... 12

    F.  Release of Claims ............................................................................... 12

IV. THE CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23 ............ 13

**V. THE SETTLEMENT AGREEMENT WARRANTS FINAL APPROVAL** ................... 15

    **A. The Strength of the Plaintiffs' Case on the Merits, Compared to the Exceptional Benefits Achieved by the Settlement, Weighs in Favor of Granting Approval** ......... 15

        1. *The Class faced significant procedural and substantive defenses in addition to the inherent risks posed by complex litigation* ................................................................. 16

        2. *The Settlement provides benefits arguably beyond the requirements of TILA and Regulation Z* ................................................................. 17

    **B. Continued Litigation Would Likely Be Time Consuming and Expensive, and Would Require the Resolution of Several Complex Issues** ......................................... 19

    **C. The Reaction of Class Members Has Been Overwhelmingly Positive, Further Supporting the Fairness of the Settlement** .................................................... 20

        1. *Objections to the amount of cash relief* .................................................... 21

        2. *Objections to the restoration of credit* .................................................... 22

        3. *Objections that the Settlement does not do enough to punish Chase and that the case should have proceeded to trial* ........................................................... 24

        4. *Objecting to the use of an appeals process* ............................................. 25

    **D. The Opinion of Competent Counsel Favors Approval of Settlement** ....................... 26

    **E. The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval of the Settlement** ................................................... 27

    **F. The Settlement Provides Benefits Consistent with Other HELOC Settlements** ....... 29

**VI. CONCLUSION** ................................................................. 30

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)...........................13

**United States Circuit Court of Appeals Cases**

*Burns v. Elrod*, 757 F.2d 151 (7th Cir. 1985) ..............................................13

*Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)........................21

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) ........................15

*In re Integra Realty Res., Inc.*, 262 F.3d 1089 (10th Cir. 2001)................................14

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996)...............................................15, 26, 27

*Mars Steele Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago,* 834 F.2d. 677
(7th Cir. 1987).....................................................................................16

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006)..................15, 16

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978 (7th Cir. 2002)........................15

**United States District Court Cases**

*Am. Civil Liberties Union v. United States Gen. Servs. Admin.*, 235 F. Supp. 2d 816
(N.D. Ill. 2002)...................................................................................20

*Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727
(N.D. Ill. Feb. 28, 2012).............................................................................16

*Hernandez v. Talman Home Mortg. Corp.*, No. 85 C 1330, 1986 WL 5205
(N.D. Ill. Apr. 29, 1986)...........................................................................22 n.7

*Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130 (N.D. Ill. 1997)....................26

*In re AT&T Mobility Wireless Data Services Sales Tax Litig.* 270 F.R.D. 330
(N.D. Ill. 2010)...............................................................................16, 22 n.7, 27

*In re AT&T Mobility Wireless Data Services Sales Tax Litig.* 789 F. Supp. 2d 935
(N.D. Ill. 2011)...................................................................................13

*In re JPMorgan Chase & Co. Sec. Litig.,* No. 06 C 4674, 2009 WL 537062
(N.D. Ill. Mar. 3, 2009)............................................................................15

*In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ........................19-20

*Kent v. Hewlett-Packard Co.,* No. 5:09–cv–05341–JF (HRL), 2011 WL 4403717
(N.D. Cal. Sept. 20, 2011) .......................................................................20-21

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ...............................13, 27

*Meyenburg v. Exxon Mobil Corp.*, No. 3:05-CV-15-DGW, 2006 WL 5062697
(S.D. Ill. June 5, 2006) ........................................................................................................16

**<u>Statutory Provisions</u>**

28 U.S.C. § 1470 ....................................................................................................................4

28 U.S.C. § 1715 ..................................................................................................................14

Fed. R. Civ. P. 23 ...........................................................................................................13, 15

## I.  INTRODUCTION

The Class Action Settlement ("Settlement" or "Agreement") preliminarily approved by the Court in this case (Dkt. 125) signifies a true victory for Settlement Class Members who had their home equity lines of credit ("HELOCs") suspended by JP Morgan Chase Bank, N.A. ("Chase" or "Defendant"). (*See* Settlement Agreement, attached as Exhibit A.) Coming on the heels of comparable settlements with Wells Fargo and Citibank, the instant Agreement provides substantial benefits to the Class Members—including the restoration of *billions* of dollars worth of HELOC credit to thousands of current accountholders and the payment of *millions* of dollars in cash to thousands of former customers.

Direct notice has gone out to the Class (reaching over 98% of the Class Members) and the response to date has been overwhelmingly positive. Several hundred Class Members have called Class Counsel expressing appreciation for the litigation and Settlement, over 13,000 claims have already been filed, and only a handful of borrowers have objected (16) or excluded (29) themselves (less than .0065% of the Class, when combined). Thus, the instant Agreement now resolves eleven class actions that were filed in eight federal districts across the country,[1] and over three and half years of hard fought litigation and negotiations, on terms that are demonstrably fair, reasonable, and adequate.

---

[1] These actions are *Walsh v. JPMorgan Chase Bank, N.A.*, No. 09-cv-4387 (C.D. Cal., filed June 18, 2009); *Wilder v. JPMorgan Chase Bank, N.A.*, No. 09-cv-834 (C.D. Cal., filed July 17, 2009); *Frank v. Washington Mutual Bank, Henderson Nevada*, No. 09-cv-3408 (E.D. Cal., filed Dec. 17, 2009); *Yakas v. Chase Manhattan Bank USA, N.A.*, No. 09-cv-2964 (N.D. Cal., filed June 7, 2010); *Malcolm v. JPMorgan Chase Bank, N.A.*, No. 09-cv-4496 (N.D. Cal., filed Sept. 24, 2009); *Kimball v. Washington Mutual Bank, Henderson, Nevada*, No. 09-cv-1261 (S.D. Cal., filed June 10, 2009); *Hackett v. JPMorgan Chase Bank, N.A.*, No. 09-cv-7986 (N.D. Cal., filed Dec. 24, 2009); *Cavanagh v. JPMorgan Chase Bank, N.A.*, No. 09-cv-3389 (D. Minn., filed Nov. 25, 2009); *Mayes v. JPMorgan Chase Bank, N.A.*, No. 10-cv-157 (N.D. Tex., filed Mar. 5, 2010) (collectively "underlying class actions"). Additional tag-along cases that have been transferred include *Waterman v. JPMorgan Chase Bank, N.A.*, No. 10-cv-514-S (W.D. Ky., filed July 28, 2010) and *Crystal v. JP Morgan Chase Bank, N.A.,* No. 10-cv-06023-FB-RER (E.D.N.Y., filed Dec. 29, 2010).

As explained in detail below, in light of the strength of the Settlement and the response of the Class Members, this Court should grant final approval to its terms. Chase has made meaningful changes to the way it suspends, reduces, and reinstates HELOCs so as to present a more level playing field than when these lawsuits were first filed. The Agreement requires that Chase continue to honor these terms, facilitate reinstatement through multiple channels, and provide cash payments to borrowers who left Chase following their account suspensions. All told, Chase's reforms arguably exceed the requirements of TILA and Regulation Z thereby providing Class Members with more than they likely would've received had the case progressed to trial.

Accordingly, and for all the reasons set forth below and in all supporting documents, this Court should grant final approval to the Settlement.

## II. HISTORY OF THE LITIGATION

### Class Counsel's Factual and Legal Investigation into the Industry's HELOC Suspensions

In the wake of the financial crisis and collapse of the housing market in late 2008, Class Counsel's law firms began to receive and review hundreds of complaints from HELOC customers stating that their lenders, including Chase, had unilaterally suspended or reduced the credit available on their HELOC accounts. (*See* Declaration of Steven L. Woodrow ("Woodrow Decl.") ¶ 2, attached as Exhibit B.) In response to these initial reports, Class Counsel launched a far-reaching investigation into the broader banking industry specifically focused on HELOC suspension, reduction, and reinstatement practices. (*Id.* ¶ 2.)

During this investigation, Class Counsel interviewed and gathered documents and information from hundreds of complaining homeowners, including their HELOC contracts, deeds, commitment letters, suspension and reduction notices, financial documents, appraisals and other property valuations and reports, bank correspondence, and other information. (*Id.* ¶ 3.)

Class Counsel then compared and contrasted the policies and practices of several banking institutions to determine how national lenders approached their duties under TILA, Regulation Z, and their borrowers' respective HELOC contracts. (*Id.*) Class Counsel also reviewed TILA and its legislative history regarding HELOC account suspensions and reinstatements, Regulation Z, and the Official Commentary from the Board of Governors of the Federal Reserve, along with publications and commentary related to HELOC suspensions and the use of the automated valuation models published by the Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, and Office of Thrift Supervision. (*Id.* ¶ 2.)

Class Counsel also received and analyzed hundreds of pages of formal, informal, and confirmatory discovery produced through the various settlement processes and collaborated with federal and California, Florida, and Illinois lawmakers, regulators, and other public officials to call attention to the economic and legal implications of unjustified HELOC suspensions and reductions. (*Id.* ¶¶ 3-4.) Specific to the Chase litigation, Class Counsel has drafted and propounded interrogatories, requests to produce, and requests to admit, engaged in countless meet-and-confers with Chase's counsel, and reviewed thousands of pages of formal, informal, and confirmatory discovery produced through this litigation, including voluminous documents produced by Chase in one of the underlying actions, *Hackett v. JPMorgan Chase Bank, N.A.* (*Id.* ¶ 11.)

As a result of this ongoing investigation,[2] Class Counsel have established themselves as leading attorneys in the area of HELOC suspension, reduction, and reinstatement law. Class Counsel were retained by the Class Representatives to prosecute the underlying cases against

---

[2] Given the evolving legal landscape regarding HELOC suspensions and changes that banks implemented at various times, Class Counsel extended this investigation throughout the litigation period. (Woodrow Decl. ¶ 19.)

Chase, and by other borrowers whose HELOCs had been suspended or reduced by other national

lenders, including Citibank, N.A., Wells Fargo Bank, N.A., National City Bank, GMAC

Mortgage LLC, and OneWest Bank, F.S.B. (*Id*. ¶ 5.)

***Coordinated Pre-Trial Proceedings and Appointment of Interim Co-Lead Counsel***

On June 7, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized pending

class actions challenging Chase's suspension of HELOCs based on decline in property value

pursuant to 28 U.S.C. § 1407(a), finding the cases presented "civil actions involving one or more

common questions of fact." (Dkt. 1.) On July 17, 2010, after a contested leadership fight between

two competing Plaintiff groups, the Court appointed attorneys from Edelson McGuire, LLC,

Abbey Spanier Rodd & Abrams, LLP, and Murray, Frank & Sailer LLP as interim co-lead class

counsel. (Dkt. 37.) On December 12, 2012, in its Order preliminarily approving the Settlement,

this Court appointed attorneys from these firms as Class Counsel. (Dkt. 127, ¶ 6.)

***Plaintiffs' Consolidated Complaint and the Underlying Actions***

On August 30, 2010, Plaintiffs filed their ten-count Consolidated Complaint alleging that

Chase reduced and suspended its borrowers' HELOCs based on false claims that their homes had

significantly declined in value. (Dkt. 41.) Specifically, Plaintiffs alleged that Chase violated

TILA and Regulation Z, 12 C.F.R. § 226.5(b) *et. seq*., California's Unfair Competition Law, Cal.

Bus. & Prof. Code § 17200 *et seq.*, the Illinois Consumer Fraud and Deceptive Business

Practices Act, 815 ILCS 505/1 *et seq.*, and the Minnesota Uniform Deceptive Trade Practices

Act, Minn. Stat. § 83.20 *et seq.*, and breached the terms of its HELOC contracts and/or the

implied covenant of good faith and fair dealing when it used flawed automated valuation models

("AVMS")—computer algorithms that provide an estimated property value—to generate falsely

low property values, which Chase then used to (falsely) justify its suspension or reduction of

borrowers' HELOCs. The Consolidated Complaint coordinated the allegations of the Named

Plaintiffs in the Underlying Class Actions as follows:

- **Plaintiff Michael Walsh:** On June 18, 2009, Walsh brought a putative class action in the United States District Court for the Central District of California against Washington Mutual Bank ("WaMu") and Chase, No. 09-cv-4387. (*Walsh* Dkt. 1.) Walsh alleged that Chase unlawfully reduced and suspended his and the putative class members' HELOCs without first obtaining legitimate home valuations in violation of TILA, Regulation Z, and the UCL, and in breach of Chase's contract with its borrowers. (*Id.*) Prior to transfer, the parties fully briefed two of Chase's motions to dismiss. (*Walsh* Dkt. 9, 28.)

- **Plaintiff Robert Wilder:** On July 17, 2009, Wilder filed a putative class against Chase and First American CoreLogic, Inc. ("CoreLogic") in the United States District Court for the Central District of California, No. 09-cv-0834. Wilder alleged that Chase and CoreLogic used faulty AVMs to produce falsely low home values, so as to trigger Chase's right to suspend or reduce HELOCs. (*Wilder* Dkt. 1.) Prior to transfer, the parties brief two motions to dismiss (one from Chase and one from CoreLogic), both of which were granted in part. (*Wilder* Dkt. 26, 53.) Chase also filed its answer and affirmative defenses. (*Wilder* Dkt. 56.)

- **Plaintiff Michael Malcolm:** On September 24, 2009, Malcolm filed a putative class action complaint in the United States District Court for the Northern District of California, No. 09-cv-4496, alleging that Chase suspended his HELOC based upon a faulty AVM value and that an appraisal proved his home had actually *increased* in value. (*Malcolm* Dkt. 1.) Prior to transfer, the parties briefed two motions to dismiss and the case was transferred prior to the court issuing an order on Chase's second motion (the first having been granted and denied in part). (*Malcolm* Dkt. 38.)

- **Plaintiff William Cavanagh:** On November 25, 2009, Cavanagh filed a putative class action in the United States District Court for the District of Minnesota, No. 09-cv-3389, alleging that Chase suspended his HELOC based on false claims that his home had significantly declined in value. (*Cavanagh* Dkt. 1.) As with Plaintiff Malcolm, an appraisal showed that Cavanagh's home had actually increased in value. (*Id.*) On April 8, 2010, the court denied Chase's motion to dismiss (which had been partially briefed) and stayed the proceedings pending a decision by the JPML. (*Cavanagh* Dkt. 26.)

- **Plaintiffs Robert and Maria Frank:** On December 8, 2009, Robert and Maria Frank filed a putative class action against WaMu and Chase in the United States District Court for the Eastern District of California, No. 09-cv-3408. (*Frank* Dkt. 1.) The Franks claimed that Chase used faulty AVMs to generate falsely low property values, which it in turn used to incorrectly justify HELOC suspensions. (*Id.*) On April 8, 2010, the court stayed proceedings in the action pending a decision by the JPML and denied Chase's pending motion to dismiss without prejudice to it being renewed after

the JPML's ruling on centralization. (*Frank* Dkt. 27.)

- **Plaintiff Shannon Hackett:** On December 24, 2009, Hackett brought a putative class action in this Court, No. 09-cv-7986, alleging that Chase unlawfully suspended its borrowers HELOCs by using faulty AVMs to undervalue homes and falsely trigger its right to suspend HELOCs. (*Hackett* Dkt. 1.) Prior to transfer, the Parties fully briefed a motion to dismiss and partially briefed a motion to strike. On December 27, 2010, following the filing of the Consolidated Complaint, this Court terminated Chase's motion to dismiss and Hackett's motion to strike affirmative defenses without prejudice. (*Hackett* Dkt. 41.)

- **Plaintiff Daryl Mayes:** On March 5, 2010, Mayes filed a putative class action on behalf of a class of Texas residents in the United States District Court for the Northern District of Texas, No. 10-cv-0157, alleging that Chase suspended or reduced HELOCs based on false claims that the borrowers' homes had significantly declined in value. (*Mayes* Dkt. 1.) An appraisal revealed that Mayes' home had declined by no more than $7,000 in value, but Chase still refused to reinstate his HELOC. (*Id.*) On April 29, 2010, prior to Chase filing an answer, the court stayed proceeding pending a decision by the JPML. (*Mayes* Dkt. 12.)

***The Court Denies Chase's Motion to Dismiss the Consolidated Complaint***

On October 19, 2010, following the filing of Plaintiffs' Consolidated Complaint, Chase moved to dismiss the Complaint in its entirety. (Dkt. 49-51.) The Parties engaged in extensive briefing and on June 30, 2011, the Court issued a comprehensive 42-page Order granting in part and denying in part Chase's Motion to Dismiss. (Dkt. 74-75.) The Court dismissed Plaintiffs' breach of contract and unjust enrichment claims to the extent they relied on Chase's imposition of annual fees on suspended accounts and Plaintiffs' fraud claims under California, Illinois, and Minnesota consumer protection statutes, but otherwise denied Chase's Motion. (*Id.*) Chase answered on August 12, 2011. (Dkt. 88.)

***The Parties' Mediation with Judge Andersen (Ret.)***

Shortly after Consolidation of the Underlying Actions, the Parties engaged in initial settlement discussions to discuss the general legal landscape of Plaintiffs' claims and their respective views of the facts. (Woodrow Decl. ¶ 6.) On May 16, 2011, prior to the Court's ruling

on Chase's Motion to Dismiss, Plaintiffs' Counsel provided Chase a letter outlining potential ways to resolve the lawsuits, relying on discovery that had been conducted in other HELOC cases. (*Id.*) Following the Court's ruling on Chase's Motion, the Parties agreed to engage in formal mediation. (*Id.*)

On December 14, 2011, the Parties met in Chicago for a mediation session with Judge Andersen (Ret.) of JAMS. Judge Andersen had experience with HELOC litigation, having served as the mediator in *Schulken v. Washington Mut. Bank*, No. 09-cv-2708-LHK (N.D. Cal.)—a separate class action lawsuit against Chase involving HELOC suspensions effectuated through an income verification program. (*Id.* ¶ 7.) During the mediation, Class Counsel obtained additional information regarding Chase's HELOC reduction, suspension, and reinstatement practices and clarification with respect to certain other outstanding issues, such as the size of the Former Customer Subclass and their potential damages. (*Id.* ¶ 8.) The Parties used the mediation to discuss relief that could be made available to the Class and to build upon the general settlement structure used in nationwide HELOC settlements. (*Id.*) While the Parties were not able to reach an agreement following a full day of arm's length negotiations, the Parties made significant progress toward reaching a resolution and agreed to continue working toward a resolution with Judge Andersen's help. (*Id.*)

During the several months thereafter the Parties negotiated and exchanged proposals and drafts of the settlement agreement, often with Judge Andersen's oversight. (*Id.* ¶ 9.) In May 2012, the Parties reached an agreement in principle with respect to the relief for Settlement Class and Subclass Members. (*Id.*) Only after having agreed upon relief for the Class and Subclass did the Parties begin negotiating incentive awards for the Class Representative and attorneys' fees for Class Counsel. (*Id.*) With Judge Andersen's continued involvement through periodic

teleconferences, the Parties eventually reached an agreement as to the incentive awards and attorneys' fees. (*Id*.)

***Preliminary Approval of the Settlement and Post Preliminary Approval Work***

During the several months following their reaching an agreement in principle, the Parties continued to negotiate the details of the settlement, finalized the terms of the settlement agreement, and prepared for preliminary approval. (*Id.* ¶ 10.) On November 20, 2012, Plaintiffs filed their Motion for Preliminary Approval. (Dkt. 122.) On December 10, 2012, this Court granted preliminary approval to the Settlement. Following cosmetic improvements to the notice forms, the Court approved all changes on December 12, 2012 and directed that Notice be issued to the Class. (Dkt. 126-127.)

During the week of January 9, 2013, Chase, acting through the Claims Administrator, caused U.S. mail notice to be sent to all Settlement Class Members using the last known address in Chase's records as updated using the National Change of Address Registry. (*See* Declaration of Jonathan D. Carameros ("Carameros Decl.") ¶¶ 3-6, attached as Exhibit C.) As explained in the Claims Administrator's Declaration, notice was sent to 726,472 customers, out of which only 2,886 (less than 1%) were undeliverable and could not be updated. (*Id.* ¶ 7.) Direct notice thus successfully reached over 99% of the Class. (*Id.*) Furthermore, as required by the Agreement, the Claims Administrator established and maintained a settlement website where Class Members can download a claim form or obtain additional information about the terms of the Agreement. (*Id.* ¶ 9.) The website has had over 47,000 visitors to date. (*Id.*)

Following the Class Notice, Class Counsel has received hundreds of telephone and email inquiries from Settlement Class Members seeking additional information regarding the Agreement. (Woodrow Decl. ¶ 16.) Class Counsel has promptly responded, and will continue

to promptly respond, to all inquires, and will assist all Class Members with filing claims or other issues. (*Id.*) Also, and concurrent with the filing of this Motion and consistent with this Court's order granting Preliminary Approval, Class Counsel has filed its petition for reasonable attorneys' fees and costs and for the Class Representatives' incentive award.

Class Counsel now respectfully moves the Court for an order granting final approval to the Settlement in this class action as fair, reasonable and adequate.

## III. KEY TERMS OF THE SETTLEMENT AGREEMENT

The key terms of the Settlement preliminarily approved by the Court are set forth in the agreement attached hereto as Exhibit A and are briefly summarized as follows:

**A. Class Definitions:** The Court, in its December 12, 2012 Preliminary Approval Order (Dkt. 127, ¶ 4), certified two Settlement Classes, defined as follows:

1. *Class:* All Chase HELOC customers nationwide who had their HELOCs suspended or reduced by Chase at any time between January 1, 2007 and September 30, 2012 based on Chase's determination that the property securing the HELOC had significantly declined in value.

2. *Former Customer Subclass ("Subclass"):* The Subclass consists of all borrowers in the Class who closed their Chase HELOC accounts following a suspension or reduction of their HELOCs by Chase, and their account was still suspended or reduced for decline in property value when the borrower closed the account.

**B. The Settlement Benefits:** Chase agrees to provide the following relief:

1. *Proactive Account Reinstatements:* Chase agrees to proactively offer account reinstatement to those Class Members who satisfy Chase's internal property value and credit guidelines. (Settlement Agreement § 3.1(a).) Chase will send a letter to any Class Member who Chase identifies as meeting these criteria advising that Chase is willing to reinstate his or her

HELOC up to a limit set by Chase. (*Id.*) The Class Members may accept Chase's offer to reinstate the HELOC by checking a box indicating their acceptance and returning the letter. (*Id.*)

2. *Notice of Right to Request Reinstatement*: Within nine months of the Effective Date, Chase agrees to send a Notice of Right to Request Reinstatement, substantially in the form attached to the Settlement Agreement as Exhibit 2, to Class Members whose accounts are open and remain suspended or reduced because of a decline in property value and who have more than 90 days left in the draw period as of the Effective Date. (*Id.* § 3.1(b).) The Notice of Right to Request Reinstatement (1) explains that Chase has revised some of its standards for reinstating HELOC accounts and that Class Members may be considered for reinstatement or partial reinstatement under Chase's revised policies, (2) reminds Class Members that they have the right to request reinstatement, and (3) explains how to exercise that right. (*Id.*)

3. *Enhanced Account Suspension/Reduction Notices*: For the twelve-month period following the Effective Date, Chase agrees to modify the notices that it sends to customers whose accounts Chase suspends or reduces based on a claim that the borrower's property has significantly declined in value, to include the value an appraisal would need to state the property is worth in order for Chase to reinstate the HELOC. (*Id.* § 3.1(c).)

4. *Limitation on Use of AVMs*: For the twelve-month period following the Effective Date, Chase will not rely upon Automated Valuation Models previously identified by Chase internally as Tier 3b, 4b, or 5b in determining whether to suspend or reduce any HELOC for a decline in property value. (*Id.* § 3.1(d).)

5. *Reimbursement of Appraisal Fee*: For the twelve-month period following the Effective Date, Chase will provide refunds of any appraisal fees paid by customers who

successfully appeal Chase's suspension or reduction of their HELOCs based on a significant decline in property value. (*Id.* § 3.1(e).)

6. *Limitation on Use of 5% Reduction Criterion*: For the twelve-month period following the Effective Date, Chase has agreed to limit use of a 5% reduction in value criterion as an indication of a significant decline in property value to "high CLTV" situations, *i.e.*, when a borrower's combined loan-to-value ratio is 90% or more. (*Id.* § 3.1(f).)

7. *Service Assurances*: For the twelve-month period following the Effective Date, Chase agrees to use only AVM models that have gone through its testing and validation processes. Chase further agrees to not materially change its customer service processes for notifying borrowers of account suspensions or reductions and addressing customer requests for reinstatement, unless the changes are beneficial to borrowers. (*Id.* § 3.1(g).)

8. *Future Changes in Law or Regulations*: To the extent Congress, the OCC, the Consumer Financial Protection Bureau, or any other relevant regulatory authority promulgates any law, regulation, interpretation, or clarification that would govern any conduct affected by the Settlement, those laws and regulatory provisions shall control. (*Id.* § 3.1(h).) Chase will maintain the ability to modify its policies and practices based on amendments or clarifications of applicable law as enacted or interpreted by the courts, Congress, or federal regulators, or as necessary for Chase to comply with any such amendment, interpretation, or clarification. (*Id.*)

9. *Benefits Specific to Former Customer Subclass Members*: Members of the Former Customer Subclass who submit complete and valid Claim forms attesting that they incurred damages as a result of their HELOC suspension may receive a cash payment in the amount of $35, payable by Chase. (*Id.* § 3.2.) Checks will be sent to approved claimants within sixty (60) days following the Effective Date. (*Id.*)

**C. Payment of Notice and Administrative Expenses:** Chase is required to pay for all notice and settlement administration expenses. (*Id.* § 7.3.) This includes the cost of sending mail notice to Class Members in accordance with terms of the Settlement Agreement and for the creation and maintenance of the settlement website, along with all other administration costs. (*Id.*)

**D. Class Representative Incentive Award:** Chase has also agreed to pay, subject to Court approval, an incentive award to Class Representatives in the collective amount of $31,500 divided into seven equal parts of $4,500 (with the Franks sharing their award). (*Id.* § 9.3.)

**E. Payment of Reasonable Attorneys' Fees and Expenses:** The Settlement provides for $1,800,000 in reasonable attorneys' fees and reimbursable expenses, and agrees that these amounts are reasonable subject to the Court's approval. (*Id.* § 9.1.) The basis for Class Counsel's fee request is fully set forth in their contemporaneously filed Motion for Award of Attorneys' Fees, Expenses, and Incentive Award.

**F. Release of Claims:** In exchange for the relief provided above, and upon the entry of a final order approving this Settlement, Chase and each of its related affiliates and entities will be released from any claims, whether known or unknown, arising out of or relating to Chase's HELOC treatment policies, systems, standards, and procedures, including, without limitation, its HELOC account restrictions, credit limit reductions, and reinstatement standards and processes, that were or could have been alleged in the Complaint or the underlying class action complaints of the named Plaintiffs. (*See id.* §§ 1.28-1.30, § 4 for the full release.)

## IV. THE CLASS NOTICE COMPORTS WITH DUE PROCESS AND RULE 23.

Before a court can grant final approval, notice of the settlement must be provided to the class. Fed. R. Civ. P. 23(e)(1). Here, the Court-approved notice plan satisfies the standards of Due Process and Rule 23 that require that the class receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); (*see* Woodrow Decl. ¶¶ 14-15.)

"Due process does not require that every class member receive notice." *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 789 F. Supp. 2d 935, 968 (N.D. Ill. 2011); *see also Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). Rather, "notice should be mailed to the last known addresses of those who can be identified and publication used to notify the others." *Mangone v. First USA Bank*, 206 F.R.D. 222, 231 (S.D. Ill. 2001) (citation omitted).

Notice to the class must be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (citations omitted). Under Rule 23(c)(2)(B), notice directed to the class must clearly, and in concise, plain, easily understood language state: (a) the nature of the action, (b) the definition of the certified class, (c) the class claims, issues, or defenses, (d) that a class member may enter an appearance through an attorney if he or she desires, (e) that the court will exclude any member of the class upon request, (f) the method and time to request exclusion, and (g) that the judgment will be binding on class members. The Parties have strictly adhered to these requirements in this case.

The Parties have fully complied with the approved Notice Plan. First, the Claims Administrator caused U.S. mail notice to be sent to all Settlement Class Members at their last

known address in Chase's records as updated using the national change of address registry. (Carameros Decl. ¶¶ 3-6.) The U.S. mail notice was successfully sent to over 99.9% of the Class, leaving a negligible percentage of the Class who didn't receive the notice. (*Id.* ¶ 7.) This readily satisfies the concerns of Due Process and Rule 23. *See, e.g., In re Integra Realty Res., Inc.,* 262 F.3d 1089, 1110-11 (10th Cir. 2001) (adequate notice where only 77% of class members actually received notice of the settlement).

In addition to U.S. mail notice, the Claims Administrator established a settlement website at URL http://www.chasehelocsettlement.com. The website provides detailed information about the Settlement including the terms of the Settlement Agreement, gives notice to Class members of their right to seek reinstatement of their suspended or reduced HELOCs, and provides a mechanism for Former Customer Subclass members to download and submit claim forms online. The settlement website also provides links to the Settlement Agreement and other relevant Court documents. The website has to date logged over 47,000 visits.

Moreover, Chase has also complied with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA"), by serving notice of the proposed settlement along with all other required documentation on the appropriate state and federal government officials.

The Order granting Preliminary Approval found the form and methods set forth in the Settlement Agreement's Notice Plan "satisfies the requirements of due process and Rule 23" and "is the best notice practicable under the circumstances." (Dkt. 127, ¶ 9.) As the Parties executed the Plan to the letter, the Court should conclude that the form and methods of notice satisfied the requirements of Due Process and Rule 23, plainly serving as the "best practicable" notice under the circumstances.

## V.  THE SETTLEMENT AGREEMENT WARRANTS FINAL APPROVAL.

Under Federal Rule of Civil Procedure 23(e), "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). In cases where the settlement "would bind class members, the court may approve [the settlement] only after a hearing and finding that it is fair, reasonable, and adequate." Fed R. Civ. P. 23(e)(2). "Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) (*citing E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 888-89 (7th Cir. 1985)). The Seventh Circuit has found that on final approval, a district court's inquiry as to whether to grant approval "is limited to [the consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978, 986 (7th Cir. 2002) (*citing Isby,* 75 F.3d at 1198-99).

To properly evaluate the fairness of a settlement, district courts in this Circuit must consider the following five factors:

> [1] the strength of plaintiffs' case compared to the amount of defendants' settlement offer, [2] an assessment of the likely complexity, length and expense of the litigation, [3] an evaluation of the amount of opposition to settlement among affected parties, [4] the opinion of competent counsel, and [5] the stage of the proceedings and amount of discovery completed at the time of settlement.

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal citations omitted) (*citing Isby,* 75 F.3d at 1199); *accord In re JPMorgan Chase & Co. Sec. Litig.,* No. 06 C 4674, 2009 WL 537062, at *4 (N.D. Ill. Mar. 3, 2009).

As set forth below, each factor shows that final approval should be granted.

### A.  The Strength of the Plaintiffs' Case on the Merits, Compared to the Exceptional Benefits Achieved by the Settlement, Weighs in Favor of Granting Approval.

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiff's case on the merits balanced against the amount offered in the

settlement." *Synfuel Techs.*, 463 F.3d at 653 (citations omitted); *Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *2 (N.D. Ill. Feb. 28, 2012) (same). To analyze this factor, the court should compare "the benefit to the class under the proposed settlement against the likely benefit the class would have received after a successful trial on the merits." *Meyenburg v. Exxon Mobil Corp.*, No. 3:05-CV-15-DGW, 2006 WL 5062697, at *4 (S.D. Ill. June 5, 2006) (citations omitted). The settlement is presumed to be substantively fair to the plaintiffs "if it gives them the expected value of their claim if it went to trial, net the costs of trial." *Mars Steele Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago,* 834 F.2d. 677, 682 (7th Cir. 1987) (citations omitted). Of course, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility Wireless Data Services Sales Tax Litig.* 270 F.R.D. 330, 347 (N.D. Ill. 2010) (internal quotations omitted).

As explained below, whereas the Class faced significant procedural and substantive hurdles proceeding forward, the Settlement confers significant benefits that arguably extend beyond the requirements of TILA and Regulation Z.

1. *The Class faced significant procedural and substantive defenses in addition to the inherent risks posed by complex litigation.*

As with most complex consumer class actions, Plaintiffs faced an uphill battle on the road to judgment. Prevailing in this case would require Plaintiffs to obtain adversarial class certification under Rule 23—overcoming Chase's significant defenses and arguments regarding the presence of individualized issues. If Plaintiffs were able to overcome this procedural hurdle, Plaintiffs would then need to prove and prevail on various legal and factual disputes at trial, including whether Chase reduced or suspended HELOCs in the absence of significant declines in its borrowers' home values, the limitations established by TILA and Regulation Z

16

with respect to the bank's HELOC reductions and suspensions property value declines, and the terms and meaning of Chase's HELOC contracts. These issues are undoubtedly novel—the first wave of HELOC suspensions across the industry took place in the middle of 2008. (Woodrow Decl. ¶ 18.) Only a handful of courts have decided similar claims, and only one has addressed class certification issues.[3] (*Id*.)

Accordingly, in the absence of this Settlement, the Class would face substantial obstacles obtaining relief against Chase in this case.[4] As explained below, when compared to the class benefits, the fairness and adequacy of the Agreement cannot credibly be contested.

2. *The Settlement provides benefits arguably beyond the requirements of TILA and Regulation Z.*

As explained throughout this litigation, Class Members primarily seek the reinstatement of their borrowing power (ability to access and use the HELOC funds). The Agreement restores such access in several ways. (*See* Settlement Agreement, §3.1.)

First, Chase has agreed to proactively offer account reinstatements to Class Members who satisfy Chase's internal property value and credit guidelines. (*Id.* § 3.1(b).) As explained in the Expert Report of Don Frankenfeld submitted in support of Plaintiffs' Motion for Award of Attorneys' Fees, Expenses and Incentive Award, pro-active reinstatements will restore access to between $2.81 billion and $3.89 billion worth of affordable HELOC credit to a projected

---

[3] In *Schulken,* the court certified a class and subclass where plaintiff alleged Chase improperly suspended HELOCs under Chase's IRS FORM 4506T Program, rather than based on a purported reduction in property value. *See* No. 09-cv-2708, Dkt. 184 (N.D. Cal. Jan. 5, 2012.) To Plaintiffs' knowledge, this is the only HELOC suspension class action where a Court has certified a class of suspended and reduced HELOC borrowers under Rule 23.

[4] Of course, notwithstanding Chase's defenses, the majority of Plaintiffs' claims survived Chase's Motion to Dismiss the Consolidated Complaint and Plaintiffs and Class Counsel firmly believed (and continue to believe) in the merits of their legal positions and factual assertions. (Woodrow Decl. ¶ 18.)

48,000 to 54,000 borrowers.[5] (Frankenfeld Report 5, attached as Exhibit 2 to the Motion for Award of Attorneys' Fees, Expenses, and Incentive Award.) Using a proxy that projects the costs attendant to securing a replacement HELOC, Mr. Frankenfeld explains that this saves (and thus confers a benefit upon) such Class Members worth between $21,600,000 and $54,000,000. (*Id*.)

Likewise, the Settlement restores access through the Notice of Right to Request Reinstatement. Mr. Frankenfeld explains that between 6,691 and 11,151 additional Class Members will benefit from these reinstatements. As a result, they'll receive restored HELOC access to between $391,416,948 and $802,906,560 worth of affordable credit. Mr. Frankenfeld, again using the proxy, values such reinstatements between $3,010,900 and $11,151,480.

Further, for Class Members who closed their Chase HELOCs following their suspension or reduction, the Settlement provides cash payments of $35 upon filing of a simple claim form. (Settlement Agreement § 3.2.) While not full compensation, the $35 represents a fair, negotiated percentage of the typical damages incurred, including insufficient funds fees and appraisal fees or application costs and fees associated with finding replacement credit. (Woodrow Decl. ¶ 13.) Collectively, the Agreement makes over $6.7 million available to former customers. Under TILA, statutory damages would be capped at $500,000 plus actual damages—which would require that the Class spend years proving damages through experts. Here, the Settlement affords an additional $6.2 million in actual damages just to the former customers.

---

[5] This number is based on discovery provided to Mr. Frankenfeld, which indicated that approximately 60,000 borrowers will be provided with pro-active offers of reinstatement. That baseline figure is expressly understood to be merely an estimate and is subject to change given that the Settlement requires Chase to determine the number of customers as of the Effective Date, which is still several months away. Mr. Frankenfeld projects a "decay rate" of 10% – 20%, meaning that 80% – 90% will accept the pro-active offers. Class Counsel anticipate that a higher percentage of borrowers than those forecasted by Mr. Frankenfeld will accept Chase's pro-active reinstatement offers (closer to 90% – 95%) but accept his conservative numbers out of an abundance of caution. (Woodrow Decl. ¶ 13.)

Moreover, Chase has made significant improvements to its HELOC suspension and reinstatement practices both after the start of the litigation and through the Settlement. These changes benefit customers by providing a more level playing field when challenging the bank's decision—by telling borrowers the home value needed to achieve reinstatement, by taking into account first mortgage pay downs, by treating Regulation Z's 50% safe harbor as a bright line, and by reimbursing appraisals following successful appeals—not to mention by placing more restrictions on the bank's ability to freeze or reduce accounts in the first place. The Agreement requires that Chase honor these changes and continue its (now more) customer-friendly policies, conferring additional benefits on Class Members beyond Regulation Z's requirements.

Finally, in addition to and without diminishing all of the forms of relief stated above, Chase has also agreed to pay Class Counsel's attorneys' fees in the amount of $1,800,000.00 and a Class Representative incentive award totaling $34,500. (Settlement Agreement §§ 9.1., 9.3.) Chase has also agreed to pay all Settlement Administrative Expenses, including the cost of U.S. mail notice and establishing and maintaining the settlement website.

Accordingly, the Settlement provides significant benefits today while avoiding the substantial risks of proceeding through adversarial class certification, summary judgment, and trial. As the Settlement Benefits likely exceed whatever the Class could have achieved had the litigation proceeded on adversarial grounds, this factor supports the fairness of the settlement.

### B. Continued Litigation Would Likely Be Time Consuming and Expensive, and Would Require the Resolution of Several Complex Issues.

Final approval of a settlement is also favored where "continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time." *In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000) (finding

19

settlement is favored where further litigation would require additional written discovery, depositions and expert discovery, and where appellate practice is likely to result).

In this case, and as alluded to above, the expense, duration and complexity of protracted litigation that would result in the absence of the instant Settlement would be substantial. Counsel for Chase has made it clear to Class Counsel that Chase would continue to deny any wrongdoing and launch a defense in all of the underlying matters. Again, to prevail would require the Plaintiffs to achieve adversarial certification and survive summary judgment. This would require extensive discovery and briefing on a multitude of unresolved questions regarding the bank's ability to suspend or reduce HELOCs under TILA and Regulation Z through its use of AVMs. And even if the case made it that far, any trial between the Parties would undoubtedly span multiple weeks and involve testimony from dozens of Chase employees and experts. Further, given the nature of the primary relief sought in this matter—restored access to HELOC credit— Class Members are unlikely to benefit from any additional delay of continued litigation, which may force them to seek (and pay for) alternative access to credit.

Accordingly, prolonged litigation would require an extensive amount of time and lead to the accumulation of significant costs. (Woodrow Decl. ¶ 18.) Thus, the substantial and prompt relief provided to the Settlement Class under the Settlement weighs heavily in favor of approval.

**C. The Reaction of Class Members Has Been Overwhelmingly Positive, Further Supporting the Fairness of the Settlement.**

The relative lack of objectors challenging a class settlement also favors a finding that the settlement is "fair and reasonable." *Am. Civil Liberties Union v. United States Gen. Servs. Admin.*, 235 F. Supp. 2d 816, 819 (N.D. Ill. 2002) *see also Kent v. Hewlett-Packard Co.*, No. 5:09-cv-05341-JF (HRL), 2011 WL 4403717, at *2 (N.D. Cal. Sept. 20, 2011) (finding 24 exclusions (.0543%) and eight objections (.017%) out of an estimated 45,000 class members was

a "positive response from the class weigh[ing] strongly in favor of approving the settlement");

*Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming approval of

settlement where 45 of 90,000 member class objected and 500 class members opted out).

In this case, the reaction of the Class Members has been overwhelmingly positive. Many of

the calls received by Class Counsel have been complimentary of the litigation and Settlement. To

date, only 29 individuals have requested exclusion. (Carameros Decl. ¶ 10.) This represents less

than .01% of the Settlement Class and is lower than what has been found reasonable in other

litigation where the class consisted of thousands of people. Additionally, to date there have been

only sixteen objections (all of them *pro se*) which is low when considering the notice was mailed

to 726,472 people.[6] (*See* Objections, attached as Group Exhibit D.) As explained below, none of

the objections show the Settlement is in any way unfair, unreasonable, or inadequate.

   *1.  Objections to the amount of the cash relief.*

The majority of the objections claim that $35 isn't sufficient compensation for former

customers. Objectors Jerry Bartos, Kim and Martin Josund, and Victor Aiello and Deborah Craig

indicated they had to pay appraisal costs, closing costs, and/or greater interest to their new

HELOC lenders. While persons who close their HELOCs potentially incur such charges, these

objectors appeared to pay charges on the high end of what banks typically charge. Borrowers

weren't charged fees by Chase when they closed their accounts, and many banks offer HELOCs

without any closing costs or upfront charges. Nevertheless, while the $35 doesn't fully

compensate such borrowers, it must be recalled that it is a negotiated and fair percentage of the

typical damages suffered, especially when in the aggregate the Settlement makes over $6.7

---

[6] Class Counsel only recently received three of these objections, which will be addressed in conjunction
with any other objections received by the objection deadline in a supplemental brief.

million collectively available.[7] That over 13,000 people have already filed claims is strongly suggestive of the adequacy of the amount.

Objectors Gary King and Robert and Kristine Musselman take issue with the fact they were charged annual fees after their HELOCs were suspended. This confuses the concept of a draw period with the ability of the bank to suspend or reduce the credit limit available. Chase's HELOC agreements allow for the charging of an annual fee during the draw period, which lasts the first ten years or so of the HELOC contract. Even if credit privileges are suspended or reduced during this time, nothing under federal law prohibits the bank from charging the annual fee. Indeed, should the condition permitting the suspension no longer apply, the bank is required to restore the borrower's ability to access the line. Thus, annual fees aren't recoverable in such instances as a general matter. Moreover, the Court's order denying in part and granting in part Chase's Motion to Dismiss the Amended Consolidated Class Action Complaint dismissed any claims seeking compensation for such fees. As they can't be recovered here, that they aren't included in the Settlement is hardly cause for objecting.

Likewise, objectors Stacey Street and Michael Alsip claim that $35 isn't enough given that the suspension interfered with their ability to pay real estate taxes and that the amount should be increased due to the damages suffered. The couple doesn't specify what amount would be commensurate with their supposed damages, which apparently flow from being required to find other sources of money from which to pay the real estate taxes.

---

[7] Again, "[a] settlement is, by its very nature, a compromise. Settlement for less than the full amount claimed is routine." *Hernandez v. Talman Home Mortg. Corp.*, No. 85 C 1330, 1986 WL 5205, at *2 (N.D. Ill. Apr. 29, 1986). Indeed, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility*, 270 F.R.D. at 347 (internal quotations omitted).

Accordingly, none of the objections to the amount of the cash award weighs against approving the Settlement.

### 2. Objections to the restoration of credit.

Objectors Sheilah McClinton and Sonya Doyle each take issue with the restoration of credit. Ms. McClinton indicates that the bank should pay her $4,500 (the amount Class Representatives are allowed to receive, subject to Court approval, under the Agreement) because the bank's suspension was "morally reprehensible," and because she doesn't want to do business with the bank any longer. Ms. McClinton's objection makes clear that she was using her HELOC to live off of after she lost her job. Unfortunately, HELOCs aren't to be used for such purposes: federal law allows banks to suspend accounts when the borrower experiences a material adverse change in financial circumstances (in addition to, or separate from, a drop in property value). The point is that the bank's suspension of her HELOC even though she really needed the money doesn't entitle her to extra damages, let alone a Class Representative payment when she never participated or previously contributed to the litigation or Settlement. Most people, as demonstrated by the Expert Report of Don Frankenfeld and through countless discussions with Class Members, want to have their HELOCs reinstated.

Similarly, Sonia Doyle[8] claims that the Settlement should not be approved because, supposedly, "most of the lines of credit are coming to the end of the draw period." This is so despite the fact that, as Ms. Doyle concedes, her own draw still has three years remaining. As Mr. Frankenfeld explains, most HELOCs have three to five years remaining, or 30% – 50% of the original draw periods. Not that additional time matters: if a HELOC is open for just a few

---

[8] Although Class Counsel also received a Request for Exclusion from Ms. Doyle, Class Counsel confirmed during a telephone call to Ms. Doyle that she intends for her objection, rather than her Request for Exclusion, to be considered by the Court.

moments, borrowers can access the entire amount available. Thus, three years provides plenty of time for Ms. Doyle to access her credit line.

As with Ms. McClinton's request for a separate damages award, Ms. Doyle seeks additional relief. Specifically, she demands that Chase offer streamlined, first mortgage refinances up to 200% loan-to-value with 15, 20, and 30-year term options. Indeed, a review of Ms. Doyle's paperwork reveals that she is upset with the bank for refusing to modify the interest rate on her loan. Unfortunately for Ms. Doyle, however, neither TILA nor Regulation Z requires the bank to offer re-financing options, let alone lend up to 200% loan-to-value (which would be highly irresponsible of the bank in any case). The relief requested by Ms. Doyle is simply untenable.

3. *Objections that the Settlement doesn't do enough to punish Chase and that the case should've proceeded to trial.*

Mr. Andrew Irlam objects that the Settlement is "far too lenient towards Chase in this case." Mr. Irlam indicates that he was using his HELOC as a safety net given his job as a construction contractor. Mr. Irlam, like Ms. McClinton, overlooks that HELOCs don't serve such a role—the bank can suspend the account if finances change. Thus, that the suspension deprived certain Class Members of their "safety net" doesn't provide sufficient grounds for objecting. Likewise, Mr. Irlam questions the drop in home value from March 2008 to November 2008—ignoring that the housing market collapsed—nationwide—in September and October of 2008.

Objector Robert De Santo goes a few steps further and objects that there wasn't a full trial in this case and that, according to his unnamed "sources", "the Obama Admin. will pay back Chase, with my $$$$, the total settlement cost via a back door deal." There's no evidence to substantiate Mr. De Santo's conspiracy theory about the government's involvement in this case. Moreover, that the case didn't make it to trial is no reason to throw out the Settlement. Finally, Mr. De Santo's true motivations become clear at the end of his objection when he demands that the only

24

settlement that would suit him would be if Chase forgave his $39,501.02 outstanding HELOC balance. Mr. De Santo provides no basis for why Chase should give him such a payment, which is clearly more than anyone else is set to receive under the Settlement.

Finally, Patrick Sullivan objected that the suspension of his HELOC was embarrassing for him. He asks for an apology and $5,000. Nothing entitles him to such relief, legally, and his submissions shouldn't be considered as a serious objection to the remainder of the Agreement.

4. *Objecting to the use of an appeals process.*

Finally, Jon and Belinda Roberson object to the requirement that Class Members pay upfront for an appraisal and achieve reinstatement only if their appeal is successful. According to the Robersons, Chase shouldn't be allowed to guide the appraisal process and that, rather than use full appraisals, Chase should rely on an "industry tool that shows the appraisal of the value of like homes in the area," presumably at no cost to the borrower. The Roberson Objection further claims that the Settlement "allows [Chase] not to take responsibility."

This objection plainly misunderstands the litigation. These lawsuits were prompted by Chase's use of an "industry tool" that was allegedly based on geographic areas as opposed to its borrowers' specific properties. Moreover, Chase now reimburses customers for the costs of the appraisal if the value obtained is sufficient for reinstatement for Class Members who elect to appeal. The Court should therefore overrule the Roberson Objection.

Accordingly, none of the objections received to date[9] do anything to diminish the Settlement's fairness, reasonableness, or adequacy.

---

[9] Class Counsel also received an objection from Mr. Garth Collins, who suggested the Settlement should be improved by making clear that Chase can't charge hidden fees when reinstating accounts. No such hidden fees are being charged, which should address Mr. Collins's concerns.

**D. The Opinion of Competent Counsel Favors Approval of the Settlement.**

Courts also rely on the opinion of competent Class Counsel that the settlement is fair, reasonable and adequate, where Class Counsel are qualified and where discovery and settlement negotiations are extensive and thorough. *See Isby*, 75 F.3d at 1200; *see also Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n.6 (N.D. Ill. 1997) (noting a "strong initial presumption of fairness attaches" where settlement is "the result of arm's length negotiations," and where plaintiffs' counsel are "experienced and have engaged in adequate discovery").

All three law firms comprising Class Counsel have regularly engaged in major complex litigation similar in size, scope and complexity to this Action and have considerable experience in consumer class action litigation, especially class actions related to the banking industry and HELOC suspension practices. (Woodrow Decl. ¶ 19.) Class Counsels' extensive experience with HELOC litigation led to their leadership in the underlying class actions and their representation of aggrieved homeowners against other national lenders, including Wells Fargo Bank, Citibank, National City Bank, GMAC Mortgage and OneWest Bank. (*Id.*) Edelson McGuire attorneys were appointed Class Counsel in similar HELOC Settlements reached with Wells Fargo and Citibank, and were appointed adversarial Class Counsel in the *Schulken* litigation. (*Id.*)

As explained, prior to ever filing the underlying Complaints, Class Counsel conducted significant research into Chase's practices and policies and practices common to the banking industry generally. (*Id.* ¶ 2.) Moreover, Class Counsel have worked with lawmakers on both sides of the aisle to bring the issue of unjustified HELOC suspensions to light. (*Id.* ¶ 4.) Finally, Edelson McGuire attorneys submitted a comprehensive response to the Federal Reserve Board's request for public comment to the proposed changes to Regulation Z—the precise regulation at issue in this case. (*Id.*)

Through their investigation, review of discovery materials, litigation in this case, and mediation with Judge Andersen (Ret.), Class Counsel have gained an intimate understanding of the law and facts at issue and believe the Settlement amply meets the "fair, adequate, and reasonable" standard required for the Court's approval. (*Id.* ¶ 17.) This factor also militates in favor of final approval.

### E. The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval of the Settlement.

Approval of a settlement is proper where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was 'extensive and thorough.'" *Isby*, 75 F.3d at 1200; *accord Mangone*, 206 F.R.D. at 226.[10] "The lack of [formal] discovery prior to settlement, however, does not preclude a court from approving a settlement," especially where "counsel have conducted a significant amount of informal discovery and dedicated a significant amount of time and resources to advancing the underlying lawsuits." *In re AT&T Mobility*, 270 F.R.D. at 350 (internal citation omitted).

Plaintiffs' and Class Counsels' understanding of the factual and legal issues in this case is well developed. During pre-suit investigation, Class Counsel received and reviewed thousands of pages of HELOC contracts, financial records, appraisals and other property valuations, bank correspondence, letters from members of Congress, HELOC suspension notices, monthly billing statements, and notes of phone conversations and other materials provided by aggrieved homeowners. (Woodrow Decl. ¶ 3.) Class Counsel also analyzed TILA and its legislative history regarding HELOC account suspensions and reinstatements, Regulation Z, Official Commentary

---

[10] In fact, Courts "have often seen cases which were 'over discovered.' In addition to wasting the time of [the] Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party. Discovery in its most efficient utilization should be totally extra-judicial . . . . Being an extra judicial process, informality in the discovery of information is desired." *Lipuma*, 406 F. Supp. 2d at 1324.

from the Board of Governors of the Federal Reserve, and regulatory guidance from the Federal

Deposit Insurance Corporation ("FDIC"), Office of Thrift Supervision ("OTS"), and Office of

the Comptroller of the Currency. Class Counsel also issued requests under the Freedom of

Information Act regarding customer complaints. (*Id.* ¶ 2.) Furthermore, Class Counsel engaged

in face-to-face meetings with lawmakers on both sides of the aisle to discuss HELOC suspension

laws and regulations and the impact of such suspensions on communities. (*Id.*)

Specific to the litigation, Class Counsel engaged in formal, informal and confirmatory

discovery, which included drafting and propounding interrogatories, requests to produce, and

requests to admit and engaging in meet-and-confers with Chase's Counsel. Class Counsel also

reviewed and analyzed over 15,000 pages of documents produced by Chase and its primary

AVM vendor, CoreLogic, including (1) loan files for each of the named plaintiffs, (2) HELOC

Adverse Action Policies from March 2008 through the bank's latest revisions, (3) HELOC Line

Management Summaries from April 2009 through January 2011, (4) documents reflecting the

chronology of Chase's HELOC Adverse Action Plan and Collateral Value Decline Program, (5)

various training manuals and materials regarding the suspensions and reductions of credit lines,

(6) documents reflecting maximum CLTV charts based on the type of collateral and severity

group code (based on the county where the property is located), (7) monthly AVM Validation

Reports from October 2008 through January 2010, (8) the AVM Supply Master Agreement

between Chase and First American Corporation, (9) Risk Model Validation AVM Reports from

April 2008 through October 2010, (10) documents reflecting Property, AVM and Appraisal

Requirements, and (11) CRMA AVM Preference Table v. 3.0 (Marketing) Monthly Validation

Reports for 2010. Class Counsel also had the benefit of deposition testimony from other HELOC

suspension lawsuits against Chase regarding the bank's HELOC suspension programs.

28

Chase also provided, prior to the mediation, additional informal discovery exchanged through a meet and confer process. This continued throughout the mediation process as Chase clarified information and data contained in its monthly line management reports. Moreover, as the Parties finalized their negotiations, Chase provided critical data regarding the number of Class Members scheduled to receive reinstatement through the pro-active reinstatements, the number of borrowers eligible to apply for reinstatement, and the number of former customers eligible to file claims. Armed with this information, Class Counsel was able to ensure that the negotiated Settlement was fair, reasonable, and adequate.

Accordingly, the final *Synfuel* factor weighs in favor of final approval of the Settlement as well. As a result, this Court should have little difficulty granting final approval to its terms.

### F. The Settlement Provides Benefits Consistent With Other HELOC Settlements.

Finally, the instant Settlement provides meaningful relief to Settlement Class Members consistent with other HELOC settlements against national banks. *See Hamilton*, No. 09-cv-4152-CW, Dkt. 109 (N.D. Cal., final approval granted May 14, 2012) (*Hamilton* Settlement Agreement and Final Approval Order are attached hereto as Group Exhibit E); *Citibank*, No. 09-cv-0350-MMC (N.D. Cal., preliminary approval granted Nov. 6, 2012) (*Citibank* Settlement Agreement and Preliminary Approval Order are attached hereto as Group Exhibit F.)

In *Hamilton*, plaintiffs alleged that Wells Fargo suspended or reduced HELOCs in violation of TILA, Regulation Z, and state law, by falsely claiming a significant decline in home values. (*See* No. 09-cv-4152-CW (Dkt. 78)). The *Hamilton* settlement, which received final approval on May 14, 2012, shares many of the same benefits offered here. The *Hamilton* settlement required Wells Fargo to send class members a notice of right to request reinstatement, proactively reinstate HELOCs, and refrain from using AVM valuations that are more than 90 days old when

deciding to restrict HELOCs. (*See* Ex. E, *Hamilton* Settlement). Wells Fargo also agreed not to materially change its policies in a manner that disadvantages borrowers for a 12-month period following final approval and to provide borrowers whose HELOCs were restricted with a letter containing information to assist with the reinstatement process. (*Id.* § 3.) Finally, under the *Hamilton* settlement, former Wells Fargo borrowers who incurred "deferred origination fees" were entitled to a $150 cash payment. (*Id.*)

Similarly, in *Citibank*, plaintiffs alleged that Citibank suspended or reduced HELOCs in violation of TILA, Regulation Z, and state law, based upon false claims that the plaintiffs' homes had significantly declined in value. (*See* No. 09-cv-0350 (Dkt. 168).) The *Citibank* Settlement, which received preliminary approval on Nov. 6, 2012, requires Citibank to send class members a notice of right to request reinstatement and send enhanced suspension notices. (*See* Ex. F, *Citibank* Settlement.) Citibank is also required to work with its approved appraiser to generally confirm that appraisal fees charged are reasonable based on industry standards and is required to make other beneficial changes. (*Id.* § 3.) Former Citibank borrowers who specifically incurred an "early closure fee" are also entitled to a $120 cash payment. (*Id.*)

Accordingly, that the proposed Settlement is comparable to other nationwide HELOC class action settlements further evinces the Settlement's fairness, reasonableness, and adequacy. As such, the Court should grant final approval.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that the Court find that the Settlement reached in this case is fair, reasonable, and adequate, grant final approval to it in all material respects, and award such additional relief as the Court deems necessary and just.

Dated: February 1, 2013

Respectfully Submitted,

EDELSON MCGUIRE, LLC

/s/ Steven L. Woodrow

Jay Edelson, Esq.
Steven Lezell Woodrow, Esq.
Evan Meyers, Esq.
EDELSON MCGUIRE, LLC
350 N. LaSalle Drive, Suite 1300
Chicago, IL 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
jedelson@edelson.com
swoodrow@edelson.com
emeyers@edelson.com

Karin E. Fisch, Esq.
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
Tel: (212) 889-3700
Fax: (212) 684-5191
kfisch@abbeyspanier.com

Brian P. Murray
Glancy Binkow & Goldberg LLP
77 Water Street, Suite 721
New York, NY 10005
Tel: (646) 722-4180
bmurray@glancylaw.com

Class Counsel

**CERTIFICATE OF SERVICE**

I, Steven L. Woodrow, an attorney, hereby certify that on February 1, 2013 I electronically filed the foregoing *Plaintiffs' Motion for Final Approval of Class Action Settlement* with the Clerk of the Court using the CM/ECF system. Notice of this filing is sent to all counsel of record by operation of the Court's electronic filing system.

/s/ Steven L. Woodrow