# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | ) | |
|---|---|---|
| In re: JP Morgan Chase Bank Home | ) | MDL No. 2167 |
| Equity Line of Credit Litigation | ) | |
| | ) | Master Docket Case No. 10-cv-3647 |
| | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| | ) | |

**DECLARATION OF ATTORNEY STEVEN L. WOODROW
IN SUPPORT OF PLAINTIFFS' MOTION FOR
<u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

I, Steven Lezell Woodrow, declare on oath as follows:

1. I am a partner with the law firm of Edelson McGuire LLC and can testify competently to the information set forth in this Declaration if called upon to do so. The Court has appointed me Class Counsel by its Order granting preliminary approval of the class action Settlement reached in this case. (Dkt. 127.)

***Investigation Into Banking Industry's HELOC Suspension Practices***

2. The first wave of HELOC suspensions and reductions started in 2008 following the sharp decline in the housing market. As a result of these suspensions, our law firm received a flood of calls and other inquiries from HELOC customers nationwide claiming that their bank had improperly suspended their accounts. These contacts expanded into a comprehensive investigation into the HELOC suspension and reduction policies of several major lending institutions across the country, including an investigation into Chase's practices and policies. As part of this investigation, our firm's attorneys conducted legal research into TILA and its legislative history with a particular focus on HELOC account suspensions and reinstatements, Regulation Z, Official Commentary from the Board of Governors of the Federal Reserve, and

1

regulatory guidance and commentary from the Office of the Comptroller of the Currency ("OCC") and persuasive authority from the Office of Thrift Supervision ("OTS") and Federal Deposit Insurance Corporation ("FDIC"). We also issued requests under the Freedom of Information Act to these regulators regarding customer complaints from major banks, including Chase, and met face-to-face with lawmakers on both sides of the issue to discuss HELOC suspension laws and regulations and the impact of such suspensions on different communities across the country.

3. Throughout the course of our investigation, we interviewed and corresponded with hundreds of HELOC customers, including dozens of Chase customers, whose accounts had been suspended or reduced. We also received and reviewed thousands of pages of HELOC contracts, deeds, commitment letters, suspension and reduction notices, financial documents, appraisals and other property and income valuations, bank correspondence, letters from members of Congress, HELOC suspension notices, monthly billing statements, and notes of phone conversations and other materials provided by aggrieved homeowners. We then compared and contrasted the policies and practices of several major banks to determine which banks were complying with TILA, Regulation Z, and their borrowers' HELOC contracts, and which were not.

4. In further support of our investigation, lawyers from our offices collaborated with federal lawmakers and lawmakers from California, Florida, and Illinois, along with other public officials in an effort to share information and call attention to the legal issues involved with unjustified HELOC suspensions and reductions and the lasting impact that such actions can have on unsuspecting homeowners. Jay Edelson from our firm testified at a town hall hearing in Orlando, Florida, hosted by the Florida Senate President Mike Haridopolos, devoted to the personal and community impact of HELOC suspensions. Our firm also took the lead in responding to the

Federal Reserve Board of Governors' request for public comment on proposed changes to Regulation Z's HELOC suspension rules.

5. As a result of this investigation, our firm was retained to represent several homeowners in their cases against Chase, as well as other homeowners with claims against the country's major HELOC lenders, including Citibank N.A., Wells Fargo Bank, N.A., National City Bank, GMAC Mortgage LLC, and OneWest Bank, F.S.B.

***The Mediation Process***

6. Shortly after consolidation of the cases, the Parties engaged in early settlement discussions regarding the general legal landscape of the HELOC litigation as well as each Party's respective views on the facts. On May 16, 2011, prior to the Court's ruling on Chase's motion to dismiss, and following up on several prior settlement discussions, Class Counsel sent Chase a letter outlining potential ways to resolve this litigation based on information that Class Counsel had obtained from discovery in other HELOC cases. Following the Court's ruling, the Parties agreed to schedule a mediation session.

7. On December 14, 2011, following the Court's order on Chase's motion to dismiss, counsel for the Parties met in Chicago with Judge Andersen for a full-day mediation session. Judge Andersen had served as the mediator in another HELOC case involving Chase, *Schulken v. Washington Mut. Bank*, No. 09-cv-2708-LHK (N.D. Cal.), and therefore had experience in mediating HELOC class action settlements. The *Schulken* settlement, which involved HELOC suspensions effectuated through an income verification program, received final approval from Judge Koh on November 13, 2012.

8. During the mediation session before Judge Andersen in this case, the Parties engaged in a full day of arm's-length negotiations. As part of these negotiations, Chase's counsel provided us

3

information regarding Chase's HELOC reduction, suspension, and reinstatement practices and clarified the size of the Former Customer Subclass and their potential damages, along with other issues. While the Parties were not able to reach an agreement during the mediation, they used the mediation to discuss relief that could be made available to the Class and built upon the general settlement structure that had been implemented in similar HELOC cases. In the end, the Parties made significant progress toward reaching a resolution and agreed to continue negotiations with Judge Andersen's oversight.

9. During the several months following the mediation, the Parties continued negotiations and exchanged several proposals and drafts of the settlement agreement with the help of Judge Andersen. In May 2012, the Parties reached an agreement in principle with regard to the relief to be made available to the Class and Former Customer Subclass. Only after having reached an agreement with regard to Class relief did the Parties began negotiating incentive awards for the named Plaintiffs and attorneys' fees for Class Counsel. The Parties finally reached an agreement as to the incentive awards and attorneys' fees following a series of back and forth negotiations.

10. During the several months that followed, the Parties finalized the details of the settlement and the language in the Agreement and prepared for preliminary approval.

***Information learned through the mediation and discovery***

11. Prior to and during the mediation process, Class Counsel drafted and propounded interrogatories, requests to produce, and requests to admit and engaged in countless meet-and-confers with Chase's counsel. Class Counsel likewise received and analyzed over 15,000 pages of formal, informal and confirmatory discovery produced by Chase and its primary AVM vendor, CoreLogic, including voluminous documents produced in the *Hackett v. Chase* case. The documents produced by Chase included (1) loan files for each of the named plaintiffs, (2)

HELOC Adverse Action Policies from March 2008 through the bank's latest revisions, (3) HELOC Line Management Summaries from April 2009 through January 2011, (4) documents reflecting the chronology of Chase's HELOC Adverse Action Plan and its Collateral Value Decline Program, (5) various training manuals and materials regarding the suspensions and reductions of credit lines, (6) documents reflecting maximum CLTV charts based on the type of collateral and severity group code (based on the county where the property is located), (7) monthly AVM Validation Reports from October 2008 through January 2010, (8) the AVM Supply Master Agreement between Chase and First American Corporation, (9) Risk Model Validation, AVM Reports from April 2008 through October 2010, (10) documents reflecting Property, AVM and Appraisal Requirements, and (11) CRMA AVM Preference Table v. 3.0 (Marketing) Monthly Validation Reports for 2010.

12. During and after the mediation, Chase clarified data contained in key documents, including its monthly line management reports, and provided critical data regarding estimates of the number of Class Members presently scheduled to receives offers through the pro-active reinstatement process, the number of borrowers eligible for reinstatement, and the number of former customers who fall within the subclass. This information proved critical to the negotiation process and helped guide the settlement terms and benefits.

*Settlement Benefits*

13. The Settlement provides substantial relief to the Class. As part of the Settlement, Class Members who have already closed their accounts with Chase will receive a cash payment in the amount of $35 upon filing a claim form. This amount represents a negotiated percentage of the typical damages that former customers incurred when they closed their HELOCs, such as insufficient funds fees and appraisal fees and other costs associated with finding a new HELOC.

Additionally, Chase has, as part of the Settlement, agreed to review Class Member accounts and provide qualified Members offers for reinstatement as part of the pro-active reinstatement process. Based on our conversations with Class members, Class Counsel anticipate that a significant portion of borrowers (90 – 95%) will accept such offers.

*Notice to the Class Members*

14. In strict compliance with the court-approved notice plan, claims administer Kurtzman Carson Consultants LLC ("KCC") caused Notice to be disseminated to the members of the Settlement Class. U.S. mail notice was sent to the last known address in Chase's records for all Settlement Class Members, which had been updated using the national change of address registry. Chase has also indicated that it has properly notified the appropriate authorities that notice was sent under the Class Action Fairness Act ("CAFA").

15. KCC also established the settlement website where Class Members can download a claim form, obtain additional information about the terms of the Settlement Agreement, and learn how to file a claim, seek reinstatement of their suspended or reduced HELOCs, and opt-out or object to the Settlement.

16. In the weeks following the dissemination of the Class Notice, our firm has received over 1,000 telephone, email, mail and fax inquiries from Settlement Class Members requesting information regarding the nature of the underlying lawsuit and the Settlement and seeking advice on what they should do in light of the Settlement. Class Counsel has promptly responded to each and every inquiry and spent considerable time addressing Class Members' questions regarding the Settlement. Going forward, our firm will continue to respond to all inquiries from the Class and provide comprehensive assistance to the Class Members.

*Class Counsel's Opinion of the Settlement*

17. In Class Counsel's opinion, this Settlement is fair, adequate, and reasonable. From the onset, this litigation has brought exception relief to Class Members—including after the lawsuits were initiated—to make the policies more favorable to Chase's customers. Indeed, especially when compared with HELOC suspension settlements in other cases against industry-leading banks, like Citibank and Wells Fargo, the instant Settlement provides exceptional results for the Class.

18. The underlying cases arose from HELOC suspensions that began to occur in the middle of 2008. Our firm therefore initiated Plaintiffs' cases with the understanding that many of the applicable legal issues had been (and still are) largely untested in the courts. Few courts have issued orders on similar issues and, to my knowledge, only one court (in *Schulken v. Chase*) has addressed class certification issues. While we firmly believe in the merits of Plaintiffs' legal positions and factual assertions, we recognize that in the absence of a settlement Plaintiffs face significant procedural hurdles associated with continued litigation, not to mention the underlying challenge of proving their case on the merits. Given these challenges, prolonged litigation would necessarily require Class Counsel to expend significant time and resources litigating the case.

19. The three law firms[1] comprising Class Counsel regularly engage in complex litigation and have substantial experience litigating cases similar in size, scope, and complexity to this Action. Class Counsel likewise have considerable consumer class action experience and are among the leading attorneys in the nation with respect to lenders' ability to suspend or reduce HELOCs under TILA, Regulation Z, and the banks' contracts and have successfully prosecuted

---

[1] Class Counsel Brian Murray's law firm, Murray Frank, recently dissolved and he has joined another firm, Glancy Binkow and Goldberg LLP. Glancy Binkow likewise has a strong reputation for quality work on Plaintiff's side class action matters.

several similar actions against industry leaders, including Citibank N.A., Wells Fargo Banks, N.A., National City Bank, One West Bank, F.S.B., and GMAC Mortgage, LLC. Attorneys from our firm, Edelson McGuire, were appointed Class Counsel in similar settlements reached with Citibank and Wells Fargo and were appointed adversarial class counsel in the *Schulken* litigation. Attorneys from our firm have also met with lawmakers regarding unjustified HELOC suspensions, and our firm submitted a comprehensive response to the Federal Reserve Board's request for public comment to the proposed changes to Regulation Z. Our involvement with, and investigation of, the HELOC industry has likewise continued through the litigation period and we have remained abreast of changes to the legal landscape and the various changes to policies and procedures that banks have implemented at various times. This has included reviewing thousands of pages of formal, informal, and confirmatory discovery produced throughout the various settlement processes, including deposition testimony from other lawsuits against Chase involving its HELOC suspension programs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 1st day of February 2013, at Denver, Colorado.


/s/ Steven L. Woodrow